Karin M. Gunter, Esquire
PA Id No. 79852
Law Office of Karin M. Gunter
85 Old Cedarbrook Road
Wyncote, PA 1905
(215) 548-9992                                                          ATTORNEY FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDRE FIELDS, KENDALL GREEN and
ANDRE ROUNDTREE,
        Plaintiffs,                                Civil Action No.
    v.

AMERICAN AIRLINES, INC. and                    JURY TRIAL DEMAND
US AIRWAYS, INC. at Philadelphia International
Airport (PHL) Hub
        Defendants.

## COMPLAINT

### Preliminary Statement

This action is an employment discrimination action brought by employees against their employers Defendant American Airlines, Inc. and U.S. Airways, Inc. (collectively "American Air") based on race and color in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981, *as amended* by the Civil Rights Act of 1991 ("Section 1981"); Civil Rights Act of 1964, 42 U.S.C. §2000d, *et seq*. ("Title VI") and Pennsylvania common law tort actions of conspiracy and tortious interference. Plaintiffs allege American Air engaged in, and continues to engage in, a company-wide pattern and practice of intentional and systematic employment discrimination on the basis of race and color against them as African American employees as alleged in this Complaint. American Air's discriminatory practices include, but are not limited to, disparate treatment and hostile/abusive work environment, disparate impact based on its line bidding process; and civil conspiracy based on tortious interference with business relationship as alleged in this Complaint.

Plaintiffs seek declaratory, injunctive and equitable monetary relief from these practices;

compensatory and punitive damages; equitable remedies of accounting, restitution and disgorgement; an award of costs, expenses, and attorneys' fees; and such other relief as this Court deems just and proper all for themselves individually and on behalf of the class they seek to represent.

**Jurisdiction and Venue**

1. Original jurisdiction over Plaintiff's federal question claims is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction over Plaintiff's state law claims is conferred upon this Court pursuant to 28 U.S.C. § 1367(a).

2. Venue lies in this district by 28 U.S.C. § 1391(b) and (c) in that all actions complained of occurred and Defendant resides in this district.

**Parties**

3. Plaintiff ANDRE FIELDS ("Fields") is an African American adult person and a citizen of the United States.

   a. Fields resides in Drexel Hill, Pennsylvania.

   b. American Air hired Fields on or about September 1, 1995 as a Fleet Service Agent.

   c. At all times relevant to this action, he is a Fleet Service Agent (Baggage).

   d. At all times relevant to this action, Fields is a member of the International Association of Machinists and Aerospace Workers (IAM) union, Local 1776 ("Union").

   e. As a member of the Union, Fields pays initiation fees, assessments and membership dues.

4. Plaintiff KENDALL GREEN ("Green") is an African American adult person and a citizen of the United States.

   a. Green resides in Philadelphia, Pennsylvania.

   b. American Air hired Green on or about August 1996 as a Fleet Service Agent.

   c. At all times relevant to this action, he is a Fleet Service Agent (ABR).

    d. At all times relevant to this action, Green is a member of the Union.

    e. As a member of the Union, Green pays initiation fees, assessments and membership dues.

5. Plaintiff ANDRE ROUNDTREE ("Roundtree") is an adult person and a citizen of the United States.

    a. Roundtree resides in Philadelphia, Pennsylvania.

    b. American Air hired him as a part-time Fleet Service Agent on or about May 23, 2005.

    c. At all times relevant to this action, he is a full-time Fleet Service Agent (Catering).

    d. At all times relevant to this action, Roundtree is a member of the Union.

    e. At all times relevant to this action, he is also a shop steward for the Union.

    f. As a member of the Union, Roundtree pays initiation fees, assessments and membership dues.

6. Defendants AMERICAN AIRLINES, INC and US AIRWAYS, INC (collectively "American Air") form the world's largest airline as measured by fleet size, revenues, profit and passengers carried.

    a. American Air operates out of 10 hubs[1] in the United States including the one at Philadelphia International Airport ("PHL"), 8000 Essington Avenue, Philadelphia, PA.

    b. Its parent company, American Airlines Group, Inc. ("AAG") headquartered at 4333 Amon Carter Boulevard, in Fort Worth, Texas formed in December 2013 as a result of a merger between AMR Corporation, former parent company of American Airlines and US Airways Group, former parent company of US Airways.

    c. As a result of the merger, AAG operates the world's largest airline with

---

[1] Two hubs are in New York, which accounts for some demographics listing American Air as having 9 instead of 10 hubs.

passenger revenue of $40.3 billion, cargo revenue of $1 billion and other revenue of $2.9 resulting in total operating profits of $2.7 billion for the fiscal year ending December 31, 2018.

    d. US Airways flew its last flight on or about October 2015, a flight that began and ended at PHL.

    e. PHL is American Air's primary transatlantic hub servicing more than 20 million passengers annually or approximately 56,000 daily.

    f. American Air has approximately 70% of the market share at PHL, which makes it PHL's largest airline.

    g. American Air is the recipient of federal funding as a result of its participation in various U.S. government programs.

    h. Two such programs are: (i) Essential Air Service (EAS) program, 49 U.S.C. §§41731-41748, which includes services to and from PHL, *inter alia*; and (ii) Government-Financed Air Transportation Act, 49 U.S.C. §40118 ("Fly America Act"), which in general requires anyone traveling internationally with funds provided by the federal government to use specific U.S. flag airlines[2] owned by American companies regardless of the cost or convenience to the flyer.

## Factual Allegations

7. Plaintiffs re-aver and incorporate by reference all averments in all paragraphs, *supra*.

8. Fly America Act relates to the provisions enacted in part 5 of the International Air Transportation Fair Competitive Practices Act of 1974 (IATFCPA)[3], *as amended.* American Air, as a Fly America Act certified U.S. flag airline, is a beneficiary of the Act's proscribed purposes of (a) ameliorating the problem of discriminatory and unfair competitive practices against U.S.

---

[2] Also includes a foreign carrier that "code shares" with a U.S. flag carrier. See 49 U.S.C. §40118(b).

[3] The legislative history of IATFCPA makes it clear that the U.S. airline industry is one of the beneficiaries of this Act, and ostensibly of the Fly America Act. See Pub.L. No. 96-329, 1979 U.S.C.C.A.N. 54, 65. See

carriers operating in international air travel at the hands of foreign governments and/or carriers, and (b) affording the U.S. government authority to negotiate with foreign governments bilateral and multilateral agreements regarding government-funded transportation that benefits U.S. air carriers, *inter alia*.

9. American Air along with two other Fly America Act carriers, Delta Airlines ("Delta") and United Airlines ("United") formed a coalition known as The Partnership for Open & Fair Skies[4] with the expressed purpose to provide a level playing field for American airline workers against violations of the Open Skies policy by UAE airlines, *inter alia*.

10. In fact, in response to an U.S. agreement with the UAE meant to "protect American airline jobs," *inter alia*, American Air Chairman and CEO Doug Parker ("Parker") said that "Our goal has always been to ensure a level playing field. American Airlines will always compete aggressively, but we believe everyone should play by the same rules. We have the utmost confidence in our 130,000 team members who take great pride in the service American Airlines provides. Today's actions address the illegal subsidies received by Emirates and Etihad Airways and most importantly help create a level playing [ ] for American workers."[5]

11. Unfortunately, Parker's passion for a level playing field for American workers does not extend to African American team members at PHL.

12. Based on 2014 internal data, American Air's workforce comprises of 69% Caucasian, 14% African American, 12% Hispanic, 4% Asian/Pacific Islander and 1% Native Americans employees, with the numbers reflecting some multiple group membership.

13. Despite these numbers, the racial demographics at its PHL hub is significantly African American, with black and brown employees making up approximately 70% of all American Air employees at PHL and 85% of American Air's fleet service employees.

---

*also* Pub.L. 93-623, 1974 U.S.C.C.A.N. 7461-7463.

[4] There are also various labor organizations members of this partnership.

[5] Www.openandfairskies.com/press-releases/trump-administration-secures-agreement-united-arab-

14. Upon information and belief, the concentration of African American employees are PHL is the highest or one of the highest of all American Air's 10 hubs.

## COUNT I
### Race and Color Discrimination – Disparate Treatment
### (Hostile/Abusive Work Environment)
### Section 1981

15. Plaintiffs re-aver and incorporate by reference all averments in all paragraphs, *supra*.

16. Plaintiffs are members of a protected class.

17. As a passenger carrier, American Air provides lavatory services (bathrooms) on their airplanes for their passengers to relieve themselves during flights.

18. Once the planes land, and before they are put back in use for passenger travel again, employees in the fleet service department (ground service crew) prepare each plane for the next flight, crew and passengers.

19. Part of this airplane flight preparation process includes emptying the airplane lavatory tanks of human waste ("black water/grey water," containing the prior flight's human waste), cleaning the lavatory tanks, and then filling the lavatory tanks with chemical agent/toilet deodorant concentrate, known in the industry as "Blue Juice," which is the "blue water" that is seen inside of airplane toilets.

20. "Blue Juice" is a blue chemical liquid used by the airline industry, which contains agents and toxins that inhibit the odor of the human waste during the flight, *inter alia*.

21. The normal practice for cleaning a plane's lavatory is for American Air's lavatory trucks to pull up to the parked plane and affix a hose from the truck to a particular valve under the plane. The valve allows the lavatory waste to flow from the plane into a receiving container on the truck. Once the lavatory waste is completely removed from the plane, the hose is wrapped back up and placed back into the truck.

---

emirates-enforce-aviation-trade-agreement-protect-american-jobs. May 14, 2018.

22. Next, a different hose, which is connected to a large container of blue juice in the lavatory truck, is affixed to an intake valve under the plane. The hose then pumps the blue juice into the plane's lavatory tanks, thereby preparing the lavatories with freshly emptied and filled toilets for the next flight and passengers.

23. For approximately of 7 - 8 years prior to and including 2017[6], on certain models of American Air planes including, but not limited to, Boeing 757 aircrafts, there were broken and/or inoperable intake mechanisms for pumping the blue juice chemicals from the lavatory trucks through the bottom of the planes. The intake mechanisms were controlled by a sensor located inside the planes.

24. Instead of fixing the faulty 757 aircrafts, American Air management directed PHL minority fleet service agents to use Deer Park/Nestle five gallon jugs from the breakrooms, fill the jugs with the blue juice chemical and then walk the Deer Park/Nestle jugs onto the plane, through the cabin to the lavatories and fill the blue juice chemical directly into the toilets from the top of the plane within the cabins. This process is known as "top filling." The jug spouts often touched the toilet bowls during the top filling process.

25. Since Boeing 757s have 4 lavatories on each plane, minority (black and brown) fleet service agents were required to carry the Deer Park/Nestle five gallon jugs full of the blue juice chemicals up and down the planes 4 times per flight to perform their jobs and to fill the toilets with the lavatory chemicals.

---

[6] Plaintiffs were named plaintiffs in a prior class action lawsuit brought against Defendants and others in 2016, docketed at Smith, et al v. American Airlines, Inc., et al., 16-cv-00156 based on similar occurrences as some of those averred in this action. However, the earlier class action alleged causes of action for medical monitoring (federal) and state law claims of negligence; battery; public nuisance; violations of Pennsylvania Clean Stream Law; fraud, civil conspiracy; and breach of contract as third party beneficiaries. The prior Court granted Defendants' motion to dismiss under Rule 12(b)(6) with regards to the medical monitoring count finding it to be within the exclusive jurisdiction of the Pennsylvania Workers Compensation Act (PWCA), and declined to exercise supplemental jurisdiction over the state law claims. Thereby, dismissing without prejudice Plaintiffs' rights to raise those claims in state court under the PWCA.

Since that time, Plaintiffs learned that American Air management's practice of top filling by use of Deer Park/Nestle water jugs was uniquely and solely used at PHL, a majority minority (black and brown) hub.

26. Once the process of top filling was complete, the Deer Park/Nestle five gallon jugs were placed back on or into American Air's lavatory trucks, next to or touching the hose that had been used to remove the plane's human waste. Generally, that hose would still be dripping of human waste and the significant amounts of the blue juice chemical remained in the jugs and covered the inner walls of the Deer Park/Nestle containers.

27. American Air management, who at the time subscribed to Deer Park/Nestle returnable water jug service throughout their offices and in the breakrooms at PHL, directed minority fleet service agents to procure and use empty five gallon jugs that were waiting for return at various locations throughout PHL for top filling purposes.

28. Shockingly, egregiously and disturbingly, American Air management then caused, on a daily basis, the intermingled Deer Park/Nestle jugs used for top filling the plane lavatories with the clean water jugs waiting to be returned to Deer Park/Nestle.

29. The toxic Deer Park/Nestle five gallon jugs were regularly placed back into their commercial circulation when picked up by unsuspecting Deer Park/Nestle drives who were authorized to enter the airport to deliver new water and pick up empty jugs where they were gathered.

30. Equally disturbing, egregious and shocking, prior to sending the five gallon jugs back to Deer Park/Nestle, American Air fleet service managers filled the jugs with non-potable water from a water station on the tarmac of the airport. These water stations are for non-potable (non-drinking) water that is meant for maintenance and ramp operations and NOT for drinking.

31. The fleet service managers would then place the non-potable water filled Deer Park/Nestle jugs back in the breakrooms and other areas of PHL where employee water coolers were located.

32. Unsuspecting employees responsible for changing water cooler jugs would take a full jug from the breakroom and place it on top of the water cooler. Among the full jugs

available in the breakrooms were those that had been used to carry and top fill the blue juice chemical and later refilled with non-potable water. The entire process (use for top filling, filing with non-portable water, use for water cooler drinking and/or return to Deer Park/Nestle) repeated each time a water cooler jug became empty and placed in the breakroom for return.

33. At all times relevant to American Air's use of Deer Park/Nestle five gallon water jugs for top filling, there were an average of fifteen Boeing 757 flights per day at PHL.

34. The practice began when American Air took over lavatory service from an outside contractor in or about 2010 and continued until on or about 2017.

35. At all times relevant to American Air's use of Deer Park/Nestle five gallon water jugs for top filling, about half of the Boeing 757s in use had broken chemical intake mechanisms. Several of these aircrafts would fly up to 3 flights per day to and from PHL.

36. Thus, at PHL, there were on average approximately 8 – 10 Deer Park/Nestle five gallon jugs used and returned each day for nearly 8 years, which were put back into circulation by Deer Park/Nestle for commercial use.

37. Furthermore, official American Air Ground Operations Manual, Lavatory/Waste Section provides, under procedures for Boeing 757 aircrafts, that the required and only proper method for filing chemicals for lavatory services purposes was through the hose to the valve at the bottom of the plane.

38. Upon information and belief, American Air did not employ the Deer Park/Nestle five gallon water jug top filling, non-potable water refilling and water cooler use process at any of its other hubs - only at PHL.

39. Upon information and belief, none of the American Air's other hubs had majority minority (black and brown) populations like that of PHL.

40. American Air minority employees protested against this practice and complained to senior managers, duty managers and the head of American Air safety management team, but were ignored by them and/or threatened with losing their jobs.

41. Upon information and belief, once Deer Park/Nestle learned of American Air's shocking, egregious and disturbing practices as discussed, *supra*, they discontinued their contract with American Air corporate-wide.

42. Based upon the above discussion, Plaintiffs avers Defendants created a hostile/abusive work environment at PHL by:

   a. creating a physical work area for employees that violated its internal company lavatory/waste policies/procedures;

   b. creating a physical work environment where human waste was transported throughout work spaces by having fleet service employees use of Deer Park/Nestle five gallon water jugs on lavatory trucks where human waste hoses dripped into the trucks and were allowed to touch water jugs; where those jugs touched toilet bowls, were filled with non-potable water and placed in break room and other areas for water cooler use;

   c. Plaintiffs, as American Air PHL employees, had reasonable expectations that management would follow Lavatory/Waste policies promulgated by the company;

   d. American Air management at PHL continued this offensive conduct every day for nearly 8 years, using and refilling 8 – 10 jugs per day, creating mental and emotional anguish to Plaintiffs, similar to the impact of offensive conduct of the officials in Flint, Michigan on its citizenry;

   e. This conduct of American Air at PHL was unpleasant, unwelcomed and unwanted by Plaintiffs.

   f. Since the Deer Park/Nestle water jugs were refilled with non-potable water and placed back in breakrooms and other areas where water coolers were located, the offensive conduct of top filling with the water jugs was pervasive throughout American Air's PHL operations; and since the practice was not used at any of its other hubs, American Air's conduct was directed toward its majority black and brown workforce at PHL, including Plaintiffs;

g. American Air's conduct was physically, emotionally and mentally threatening and humiliating to Plaintiffs and well beyond simply being "tasteless"; and

h. by employing these practices at PHL only, American Air engaged in conduct that unreasonably interfered with Plaintiffs' work performance since their jobs are physically demanding and often require work under extreme heat especially when working near extremely hot aircrafts and/or in sweltering environmental conditions where hydration is a must.

43. Based upon the above discussion, Plaintiffs reasonably believe Defendants subjected them to a hostile and abusive work environment by violating company lavatory/waste protocols, requiring top filling of planes, refilling Deer Park/Nestle water jugs that carried toxic chemical with non-potable water, and putting those jugs back in breakroom and other areas for use in water coolers.

44. Plaintiffs did not welcome Defendants' conduct, which they reasonably believed was motivated by race and color, since American Air management did not direct any of its other hubs to engage in such conduct and since PHL hub is a majority minority (black and brown) hub.

45. Furthermore, American Air's conduct at PHL was so severe and/or pervasive that a reasonable person in Plaintiffs' positions would find Plaintiffs' work environment to be hostile and/or abusive.

46. Plaintiffs believed their work environment to be hostile and/or abusive as a result of American Air's conduct.

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court enter judgment in their favor and against Defendants American Airs and US Airways in the form of declaratory relief, compensatory and punitive damages, attorney's fees, expert fees, costs and such other relief as this Court deems proper.

## COUNT II
## Race and Color Discrimination – Disparate Treatment
## (Terms and Conditions of Employment)
## Title VI

47. Plaintiffs re-aver and incorporate by reference all averments in all paragraphs, *supra*.

48. As a certified U.S. flag carrier airline under the Fly America Act, American Air receives federal funding assistance to engage in the activity of non-discriminatory, competitive international air transportation.

49. As made clear by CEO Parker's statements, *supra*, Plaintiffs are intended beneficiaries of the federal funding assistance afforded by the Fly America Act. Particularly so, since Plaintiffs work at American Air's PHL hub, which is its primary transatlantic hub, implicating international travel.

50. American Air's purpose for participation in this federal funded activity is clear, that is, to create "level playing fields" for American Air "team members" such as Plaintiffs.

51. Sadly, Plaintiffs aver intentional discriminatory and unfair employment policies and practices based on race and color by Defendants at PHL, which are the very same actions the Fly America Act seek to eradicate in international air transportation, i.e., intentional discrimination based on national origin[7], *inter alia*.

52. Plaintiffs have been subjected to accelerated, excessive and adverse disciplinary actions, *inter alia*, based on race and/or color including, but not limited to, American Air's managers: (a) not following progressive disciplinary levels as used with non-protected class (white) employees, but rather skipping level to accelerate discipline and potential firing (Fields and Green); (b) assigning Green to service flights that have arrival times before Green's scheduled shift start time; (c) changing work assignments, after bidding process closed, to

---

[7] It is also important to note that intentional discrimination based on race, color and national origin have identical prima facie elements under Title VI and/or Title VII prescripts.

favor non-protected class (Caucasian) employees (Roundtree); (d) subjecting protected class (black and brown) employees to Last Chance Agreements ("LCAs") that are accelerated and substantially more restrictive and severe than non-protected class (white) employees for the same and/or substantially similar actions; (e) referring to Plaintiffs as "Black Panthers" and instructing managers to "write [his] black ass[ ] up . . " (Fields and Green), *inter alia*.

53.   Plaintiffs aver these actions taken by American Air managers against them are motivated by an intent to discriminate based on race and/or color.

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court enter judgment in their favor and against Defendants American Airlines and US Airways in the form of declaratory and injunctive relief, compensatory and punitive damages, attorney's fees, expert fees, costs and such other relief as this Court deems proper.

## COUNT III
### Race and Color Discrimination – Disparate Impact
### Title VI

54.   Plaintiffs re-aver and incorporate by references all averments in all paragraphs, *supra*.

55.   All jobs assignments in the fleet service department are made by employees' participation in a line bid process based on seniority.

56.   Those with the most seniority are given the first choice at bidding for job shift assignments, which includes work, locations, times and days.

57.   Based on US Airway's history of hiring almost exclusively non-protected class (white) high school graduates in the 1980s, 1990s and early 2000s at PHL, most of the current employees who have the most seniority are non-protected class (white) workers.

58.   Thus, the bid process results in protected class (black and brown) workers at PHL almost exclusively and disproportionally bidding on the less desirable job shift assignments. (*See* top filling discussion, *supra*).

59.   Thus, the facially neutral process of bidding for job assignments has an adverse

impact on American Air's PHL protected class (black and brown) employees, including Plaintiffs.

60. In the alternative, or in addition, American Air fails and refuses to adopt alternative employment and/or collective bargaining practices in a non-discriminatory manner as to Plaintiffs.

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court enter judgment in their favor and against Defendants American Airlines and US Airways in the form of declaratory and injunctive relief, compensatory and punitive damages, attorney's fees, expert fees, costs and such other relief as this Court deems proper.

## COUNT IV
### Civil Conspiracy – Tortious Interference with Business Relationship
### Restatement (Second) of Torts §766B

61. Plaintiffs re-aver and incorporate by reference all averments in all paragraphs, *supra*.

62. Plaintiffs are members of the Union, and are covered by the US Airways, Inc. and Fleet Service Employees, Fleet Service Agreement of July 18, 2014 ("CBA")[8].

63. The IAM (Union) represents fleet service employees, including Plaintiffs, in their negotiations of the CBA, as updated and amended, and with other economic and business affairs.

64. American Air management at PHL and the Union engage in an agreed upon practice known as deployment.

65. In general, deployment allows for either American Air management or the Union to remove union shop stewards and/or elected union officials from their bid line (i.e., job assignment) to perform company or union business, *inter alia*.

---

[8] The Fleet Service Employees are represented by the IAM. US Airways, Inc. entered this CBA before the complete integration of its merger with American Airlines, Inc. However, the Agreement has been updated periodically to include post-merger updates including, but not limited to, September 12, 2017 pay increases.

66. If the Union deploys a shop steward or elected official, the Union pays American Air time and a half or 150% of the deployed union member's pay to remove them from their "bidded line".

67. Thereafter, American Air management is then supposed to "back fill" that scheduled line with another union employee with the money (time and a half) it received from the Union.

68. The Union continues to pay the deployed union employee's wages and American Air (time and a half) management during the length of the deployment.

69. American Air management at PHL routinely fails to "back fill" scheduled lines when the Union deploys its members.

70. American Air knows union members including Plaintiffs have a business relationship with the Union.

71. By purposefully failing to "back fill" scheduled lines, American Air management at PHL is preventing union members, including Plaintiffs, from proper use, enjoyment and access to union dues and fees paid by them and benefits intended to be rendered to them by their relationship with the Union.

72. Thus, American Air management is intentionally interfering with union members', including Plaintiffs', relationship with the Union.

73. This practice of the American Air management at PHL, i.e., failing to back fill deployed lines while continuing to receive union funds intended to be paid to union members for the deployed scheduled line, has no privilege or justification in its misuse/misappropriation of Union funds in this manner.

74. American Air at PHL caused actual legal damage to Plaintiffs as dues paying union members by misappropriating union dues and funds.

75. American Air management agreed with the Union with an intent to do an otherwise lawful act (deployment of union employees), but is using unlawful means (tortuously interfering

with business relationship between union members and the union by failing to back fill deployed lines and keeping the union funds) in an attempt to injure union members (misappropriate union funds), for which there is no justification.

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court enter judgment in them favor and against Defendants American Airlines and US Airways in the form of declaratory and injunctive relief, compensatory and punitive damages, attorney's fees, expert fees, costs and such other relief as this Court deems proper.

**Respectfully submitted:**

**LAW OFFICE OF KARIN M. GUNTER**

KMG3354
Karin M. Gunter, Esquire