**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDRE FIELDS**, et al. | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-903-KSM** |
| **AMERICAN AIRLINES, INC.**, et al. | |
| Defendants. | |

**MEMORANDUM**

**Marston, J.**                                                 **September 22, 2021**

Plaintiffs Andre Fields, Kendall Green, and Andre Roundtree bring employment

discrimination and civil conspiracy claims under state and federal law against their employer,

Defendant American Airlines, Inc.[1]  American has moved to dismiss the third amended

complaint, arguing that Plaintiffs' claims are either precluded under the doctrine of res judicata,

fail to state a claim upon which relief can be granted, or must be dismissed because they fall

within the exclusive jurisdiction of the relevant System Board of Adjustment.[2]  The Court held

oral argument on the motion on July 29, 2021.  For the reasons discussed below, the motion to

dismiss is granted in part and denied in part.

## I.    *Factual Background*

Accepting the allegations in the complaint as true, the relevant facts are as follows.

---

[1] Plaintiffs also name U.S. Airways as a Defendant, but the parties agree that American Airlines and U.S. Airways are the same entity following their merger in 2013.  (*See* Doc. No. 44 at ¶ 9b (describing the 2013 merger of the parent companies for American Airlines and U.S. Airways).)

[2] The System Board of Adjustment is an arbitral board established by an "employer and the unions" under the Railway Labor Act.  *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994). The relevant System Board has exclusive jurisdiction over disputes about the interpretation or application of a collective bargaining agreement.

American Airlines operates out of ten hubs in the United States, including one at the Philadelphia International Airport ("PHL").  (Doc. No. 44 at ¶ 9a.)  Although American's national workforce is predominantly Caucasian, the airline's PHL workforce is 70% African American.[3]  (*Id.* at ¶ 16.)  Fields, Green, and Roundtree are African American men, each of whom has worked as a fleet service agent for American Airlines at PHL for more than 15 years.  (*Id.* at ¶¶ 6b, 7b, 8b.)  In their third amended complaint, Plaintiffs identify numerous employment practices that they contend discriminate against them and the rest of the primarily African American workforce at American's PHL location.  In particular, they point to the company's practice of top filling airplane lavatory tanks and allege overt racial discrimination in how managers dole out work assignments and pursue disciplinary actions, the existence of highly offensive racial statements and carvings in employee-only areas, and the placement of a stuffed gorilla in the employee break room.  We describe each of these practices in turn.

### A.    *Top Filling Airplane Lavatory Tanks*

American Airlines provides bathrooms on its airplanes for passenger use.  (*Id.* at ¶ 20.)  At the end of each flight, ground service crew members in the fleet service department prepare the plane for the next flight by emptying each lavatory tank of human waste, cleaning the tank, and refilling it with a chemical agent known as "blue juice" or "blue water."  (*Id.* at ¶¶ 21–22.)  Typically, the crew members use a lavatory truck to complete this process by pulling up beside the plane, using one hose to remove the waste, and a second hose to fill the lavatory tank with blue water from the bottom of the plane.  (*Id.* at ¶¶ 24–25.)  However, from around 2010 to 2017,

---

[3] As of 2014, American Airlines' national workforce was 69% Caucasian, 14% African American, 12% Hispanic, 4% Asian/Pacific Islander, and 1% Native American.  (Doc. No. 44 at ¶ 15.) However, at PHL, African American employees comprise 70% of American Airlines' workforce, and 85% of the fleet service employees in particular.  (*Id.* at ¶ 16.)

some of the planes landing at PHL had broken intake valves, which made it impossible to fill the tanks with blue water from the bottom of the plane using the lavatory trucks.  (*Id.* at ¶¶ 26, 39.)

Instead, managers directed fleet service agents to top fill the lavatory tanks using Deer Park/Nestle five-gallon jugs.  (*Id.* at ¶ 28.)  To do this, the agents would take empty jugs from the employee breakroom, fill the jugs with blue water, walk the jugs through the plane's cabin, and pour the blue water into each toilet.  (*Id.*)  Plaintiffs allege that the "jug spouts often touched the toilet during the top filling process."  (*Id.*)  And once the top filling process was complete, the five gallon jugs were placed on the lavatory trucks "next to or touching the hose that had been used to remove the plane's human waste," which was generally, "still [ ] dripping of human waste."  (*Id.* at ¶ 31.)  The jugs were then returned to the break room and placed in the same area as the empty jugs awaiting pickup by Deer Park/Nestle drivers for return to commercial circulation.  (*Id.* at ¶¶ 33–34.)  Plaintiffs also allege that in some instances, American Airlines' fleet service managers would fill the jugs using non-potable water from a water station on the tarmac and then place the filled jugs back in the breakroom, where unsuspecting employees would place them on the water cooler.  (*Id.* at ¶¶ 35–37.)  On average, "approximately 8–10 Deer Park/Nestle five gallon jugs [were] used and returned each day" in this manner.  (*Id.* at ¶ 41.)

This top filling process, which violated the American Air Ground Operations Manual, Lavatory/Waste Section, was used solely at PHL.  (*Id.* at ¶¶ 43–44.)  And when "minority employees" protested the practice or complained to management, they were either ignored or threatened with termination.  (*Id.* at ¶ 46.)

On September 21, 2015, Plaintiffs and other American Airlines employees at PHL sued American Airlines and multiple individual defendants in Pennsylvania state court alleging that its top filling practices were unsafe, reckless, and discriminatory.  (*See generally* Doc. No. 47-3,

2015 State Court Complaint; Doc. No. 47-4, 2015 State Court Second Am. Complaint.[4])  They brought a class action claim for medical monitoring, along with individual counts for negligence, battery, public nuisance, violations of the Pennsylvania Clean Streams Law, fraud, civil conspiracy, and breach of contract.  (Doc. No. 47-4 at Counts I–VIII.)  On January 13, 2016, the defendants removed the case to this Court, and on August 12, 2016, the Honorable Nitza I. Quinones Alejandro granted the defendants' motion to dismiss after finding that the plaintiffs failed to state a class action claim for medical monitoring and that the court lacked jurisdiction over the remaining state law counts.  *See Smith v. Am. Airlines, Inc.*, Civil Action No. 16-156, 2016 WL 8735710, at *7 (E.D. Pa. Aug. 12, 2016) ("*Smith I*").  On March 23, 2017, the plaintiffs returned to state court with most of their remaining claims,[5] all of which were dismissed with prejudice by the Court of Common Pleas of Philadelphia County on June 1, 2017. *Smith v. Am. Airlines*, No. 170302506, Doc. No. 21 (Pa. Ct. Comm. Pl. March 23, 2017) ("*Smith II*").

### B.     *Offensive Conduct and Comments*

Toward the end of 2016, and while *Smith I* and *Smith II* were pending, Plaintiffs began noticing deeply offensive racial carvings and statements on the walls of employee-only areas, including breakrooms and bathrooms:

- "Fuck you niggers;"

- "All niggers should go back to Africa;"

---

[4] In deciding a motion to dismiss on the theory of res judicata, the court "may take judicial notice of the record from the previous court proceeding between the parties."  *Jones v. Gemalto, Inc.*, Civil Action No. 15–00673, 2015 WL 3948108, at *5 (E.D. Pa. June 29, 2015).

[5] In *Smith II*, Plaintiffs brought individual counts for medical monitoring, battery, violations of Pennsylvania's Clean Streams Law, fraud, and breach of contract.  *See Smith v. Am. Airlines*, No. 170302506, Doc. No. 1 (Pa. Ct. Comm. Pl. March 23, 2017) ("*Smith II*").

- "I hate niggers;" and

- A black face drawing next to the statement, "Do you like watermelon?"

(Doc. No. 44 at ¶ 47; *see also* Doc. Nos. 44-1, 44-2.)  Additionally, a stuffed monkey was also left on top of the refrigerator in the break room.  (Doc. No. 44 at ¶ 47; *see also* Doc. No. 44-3.)  Green and Roundtree complained to managers in their units about the offensive cravings and statements and the stuffed animal, but no action was taken.  (Doc. No. 44 at ¶¶ 49, 50.)

In addition, Fields and Green allege that PHL managers directed racially offensive comments toward them.  Duty Manager Don Logan told Fields, "Boy, put them [luggage] in the cart" (*id.* ¶ 51), and Ramp Manager William Jackson referred to Green as a "Black Panther," and told Green that he'd been instructed to "write [Green's] black ass[ ] up" for disciplinary violations.  (*Id.* at ¶ 52.)

Plaintiffs also allege that they are generally treated differently than their Caucasian coworkers.  (*Id.* at ¶ 60.)  Among other things, they are "routinely and systematically given work assignments that have heavier workloads and/or less agents assigned to their work areas than non-protected class members."  (*Id.*; *see also id.* at ¶ 53 (alleging that unidentified lead ramp agents often "tamper[ed] with the work schedules and ma[de] false statements against Fields and his work schedule"); *id.* at ¶ 61b (alleging that Green was assigned to service flights that arrive in PHL before his scheduled shift start time).)  For example, Fields alleges that he was frequently given subpar equipment and insufficient time to properly perform his duties.  (*Id.* at ¶ 61d.)  He was also frequently assigned to understaffed baggage carousels with heavier workloads, while Caucasian ramp agents were assigned to carousels with lighter workloads and additional agents.  (*Id.* at ¶ 61c.)  Roundtree likewise alleges that his work assignments were changed after the bidding process closed to favor Caucasian employees.  (*Id.* at ¶ 61g.)

Plaintiffs have also been "subjected to accelerated, excessive and adverse disciplinary actions" to which Caucasian employees were not subject. (*Id.* at ¶ 61.)  For example, Green and Fields allege that managers failed to follow progressive disciplinary levels when punishing them, and instead, skipped levels to accelerate discipline and potential firing. (*Id.* at ¶ 61a.)  Green also alleges that upper management punished him for expressing concerns about safety and fair treatment (*id.* at ¶ 61e), and that American Airlines' Human Resources department failed to investigate his internal complaints of racial discrimination (*id.* at ¶ 61g).  Last, Plaintiffs allege generally that African American employees were given Last Chance Agreements that contained accelerated and substantially more restrictive provisions than those given to similarly situated Caucasian employees. (*Id.* at ¶ 61h.)

Plaintiffs suggest that management took many of these actions, including the more difficult work assignments and accelerated disciplinary actions, in retaliation for their participation as named plaintiffs in the 2015 class action lawsuit, and as named complainants in a Department of Labor, Occupational Safety and Health Act ("OSHA") complaint against American Airlines in May 2017. (*Id.* at ¶¶ 63–65.)  They also claim that American Airlines' policies and practices related to bidding for work assignments, training, and accelerated disciplinary actions have a disparate impact on Plaintiffs and other African American employees. (*Id.* at ¶ 67.)

### C.   *Backfilling Union Openings*

Plaintiffs are members of the International Association of Machinists and Aerospace Workers Union, Local 1776 (the "Union") (*id.* at ¶¶ 6b, 6d, 7b, 7d, 8b, 8d), and are covered by a collective bargaining agreement ("CBA") between the Union and American Airlines (*see id.* at ¶¶ 80 & n.13).  The Union "represents fleet service employees, including Plaintiffs, in their

negotiations of the CBA, as updated and amended, and with other economic and business affairs." (*Id.* at ¶ 81.)  In addition to the CBA, American Airlines and the Union have agreed to engage in a practice known as deployment. (*Id.* at ¶ 84.)  This process allows the Union to temporarily remove a union representative from his or her American Airlines job assignment to perform union business. (*Id.*)  In exchange, the Union pays American Airlines the equivalent of time and a half of the deployed union member's pay, and American Airlines uses the money to "back fill" the job assignment with another union employee. (*Id.* at ¶¶ 85–86.)

Plaintiffs allege that American Airlines and the Union acted "in concert" by "routinely fail[ing] to 'back fill'" the scheduled assignments. (*Id.* at ¶ 89.)  Instead, American Airlines and the Union are "misappropriat[ing] union dues/funds . . . [and] using those funds for fraudulent purposes, including, but not limited to, kick-backs in the form of paid trips and 'special projects' for union representatives as well as profits for American Air[lines] at PHL, and not for the benefit of members." (*Id.* at ¶ 94.)  This practice deprives union members of the "proper use, enjoyment, and access to union dues and fees paid by them and benefits intended to be rendered to them by their relationship with the Union." (*Id.* at ¶ 90.)

## II.    *Procedural History*

Plaintiffs filed their complaint in this case on March 4, 2019. (Doc. No. 1.)  On February 24, 2020, the case was reassigned from the Honorable Cynthia M. Rufe to the Honorable Karen Spencer Marston. (Doc. No. 35.)  At the time of the transfer, Plaintiffs had twice amended the complaint, with American Airlines filing motions to dismiss each time. (*See* Doc. Nos. 1 & 7 (complaint and motion to dismiss), Doc. Nos. 8 & 12 (amended complaint and motion to dismiss), Doc. Nos. 26 & 30 (second amended complaint and motion to dismiss).)  On March 16, 2020, the Court held a Rule 16 conference, and issued a Scheduling Order which allowed

Plaintiffs to file yet another amended complaint for the limited purpose of adding "their

Pennsylvania Human Relations Act ["PHRA"] claims and the Union as a party."  (Doc. No. 39.)

One week later, Plaintiffs filed the third amended complaint, the operative complaint in

this matter, in which they added claims under the PHRA but declined to add the Union as a

party.[6]  (Doc. No. 44.)  In sum, the third amended complaint asserts counts for:

1. Race discrimination (harassment/hostile work environment) in violation of Section 1981, Title VII, and the PHRA;

2. Race discrimination (disparate treatment) in violation of Section 1981, Title VII, and the PHRA,

3. Race discrimination (retaliation) in violation of Section 1981, Title VII, and the PHRA,

4. Race discrimination (disparate impact) in violation of Title VII and the PHRA,

5. Race discrimination (disparate treatment) in violation of Title VI,

6. Civil conspiracy with the Union to tortiously interfere with business relations, and

7. Civil conspiracy with the Union to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO").

(*See generally id.*)  Defendants now move to dismiss the third amended complaint in its entirety,

arguing that Plaintiffs are precluded from bringing any claims based on top filling, that the

discrimination claims fail to state claims upon which relief can be granted, and that this Court

lacks subject matter jurisdiction over the civil conspiracy claims.[7]  (*See generally* Doc. No. 47.)

---

[6] In light of the new pleading, the Court denied as moot Defendants' motion to dismiss the second amended complaint.  (Doc. No. 45.)

[7] Plaintiffs make the nonsensical argument that American Airlines' motion should be stricken to the extent it makes new arguments not raised in its previous motions to dismiss.  (Doc. No. 55 at pp. 3–4; Doc. No. 55-1 at pp. 9–10.)  Plaintiffs suggest that because the Court limited their most recent amendment to the PHRA claims, the third amended complaint is largely the same as the second amended complaint, and American should not be able to make new arguments in its motion to dismiss.  (Doc. No. 55 at pp. 3–4; Doc. No. 55-1 at pp. 9–10.)  Plaintiffs have cited no statute, regulation, rule, or case that substantively limits a defendant's responsive pleading in such circumstances.  And we find they are mistaken for two reasons.  First, by choosing to amend their complaint yet again, *Plaintiffs* gave American Airlines the opportunity to respond to that complaint however they chose.  If they wanted to

### III.   *Standard of Review*

American Airlines moves to dismiss the third amended complaint under Federal Rules of

Civil Procedure 12(b)(6) and 12(b)(1).

#### A.   *Rule 12(b)(6)*

First, American moves to dismiss all of the counts in the Third Amended Complaint

under Rule 12(b)(6).  Under Rule 12(b)(6), the court must dismiss a complaint if it lacks

"sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard

is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id.*  When reviewing a motion to dismiss under Rule 12(b)(6),

the court "must accept the allegations in the complaint as true, but [is] not compelled to accept

unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual

allegation."  *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks

omitted).

"As a general matter, a district court ruling on a motion to dismiss may not consider

matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

---

limit American Airlines to the arguments it made in the previous motion to dismiss, then Plaintiffs could have chosen not to amend their complaint.  Second, and relatedly, when Plaintiffs filed the third amended complaint, it rendered moot the motion to dismiss the second amended complaint.  Therefore, American Airlines *had* to file a new motion to dismiss.

Plaintiffs also argue that American violated this Court's policies and procedures when it failed to request a meet and confer with Plaintiffs before filing the motion to dismiss.  (Doc. No. 55 at pp. 1–2.)  Because this fourth motion to dismiss is substantially similar to American's previous motion, we will not penalize American for its reasonable assumption that it was not required to — yet again — meet and confer with Plaintiffs.

1426 (3d Cir. 1997).  "However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  *Id.* (quotation marks omitted and alterations accepted); *see also Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) ("In deciding a Rule 12(b)(6) motion, a court considers only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputably authentic documents if the complainant's claims are based upon these documents"); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 571 (E.D. Pa. 2009) (explaining that on review of a Rule 12(b)(6) motion to dismiss, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine . . . , in particular documents incorporated into the complaint by reference and matters of which a court may take judicial notice" (quotation marks omitted)).

### B.      *Rule 12(b)(1)*

American Airlines also moves to dismiss Counts VI and VII under Rule 12(b)(1).  Rule 12(b)(1) governs jurisdictional challenges to a complaint.  *Williams v. Litton Loan Servicing*, Civil Action No. 16-5301 (ES) (JAD), 2018 WL 6600097, at *5 (D.N.J. Dec. 17, 2018) ("The Court can adjudicate a dispute only if it has subject-matter jurisdiction to hear the asserted claims." (quotation marks omitted)).  "A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction."  *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000).  Because American Airlines supports its motion with a sworn affidavit and other evidence, the motion "must be construed as a factual, rather than a facial attack."  *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 711 (3d Cir. 1982).  "In such a case, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.*  "In short, no presumptive truthfulness

attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of its jurisdiction." *Id.* (quoting *Mortensen v. First Fed. Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "[T]he plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.* (quoting *Mortensen*, 549 F.2d at 891).

## IV.    *Discussion*

American Airlines argues that the third amended complaint should be dismissed in its entirety because: (1) all claims related to top filling are barred by res judicata, (2) Counts I through V fail to state claims for discrimination as a matter of law, and (3) the Court lacks jurisdiction over the civil conspiracy claims in Counts VI and VII and in the alternative, those counts fail to state claims for tortious interference with business relations or for violations of the RICO Act. (*See generally* Doc. No. 47-1.) We address each argument in turn.

### A.    *Top Filling Allegations*

First, Defendants argue that Plaintiffs' claims for race discrimination based on top filling are precluded under the doctrine of res judicata, because they are "virtually identical to the allegations in [Plaintiffs'] past complaints originally filed in 2015, which they brought against the same party, and that were dismissed with prejudice." (*Id.* at pp. 17–18.) We agree.

"Res judicata, also known as claim preclusion, bars 'repetitious suits involving the same cause of action once a court of competent jurisdiction has entered a final judgment on the merits.'" *Williams*, 2018 WL 6600097, at *8 (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315 (2011)). In 2017, the Philadelphia Court of Common Pleas dismissed with prejudice Plaintiffs' state law claims in *Smith II*, which were based on top filling allegations that are nearly identical to those alleged here. *See Smith II*, Doc. No. 26. Because the claims

were ultimately dismissed with prejudice by a Pennsylvania state court, we apply Pennsylvania

preclusion law.  *See Williams*, 2018 WL 6600097, at *9 ("The preclusive effect of a state-court

judgment in a subsequent federal action depends on the law of the state that adjudicated the

original action.").

In Pennsylvania, res judicata:

> bars a later action on all or part of the claim which was the subject of the first action.
> Any final, valid judgment on the merits by a court of competent jurisdiction
> precludes any future suit between the parties or their privies on the same cause of
> action.  *Res judicata applies not only to claims actually litigated, but also to claims
> which could have been litigated during the first proceeding if they were part of the
> same cause of action.*

*Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006) (quoting

*Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995)); *see also Wilmington Trust, Nat'l*

*Assoc. v. Unknown Heirs*, 219 A.3d 1173, 1179 (Pa. Super. Ct. 2019) ("Under the doctrine of res

judicata, a judgment on the merits in a prior suit bars a second suit on the same cause of action or

one that could have been brought in the prior action.").  Pennsylvania courts have interpreted this

doctrine as requiring four conditions:  "(1) identity in the things sued upon or for; (2) identity of

the cause of action; (3) identity of persons and parties to the action; and (4) identity of the quality

or capacity of the parties suing or being sued."  *Del Turco v. Peoples Home Sav. Ass'n*, 478 A.2d

456, 461 (Pa. Super. Ct. 1984); *see also In re Coatesville Area Sch. Dist.*, 244 A.3d 373, 379 (Pa.

2021) (discussing the "four identities"); *Davis v. U.S. Steel Supply*, 688 F.2d 166, 170 (3d Cir.

1982) (same).

There can be no doubt that the first, third, and fourth conditions are satisfied.  As here,

Fields, Green, and Roundtree sued American Airlines in *Smith II*, *see Brown v. Bank of Am.*, No.

1858 WDA 2013, 2014 WL 10919554, at *7 (Pa. Super. Ct. June 20, 2014) ("The identity of

parties element requires that the parties to both proceedings either be identical or be parties in

privity with identical parties."), about the propriety and legality of American Airlines' top filling practices at PHL and the effect of that practice on Plaintiffs and other minority employees, *id.* at *6 (finding identity in the thing being sued upon where the "subject of both actions is the mortgage itself and the propriety of proceeding to foreclosure on the property").  And there is no dispute that the parties are participating in the same capacity in this action as in the state court action.  In both cases, Fields, Green, and Roundtree allege in their individual capacity that their employer, American Airlines, harmed them through its top filling practices.  *Cf. Sec. Trust Co. of Pottstown v. Feist*, 5 A.2d 119, 122 (Pa. 1939) ("[W]hile in form the petition and decree did not name plaintiff as trustee, it was in that capacity only that the proceedings were had, whereas the present claim on the mortgage is by plaintiff in its own right.  The doctrine of res adjudicata does not generally apply where a party appears in the two proceedings in different capacities.").

That leaves the second condition:  identity of the cause of action.  "An identity of causes of action is found when the subject matter and the ultimate issues are the same in both proceedings."  *Cromartie v. Pa. Bd. of Prob. & Parole*, 680 A.2d 1191, 1196 (Pa. Commw. Ct. 1996).  This rule is broader than it seems, encompassing not only those causes of action which were actually brought in a previous action, but also those causes of action that could have been brought.  For example, in *Cicchiello v. SEIU 1199P Union Service Employees International Union*, the plaintiff brought numerous cases after she was discharged from her position as a registered nurse at a state correctional facility.  No. 361 M.D. 2015, 2016 WL 1639015, at *1 (Pa. Commw. Ct. Apr. 26, 2016).  In one of those cases, she filed suit in federal court in the Middle District of Pennsylvania, claiming that her discharge violated her rights under the First and Fourteenth Amendments because she was exercising her First Amendment rights at the time of her discharge.  *Id.* at *4.  The district court granted summary judgment in favor of the

13

defendants, and the decision was affirmed by the Third Circuit. *Id.* at *3. The plaintiff then filed a second action in state court, again under § 1983, claiming that she "was subject to discipline and termination, all in violation of her rights under the First and Fourteenth Amendments." *Id.* at *4. The court found that "[a]lthough many of [the plaintiff's] factual allegations in the present matter involve the circumstances surrounding her grievance and the various settlement agreements, she also implies that she was terminated on or about January 2007 due to her being a representative for SEIU Health Care Union 1199P." *Id.* (cleaned up). The court held that all the claims challenging the plaintiff's termination were barred by res judicata because they could have been raised in the prior federal action. *Id.* (Although the previous action "did not assert a claim based on [the plaintiff] being discharged because of her status as a union representative . . . it was a claim that could have been raised during that proceeding and, therefore, is subject to res judicata.").

Like the plaintiff in *Cicchiello*, here Plaintiffs could have raised their current discrimination claims based on top filling during *Smith II*. And tellingly, although Plaintiffs did not bring employment discrimination claims in that case, they alleged in their prior pleadings that top filling discriminated against the African American employees working at PHL. (*See, e.g.*, Doc. No. 47-3 at p. 7 (stating that the top filling practices "involve discriminatory 'directives' to minority employees to perform poisonous and illegal chores, in dangerous conditions, and retaliation for speaking out against these practices"); Doc. No. 47-4 at p. 5 (same).) Plaintiffs, thus, could have — and indeed, should have — brought their claims of racial discrimination based on top filling as part of *Smith II*. *See Cicchiello*, 2016 WL 1639015, at *4 ("[W]e view the claims and ultimate issues in Count I as being identical to those in *Cicchiello II* or ones that could have been raised therein, thereby meeting these requirements for both res

judicata and collateral estoppel."); *see also Lewis v. Citibank, N.A.*, 179 F. Supp. 3d 458, 462
(E.D. Pa. 2016) ("All of plaintiffs' remaining claims — fraud in the concealment, fraud in the
inducement, violation of RESPA, fraudulent misrepresentation, violation of HOEPA, negligent
infliction of emotional distress, negligence, and 'dual tracking,' could have been litigated in the
State Court Action as they relate to the defendants' conduct with regard to plaintiffs'
mortgage.").

Plaintiffs argue that they are not precluded from asserting discrimination claims related to
top filling because American Airlines' discriminatory conduct continued after the close of the
previous lawsuits.  (Doc. No. 55-1 at p. 19 (referring to the "continuing violation doctrine");
Draft Tr. at 21:7–12, 22:15–23:7.)  But the continuing violation doctrine allows claims that are
"otherwise barred by a statute of limitations to go forward."[8]  *Carter v. Potter*, Civil Action No.
09-2897, 2010 WL 2891504, at *6 (E.D. Pa. July 21, 2010); *see also Satterfield v. Consol. Pa.
Coal Co., Bailey Mine*, Civil Action No. 03-1312, 2006 WL 8456782, at *6 (W.D. Pa. Mar. 21,
2006) ("The continuing violation doctrine allows a plaintiff to pursue discrimination claims
under the ADEA for conduct that began prior to the filing period if he can demonstrate that the
act is part of an ongoing practice or pattern of discrimination of the defendant." (cleaned up)).

Significantly, the continuing violation doctrine does not "defeat the doctrine of res
judicata."  *Carter*, 2010 WL 2891504, at *6; *see also Dubuc v. Green Oak Twp.*, 312 F.3d 736,
749 (6th Cir. 2002) ("Even if there were some alleged new facts that arose after the filing of [the
first action], it does not preclude application of res judicata."); *Pitts v. Onondaga Cnty. Sheriff's*

---

[8] American Airlines also moves to dismiss the § 1981 claims based on top filling on the grounds
that they are barred by the statute of limitations and have not been administratively exhausted.  (Doc. No.
47-1 at pp. 9–11.)  Because we find that res judicata precludes Plaintiffs from asserting any claims based
on top filling, we need not address American's statute of limitations and exhaustion arguments.

*Dep't*, No. 5:04–CV–0828 (GTS/GJD), 2009 WL 3165551, at *6 (N.D.N.Y. Sept. 29, 2009) ("Granted, the continuing violation doctrine . . . may have the effect of rendering timely an otherwise untimely claim.  However, this doctrine cannot act as a vehicle to reopen claims that have already been decided.").

Therefore, to the extent that Plaintiffs' claims are based on American Airlines' top filling practices, they are barred by the doctrine of res judicata, and we grant American's motion to dismiss with prejudice.  We emphasize however that res judicata does not prohibit Plaintiffs from asserting claims based on other, unrelated discriminatory conduct that occurred after the state court case was decided in 2017.  *See Morgan v. Covington Township*, 648 F.3d 172, 178 (3d Cir. 2011) ("We hold that res judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint . . . ."); *Dubuc*, 312 F.3d at 750 (explaining that the court's res judicata analysis "should not be read to preclude the victim of ongoing retaliation from filing multiple suits," because if the defendant continues to retaliate "after the victim prevails in an initial suit, or even if the victim does not prevail, then res judicata would not affect access to the courts").  Nor will we prohibit Plaintiffs from referring, within reason, to the top filling practice as relevant background information for Plaintiffs' discrimination claims.

Having dismissed the claims based on top filling, we consider whether each count in the third amended complaint survives based on the remaining allegations.

### B.    *Discrimination Counts*

In Counts I through III, Plaintiffs bring hostile work environment, disparate treatment, and retaliation claims under § 1981, Title VII, and the PHRA.  In Count IV, they raise a claim for disparate impact under Title VII and the PHRA.[9]  And in Count V, Plaintiffs contend that

---

[9] "As a general matter, claims of race-based employment discrimination under Section 1981, Title VII, and the PHRA are analyzed coextensively."  *Lara v. Samuel Adams Pa. Brewing Co.*, No. 5:20-cv-

American Airlines' discriminatory practices violate Title VI.

### 1.    *Count I:  Hostile Work Environment*

To state a claim for hostile work environment based on race, a plaintiff must show that (1) he/she "suffered intentional discrimination because of his/her race;" (2) "the discrimination was severe or pervasive;" (3) "the discrimination detrimentally affected the plaintiff;" (4) "the discrimination would detrimentally affect a reasonable person in like circumstances;" and (5) "the existence of *respondeat superior* liability, meaning the employer is responsible." *Castleberry*, 863 F.3d at 263 (quoting *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).  American Airlines focuses on the second element, arguing that Plaintiffs' allegations "regarding graffiti, heavier workloads, ordinary workplace discipline, and (as to two plaintiffs) sporadic comments over a 20-year period" do not amount to a hostile work environment.  (Doc. No. 47-1 at p. 21.)

The Third Circuit has clarified that in analyzing whether this second element is met, the "correct standard" is whether the harassment was "severe *or* pervasive." *Castleberry*, 863 F.3d at 264.  In other words, "'severity' and 'pervasiveness' are alternative possibilities:  some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable conduct, will contaminate the workplace only if it is pervasive." *Id.* (quotation marks omitted).  We must look to the "totality of the circumstances, including:  'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

---

0498, 2020 WL 5211206, at *7 (E.D. Pa. Sept. 1, 2020); *see also Castleberry*, 863 F.3d at 263 ("In employment discrimination cases, these claims are subject to the same analysis as discrimination claims under Title VII."); *see also Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently.").  The one exception to this is claims for disparate impact, which are available under Title VII and the PHRA, but not § 1981. *Lara*, 2020 WL 5211206, at *7 n.17; *cf. Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 753 (E.D. Pa. 2014) ("A right to relief under § 1981 can be shown in three ways:  (1) purposeful racial discrimination; (2) a hostile work environment based on racial harassment; or (3) retaliation.").

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).

For example, in *Castleberry*, the Third Circuit held that the plaintiffs "pled a plausible claim for hostile work environment under either theory — that the harassment was 'severe' or 'pervasive.'" *Id.* at 266.  The allegations were "severe" because the plaintiffs alleged that "their supervisor used a racially charged slur in front of them and their non-African-American coworkers" during an incident where he also threatened to fire them.  *Id.* at 265.  And the allegations showed "pervasive" harassment because the plaintiffs also alleged that "'on several occasions' their sign-in sheets bore racially discriminatory comments and that they were required to do menial tasks while their white colleagues (who were less experienced) were instructed to perform more complex work."  *Id.* at 265.

Similarly, here, Plaintiffs allege that since 2016, employee-only breakrooms and bathrooms have borne deeply offensive, racially discriminatory writings and carvings and that a stuffed monkey has been left on the refrigerator in the breakroom on several occasions.  (Doc. No. 44 at ¶ 47; *see also* Doc. Nos. 44-1, 44-2, 44-3.)  Managers were aware of these incidents but did nothing to investigate, remove the offensive writings, or stop the conduct.  (*Id.* at ¶¶ 49, 50.)  Managers have also directed racially offensive comments toward Plaintiffs, referring to Green as a "Black Panther," telling Green that the supervisor was going to "write [his] black ass[ ] up," and calling Fields, "Boy."  (*Id.* at ¶¶ 51–53.)  In addition to these comments, Plaintiffs allege that their complaints of discrimination are often ignored, that they have been subjected to accelerated and excessive discipline, and that they are routinely given heavier workloads than their Caucasian counterparts.  (*Id.* at ¶¶ 60–61.)

Viewing these allegations collectively, we find that Plaintiffs have plausibly pled a claim

for hostile work environment.[10]  *See Castleberry*, 863 F.3d at 265–66; *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576–77 (D.C. Cir. 2013) (finding the plaintiff stated a plausible claim for racially hostile work environment where he alleged that his supervisor used an offensive racial epithet while yelling at him, that he was then forced to work with that supervisor for another three months, and that another supervisor used a racially explicit statement while denying the plaintiff a raise).  "Whether these allegations are true and whether they amount to 'pervasiveness' [or 'severity'] are questions to be answered after discovery . . . ."  *Castleberry*, 863 F.3d at 266.

### 2.  *Count II:  Disparate Treatment*

"A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII."  *Boyle v. City of Philadelphia*, 476 F. Supp.

---

[10] During oral argument, defense counsel for the first time argued that this claim fails because Plaintiffs "don't allege that they actually saw these images or that they heard this language or that it was directed towards them" and because Plaintiffs have not alleged that the hostile conduct altered their work performance.  (Draft Tr. at 5:4–9, 6:8–12, 8:8–11 (describing the issue as "whether these [actions] interfered with [Plaintiffs'] job performance").)  We do not consider arguments raised for the first time at oral argument.  *See In re Corio*, 371 F. App'x 352, 355 (3d Cir. 2010) (finding that the bankruptcy court did not abuse its discretion when it refused to consider an argument raised for the first time during oral argument); *Doherty v. Allstate Indem. Co.*, Civ. A. No. 15-05165, 2017 WL 1283942, at *23 (E.D. Pa. Apr. 6, 2017) ("[B]ecause this argument was asserted for the first time in Doherty's reply and at oral argument, it is waived.").  In the alternative, even if we were to consider Defendants' arguments, we find them at odds with the allegations in Plaintiffs' third amended complaint.  Plaintiffs allege that multiple supervisors directed race-based comments toward them and that they personally experienced accelerated discipline and heavier workloads than their Caucasian counterparts.  (*See* Doc. No. 44 at ¶¶ 51–53.)  As for the writings, drawings, and the stuffed animals, we agree with Plaintiffs that it is "almost nonsensical to think that [Plaintiffs] would work in employee-only areas [and] take pictures of the offensive language," but "not have seen it, not have experienced it, not have been in the bathroom stall where the black face was, not have been in the break room where the monkey was on top of the refrigerator." (Draft Tr. at 24:2–7; *see also* Doc. No. 44 at ¶ 47 (alleging that "*Plaintiffs* are also being subjected to racially offensive carvings, statements, *inter alia* in employee only areas . . . .").)  *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) ("The District Court, in deciding a motion under Fed.R.Civ.P. 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].").

3d 101, 111 (E.D. Pa. 2020) (quoting *O'Brien v. City of Philadelphia*, 837 F. Supp. 692, 697

(E.D. Pa. 1993)).  "To set forth a claim for disparate treatment employment discrimination, a

plaintiff must plead facts that raise a reasonable expectation that discovery" will show:  "(1) that

he is a member of a protected class; (2) that he was qualified for the position sought to be

retained; (3) that he suffered an adverse employment action; and (4) that either similarly-situated

non-members of the protected class were treated more favorably, or the adverse job action

occurred under circumstances that could indicate that [the plaintiff's] protected status played a

motivating or determinative factor in the adverse action."  *Lara*, 2020 WL 5211206, at *8

(quotation marks omitted); *see also Wallace v. Federated Dep't Stores, Inc.*, 214 F. App'x 142,

144 (3d Cir. 2007) (same).  American Airlines argues that Count II fails because Plaintiffs have

not alleged any conduct that rises to the level of an adverse employment action, and even if they

had, these "facially neutral actions" do not give rise to an inference of discrimination.  (Doc. No.

47-1 at p. 23; *see also* Draft Tr. at 9:24–10:3.)

### i.       *Adverse Employment Action*

To constitute an "adverse employment action," the employer's conduct must be "serious

and tangible enough to alter an employee's compensation, terms, conditions, or privileges of

employment."  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quotation

marks omitted).  "Put another way, an adverse employment action is 'a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits."  *Durham Life

Ins. Co. v. Evans*, 166 F.3d 139, 152–53 (3d Cir. 1999).  In addition, "[i]f an employer's act

substantially decreases an employee's earning potential and causes significant disruption in his

or her working conditions, a tangible employment action may be found."  *Id.* at 152.

20

Here, Plaintiffs allege that they are "routinely and systematically given work assignments that have heavier workloads and/or less agents assigned to their work areas than non-protected class members (Caucasian)" (Doc. No. 44 at ¶ 60; *see also id.* at ¶¶ 61c (explaining that Fields and other African American ramp agents are consistently assigned to Carousel #4, which has heavier workloads than Carousels #1–#3), 61g (changing Roundtree's work assignments after bidding closes)); that they are often given subpar equipment and insufficient time to finish these assignments (*id.* at ¶¶ 61b (assigning Green to service flights that have arrival times before his scheduled shift start), 61d (providing Fields and other African American ramp agents with subpar equipment and insufficient time to perform duties)); and that managers subject them to accelerated discipline (*id.* at ¶¶ 52 (manager stating that he "had been instructed to 'write Green's black ass up'"), 65 (describing write ups and disciplinary actions against Fields)).

We find these allegations sufficient at the motion to dismiss stage to allege adverse employment actions related to the conditions and nature of Plaintiffs' employment. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411–12 (3d Cir. 1999) (finding that the plaintiff teacher — who was transferred to a "difficult school" and assigned to teach a less desirable science class instead of his preferred physics course — showed that he "was subjected to sufficient adverse employment actions such that" he stated a prima facie case under Title VII and the PHRA); *Parker v. Del. Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 478 (D. Del. 1998) (finding that the plaintiff stated a prima facie case of sex discrimination where she alleged that she and other women were assigned to rotating shifts, which presented problems for employees with child care needs, while male troopers were assigned to non-rotating shifts); *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 481 (E.D. Pa. 2013) ("The disciplinary memorandum is an adverse employment action" because it "constituted an official reprimand" that "altered the 'terms and

conditions of employment.'"); *cf. Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90–91 (3d Cir. 2015) (finding the plaintiff failed to allege an adverse employment action because she argued only that she was subject to "disciplinary accusations," and failed to allege that she received "any type of discipline, demotion, decrease in salary, written warning[,] nor was she placed on a performance improvement plan").

### ii. *Inference of Discrimination*

In addition, Plaintiffs allege facts which suggest that they were assigned less advantageous work assignments and were subjected to accelerated discipline because of their race. To satisfy this element, Plaintiffs must allege that either (1) similarly situated Caucasian employees were treated more favorably than them, or (2) race was a motivating or determinative factor in Plaintiffs' job assignments and discipline. *Lara*, 2020 WL 5211206, at *9. Here, Plaintiffs allege, among other things, that they are "routinely and systematically given work assignments that have heavier workloads and/or less agents assigned to their work areas than non-protected class members (Caucasian)." (Doc. No. 44 at ¶ 60.) Specifically, American Airlines managers "routinely and systematically manipulat[e] the bid assignments resulting in staffing baggage Carousel #4, which has heavier workloads and is understaffed," with Fields and other African American ramp agents, "while routinely and systematically staffing Carousels #1–#3, which have lighter workloads and more agents with non-protected class (Caucasian) ramp agents." (*Id.* at ¶ 61c; *see also id.* at ¶ 61g (alleging that Roundtree's work assignments are changed "to favor non-protected class (Caucasian) employees").) In addition, Plaintiffs allege that Green's supervisor told him that he had been instructed to "write Green's black ass up," suggesting disciplinary actions were taken at least in part on the basis of race. (*Id.* at ¶ 52 (alterations adopted); *see also id.* at ¶¶ 65e–h (describing how Fields was disciplined but

Caucasian ramp agents who engaged in similar activity were not).)

These allegations are sufficient at the motion to dismiss stage to suggest that the heavier work assignments and accelerated discipline that Plaintiffs received occurred "under circumstances that could give rise to an inference of intentional discrimination." *Eubanks v. Sunoco Logistics Partners, LP*, Civil Action No. 12-1741, 2012 WL 3866961, at *3 n.4 (E.D. Pa. Sept. 6, 2012) ("Eubanks has also adequately pleaded the fourth element of a prima facie case of discrimination — 'the action occurred under circumstances that could give rise to an inference of intentional discrimination'" — by "alleging that Mr. Gillion, a Caucasian co-worker, received no discipline for committing substantially similar acts and omissions."); *see also Lara*, 2020 WL 5211206, at *9 (finding race was a motivating factor because the plaintiff alleged that white employee made racist comments, which the employer dismissed as a joke, while the non-white employee was terminated for similar behavior).

For those reasons, the motion to dismiss Count II is denied.[11]  *See Castleberry*, 863 F.3d at 266 (finding the plaintiffs stated a claim for disparate treatment where they alleged that "they were the only black males assigned to their specific site, they were assigned undesirable duties, they were the targets of racial epithets, and they were fired due to their race").

### 3.    *Count III:  Retaliation*

To state a claim for retaliation, the plaintiff must allege facts tending to show that: "(1) he engaged in a protected activity; (2) the employer took an adverse employment action

---

[11] American Airlines throws in a one-sentence argument that Count II should be dismissed because Plaintiffs failed to allege that they satisfactorily performed their jobs.  (Doc. No. 47-1 at p. 23.) We disagree.  Plaintiffs have sufficiently alleged facts which give rise to the inference that they satisfactorily performed their duties.  Most notably, Plaintiffs allege that they have worked in their relative positions since 1995, 1996, and 2006, and all three Plaintiffs continue to be employed by American Airlines.  *See Lara*, 2020 WL 5211206, at *9 (finding the complaint sufficiently alleged that the plaintiff was "qualified for his position and satisfied all relevant job requirements, an allegation that is further supported by the length of his tenure at Sam Adams").

against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."[12] *Castleberry*, 863 F.3d at 267; *see also Lara*, 2020 WL 5211206, at *9 (cleaned up). American Airlines argues that Count III fails because Plaintiffs have not "allege[d] a causal nexus between their complaints" in 2015 and 2017 and the adverse work assignments and disciplinary actions.[13] We agree.

The Third Circuit recognizes two tests for determining whether a plaintiff has alleged a causal connection between the protected activity and the alleged retaliation. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). First, when "the temporal proximity between the protected activity and adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Id.* Second, when the temporal proximity is not "unusually suggestive," the court asks whether the factual allegations, "looked at as a whole, may suffice to raise the inference." *Id.* (quotation marks omitted). Among other things, we must consider whether the plaintiff has alleged "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.*

In the third amended complaint, Plaintiffs allege that American Airlines managers gave them more difficult job assignments and subjected them to accelerated disciplinary actions

---

[12] To state a retaliation claim under § 1981, the plaintiff must also "demonstrate that there has been an underlying section 1981 violation." *Castleberry*, 863 F. 3d at 267 (quoting *Estate of Olivia*, 604 F.3d at 798).

[13] In the alternative, American argues that Plaintiffs have failed to allege an adverse employment action. (Draft Tr. at 11:16–18.) For the reasons discussed above in connection with Plaintiffs' disparate treatment claim, we reject this argument. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 43, 67 (2006) (concluding that "Title VII's substantive provision and its antiretaliation provision are not coterminous" and the "scope of the antiretaliation provision" is broader, extending "beyond workplace-related or employment-related retaliatory acts and harm").

because they served as named plaintiffs in *Smith I* and were the named complainants in a 2017

OSHA complaint for race discrimination.  (Doc. No. 44 at ¶¶ 63, 64.)  However, in their briefing

on the motion to dismiss, Plaintiffs no longer rely on their positions as named plaintiffs in *Smith*

*I*, and instead argue that they "engaged in protected activities when in May 2017 they filed [a]

complaint with the Department of Labor, Occupational Safety and Health Act (OSHA) (race

discrimination) and currently when they filed the instant litigation as well as on-going, current

internal complaints of discrimination with American Human Resources offices at PHL."  (Doc.

No. 55-1 at p. 23; *see also* Draft Tr. at 38:23–39:15.)  The allegations regarding the human

resources complaint, which are nowhere in the third amended complaint, are outside the realm of

our consideration.  *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A

plaintiff may not amend his complaint through arguments in his brief in opposition to a motion

for summary judgment." (cleaned up)); *Garnett v. Bank of Am.*, 243 F. Supp. 3d 499, 507 n.2 (D.

Del. 2017) ("In her response, Garnett also refers to religious discrimination, stating that her

religious beliefs were questioned.  The Court does not consider this claim given that it is raised

for the first time in Garnett's responsive brief."  (citations omitted)).

  That leaves the OSHA complaint.  But other than vaguely alleging that Plaintiffs were

"some of the named complainants in a Department of Labor, Occupational Safety and Health Act

complaint against Defendant in May 2017 for race discrimination," Plaintiffs have provided *no*

allegations related to that proceeding.  Plaintiffs' vague allegations about timing as to this

complaint and the alleged disciplinary actions are insufficient to demonstrate a temporal causal

connection.  The only specific time given for any of the disciplinary actions is Plaintiffs'

allegation that Fields was disciplined in February, July, and September 2018.  (Doc. No. 44 at

¶ 65e, 65f.)  But each of these actions occurred at least 11 months after Plaintiffs filed their

OSHA complaint.  *See Leboon*, 503 F.3d at 232–33 (finding that a "gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation").  And without knowing the particulars of the OSHA complaint and Plaintiffs' role in pursuing it, it is impossible to find a causal connection between that complaint and Plaintiffs' negative work assignments and disciplinary actions.  Although there is some suggestion that Fields and Green were disciplined at the direction of upper management "in an effort to terminate" them, there is no allegation that this direction was given *because of* Plaintiffs' OSHA complaint.[14]

Therefore, we grant American's motion to dismiss Count III.  However, because we cannot find that Plaintiffs are foreclosed from asserting any facts which would give rise to a claim for retaliation, Count III is dismissed without prejudice.

### 4.    *Count IV:  Disparate Impact*

In addition to their other discrimination claims, Plaintiffs allege discrimination under Title VII and the PHRA on a theory of disparate impact.  "Under a disparate impact theory, liability is established when a facially neutral policy affects members of a protected class in a significantly discriminatory manner."  *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 131

---

[14] Even if we were to look to Plaintiffs' roles in *Smith I* and *Smith II*, there is similarly no allegation that establishes a causal connection between Plaintiffs' roles in those lawsuits and their heavier workloads or accelerated discipline.  Plaintiffs have not, for example, alleged that they first received the heavier workloads and accelerated discipline immediately after filing the blue water lawsuit.  Similarly, we cannot find a causal connection between Plaintiffs' allegation that they were retaliated against for complaining about discrimination (Draft Tr. at 39:10–12) because it is not clear from the third amended complaint when each Plaintiff complained about discrimination, when they first experienced increased workloads and accelerated discipline, or how the alleged retaliation is related to those complaints (*see, e.g.*, Doc. No. 44 at ¶ 46 ("American Air minority employees protested against this [top filling] practice and complained to senior managers . . . ."), ¶ 49 ("Green complained to ABR Managers . . . regarding these incidents."); Draft Tr. at 24:24–25:9 ("As it relates to the allegations in this case, they occurred after June 1, 2017.  What was continuing was American Airlines' offensive and inflammatory conduct.")).  If Plaintiffs choose to file an amended complaint, they should be mindful of these deficiencies.

(3d Cir. 1996).  A disparate impact claim has two components.  "The plaintiff must begin by identifying the specific employment practice that is challenged," and then "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988).

Plaintiffs allege that "American Air[lines'] policies and practices of bid process for work assignments; training; excessive and accelerated disciplinary actions and other employment practices though facially neutral, have a disparate impact on protected class members (African Americans) including, but not limited to, Plaintiffs."  (Doc. No. 44 at p. 17; Draft Tr. at 29:12–30:6.)  American Airlines argues that this conclusory sentence does not satisfy the standard set out in *Twombly* and *Iqbal*.  (Doc. No. 47-1 at p. 24; Draft Tr. at 13:14–14:10.)  We agree. Although Plaintiffs "incorporate by referenced [sic] all averments in all paragraphs," none of their averments identify with specificity a facially neutral bid process for work assignments, a facially neutral disciplinary scheme, or a facially neutral training regime.

Instead, Plaintiffs allege that managers "chang[ed] work assignments, after [the] bidding process closed," and "routinely and systematically manipulat[ed] the bid assignments" to give African American ramp agents heavier workloads.  (Doc. No. 44 at ¶¶ 61c, g.)  But neither practice is facially neutral.  To the contrary, Plaintiffs' allegations suggest facially discriminatory treatment by American Airlines' managers, which does not support a claim for disparate *impact*. *See Castleberry*, 863 F.3d at 267 ("Moreover, a theory of disparate impact is not supported by Plaintiffs' allegations, which is that there is a policy that only African-American males will be assigned undesirable work, and only they will be fired if they complain about discrimination. Those alleged policies are not facially neutral."); *Healey*, 78 F.3d at 131 ("[S]ince this case

involves a facially discriminatory employment policy, not a facially neutral one, disparate impact is not appropriate to this case.").

Similarly, Plaintiffs' allegations about accelerated disciplinary action describe facially discriminatory treatment that goes against an otherwise neutral policy — that American Airlines' managers failed to follow "progressive disciplinary levels as used with non-protected class (Caucasian) employees, but rather skipping level to accelerate discipline and potential firing." (Doc. No. 44 at ¶¶ 61a, 76a; *see also id.* at ¶ 61e.)  *See Healey*, 78 F.3d at 131 (finding disparate impact theory inapplicable because "Southwood uses sex as an explicit factor in assigning its staff to the various shifts," and "[a]nalysis under disparate impact is not appropriate where plaintiff claims injury based on a facially discriminatory policy").

Finally, other than Plaintiffs' conclusory statement that American Airlines' training policies have a disparate impact on African American workers, Plaintiffs do not identify the relevant training policies or explain how those policies adversely impact African American workers.  *See Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) ("[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." (quotation marks omitted)); *see also Knox v. PPG Indus., Inc.*, No. 2:15-cv-1434, 2016 WL 279004, at *7 (W.D. Pa. Jan. 22, 2016) ("While Plaintiff does employ some disparate-impact buzzwords in her complaint — e.g., she claims that PPG's policies 'adversely impacted' women — these are bare legal conclusions, not facts, and thus cannot carry Plaintiff's claim over the plausibility threshold." (cleaned up)).  Indeed, Plaintiffs do not discuss training anywhere else in the third amended complaint.  (*See generally* Doc. No. 44.)

Because Plaintiffs have failed to allege any facts to support their conclusory assertion that American Airlines' policies have a disparate impact on African American employees, the motion to dismiss is granted as to this count as well.  *See Ashcroft*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  However, because we cannot find that Plaintiffs are foreclosed from asserting any facts which would give rise to a claim for disparate impact, Count IV is dismissed without prejudice.

### 5.    *Count V:  Discrimination Under a Program Receiving Federal Assistance*

Next, Plaintiffs contend that American Airlines' discriminatory treatment violates Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race "under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

Plaintiffs allege that American Airlines receives federal funding assistance and subsidies under the Essential Air Service (EAS) program, under the Fly America Act, as a government contractor through GSA's City Pairs Program, and from its contracts with the United States Postal Service.  (Doc. No. 44 at ¶¶ 9h, 71, 75, 78.)  American Airlines argues that it does not receive "federal financial assistance" under any of these programs and that in any event, Plaintiffs' claims fail because they have not alleged a logical nexus between any of the programs that they identify in the operative complaint and the employment discrimination that they allegedly suffered.  (*Id.* at p. 28; *see also* Draft Tr. at 14:19–25.)  In their response, Plaintiffs do not discuss the EAS program or the Fly America Act.  Instead, Plaintiffs assert that American Airlines receives "a subsidy from the federal government for transport of mail for the U.S. Postal Service," and that "under the theory of infection," there is a "causal nexus . . . between

employment discrimination" and American Airlines' "transport of mail since the African American public are plausible beneficiaries of the U.S. Postal Service."[15]  (Doc. No. 55 at p. 31.)

Because Plaintiffs do not respond to American's arguments about the EAS program, the Fly America Act, or American's role as a government contractor, we grant the motion to dismiss these claims as uncontested.  *See, e.g.*, *Ghoubrial v. Johanns*, Civil Action No. 05-CV-04256, 2006 WL 8459472, at *2 n.6 (E.D. Pa. Sept. 29, 2006) ("[P]laintiff filed a response but did not address the sovereign immunity argument made by the United States.  The motion to dismiss by the United States could, therefore, be granted as uncontested."); *Bowser v. Bogdanovic*, No. 08-cv-847, 2010 WL 1462548, at *5 (M.D. Pa. Apr. 9, 2010) ("We note that, as a matter of course, the Court could dismiss Plaintiffs' claims because Plaintiffs failed to respond to the arguments for dismissal of those claims set forth in the Defendants' Brief in Support of the instant Motion.").  That leaves Plaintiffs' allegation that American Airlines "receives subsidies from its contracts with the U.S. Postal Service for transport of mail via interstate and international commerce."  (Doc. No. 44 at ¶ 78.)  We agree with American Airlines that this claim must be dismissed because Plaintiffs have not demonstrated a nexus between the funds that American receives for delivering mail and the alleged employment discrimination.[16]  (Draft Tr. at 15:10–

---

[15] Plaintiffs also allege that American Airlines is receiving financial assistance through the Coronavirus Aid, Relief, and Economic Security (CARES) Act.  (Doc. No. 55-1 at p. 27.)  However, as mentioned above, Plaintiffs cannot amend their complaint through arguments in a response brief.  *Bell*, 275 F. App'x at 160.  In addition, the CARES Act was passed in 2020, *after* the events described in Plaintiffs' third amended complaint.  During oral argument, Plaintiffs' counsel argued that they could nevertheless rely on the CARES Act because other federal courts have found that "a plaintiff may still sue for an act not included in the EEOC charge if the act is included in the scope of the EEOC investigation, which can reasonably be expected to grow out of a charge of discrimination."  (Draft Tr. at 32:7–24.)  Those cases, which analyze whether a discrimination claim has been administratively exhausted, have no bearing on the question before us.  It should go without saying that a plaintiff cannot experience discrimination under a program receiving federal assistance when the statute establishing the program did not exist at the time of the alleged discrimination.

[16] American Airlines repeatedly describes this as a "standing" requirement, arguing that "to establish standing under Title VI, [the] plaintiff needs to be the intended beneficiary of the spending

19, 15:24–16:4.)

Courts have interpreted Title VI as requiring "a logical nexus" between the use of federal funds and the alleged discrimination. *Johnson*, 566 F. Supp. 2d at 457; *see also Waris v. HCR Manor Care*, Civil Action No. 07-3344, 2009 WL 330990, at *19 (E.D. Pa. Feb. 10, 2009)

---

program," but here, "plaintiffs are no such beneficiaries" and there is "no relationship between . . . a piece of mail carried by the postal service and the alleged discrimination here." (Draft Tr. at 15:14–19, 49:6–9.) This argument conflates two separate issues — statutory standing and the logical nexus requirement of § 604. *See Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp. 2d 742, 748–49 (D. Md. 2012) ("A minority of cases have characterized [the limitation in § 604] as a 'standing' requirement. That label, however, may be misleading. . . . Rather than being a standing requirement, the limitation of § 604 is more properly understood as an element of a litigant's cause of action."). We agree that Plaintiffs have not established a logical nexus between the federal funding and the alleged discrimination. However, we must reject American Airlines' standing argument as it is currently phrased.

For its standing analysis, American Airlines relies solely on *Brown-Dickerson v. City of Philadelphia*, Civil Action No. 15-4940, 2016 WL 1623438 (E.D. Pa. Apr. 25, 2016) and the court's assertion that to "establish standing under Title VI, the plaintiff must be the intended beneficiary of the federal spending program" at issue. *Id.* at *9 (citing *Simpson v. Reynolds Metal Co.*, 629 F.2d 1226, 1235). (Doc. No. 47-1 at p. 28; Draft Tr. at 15:20–23.) This requirement is sometimes referred to as the "*Simpson* Doctrine." However, in recent years courts in this and other Circuits have refused to follow this doctrine, holding that it is inconsistent with the Supreme Court's ruling in *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479 (1998) ("*NCUA*"). *See Bryant v. N.J. Dep't of Transp.*, 998 F. Supp. 438, 443 (D.N.J. 1998) ("[I]t is therefore clear to me that the Supreme Court's zone of interests test is inconsistent with the *Simpson* Doctrine's exclusive search for intended beneficiaries, applicants, or participants."); *see also, e.g.*, *NCUA*., 522 U.S. at 488–89 ("Although our prior cases have not stated a clear rule for determining when a plaintiff's interest is 'arguably within the zone of interests' to be protected by a statute, they nonetheless establish that we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff."); *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 715 (4th Cir. 2014) ("Title VI does not require that an injured party be the intended beneficiary of federal funds."); *Alexander v. Hunt*, Case No. 5:16-cv-192, 2018 WL 3801240, at *8 (D. Vt. Aug. 9, 2018) ("In the wake of *NCUA*, a number of district courts have acknowledged that Title VI plaintiffs need not allege that they are the intended beneficiaries of any federally funded project in order to establish Title VI standing."). *But see, e.g.*, *Azteca Enterprizes, Inc. v. Dall. Area Rapid Transit*, 31 F. App'x 839, 839 (5th Cir. 2002) (citing pre-*NCUA* cases for the proposition that "[t]o state a cause of action under Title VI, a plaintiff must allege that he is the 'intended beneficiary of, an applicant for, or a participant in a federally funded program'").

Although the case law is not entirely clear on this point and some cases, such as *Brown-Dickerson*, continue to apply the intended beneficiary test, we find the *Bryant* line of cases persuasive and agree that the "the proper inquiry is simply whether the interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected by" Title VI. *NCUA*, 522 U.S. at 492. That said, we do not affirmatively rule on this issue at this time given our conclusion that Plaintiffs' Title VI claim must be dismissed because they have not (and cannot) allege facts tending to show the logical nexus required by § 604.

("[D]istrict courts in Pennsylvania have adopted the reasoning set forth by other circuits and have required a 'logical nexus' between the federal funds received and the alleged discrimination."). This nexus analysis comes from Section 604 of Title VI. *See Burks v. City of Philadelphia*, 950 F. Supp. 678, 683 (E.D. Pa. 1996).

Section 604 states that "[n]othing contained in this subchapter shall be construed to authorize action under this subchapter . . . with respect to any employment practice of any employer . . . except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3; *see also Burks*, 950 F. Supp. at 683. In other words, under § 604, "discriminatory employment practices can give rise to Title VI liability only when a primary objective of the federal money that Congress extends to the program or activity is to provide employment." *Burks*, 950 F. Supp. at 683; *see Rogers*, 859 F. Supp. 2d at 747 ("[T]here must be a 'logical nexus' between the alleged discriminatory practices targeted by agency action and the use of federal funds — i.e., both must relate to employment."). This requirement reflects the fact that "Congress did not intend Title VI to be the primary federal vehicle to prohibit employment discrimination." Department of Justice, Title VI Legal Manual (Updated) § X.A (Apr. 22, 2021).

To show a logical nexus, the plaintiff "must show either (1) that a primary objective of the federal funding defendant receives is to provide employment, or (2) that the employment discrimination complained of necessarily causes discrimination against the intended beneficiaries of the federal funding." *Rogers*, 859 F. Supp. 2d at 748–51 (collecting cases). Plaintiffs concede that the "primary objective" of the monies that American Airlines receives for delivering mail is not employment, but instead, to "get the mail where it needs to go." (Draft Tr. at 31:20–21.) *See Burks*, 950 F. Supp. at 683 (finding that the plaintiffs failed to "state a claim under 2 U.S.C.

§ 2000d-3" because they did not "contend that a primary purpose of the [federal] funds is to provide employment"); *Mitchell v. N.C. Div. of Emp. Sec.*, 76 F. Supp. 3d 620, 626–27 (E.D.N.C. 2014) ("In his complaint, Mitchell alleges that 'the Division of Employment Security receives federal funds.' Under *Iqbal* and Title VI, Mitchell has not plausibly alleged that providing employment is a primary objective of the federal funds that North Carolina Division of Employment Security allegedly receives."); *Johnson v. County of Nassau*, 411 F. Supp. 2d 171, 175–76 (E.D.N.Y. 2006) ("Finally, the Court notes that courts have dismissed complaints for failure to specify when funds were received, what they were used for, and whether their primary objective was to provide employment." (cleaned up)); DOJ, Title VI Legal Manual (Updated) § X.A ("To sustain a Title VI Claim of employment discrimination under the exception for 'a primary objective,' the plaintiff has a specific threshold requirement: not only must the plaintiff establish that the recipient receives federal financial assistance, but also that the 'primary objective' of the federal funding is to provide employment." (collecting cases)); *cf. Rogers*, 859 F. Supp. 2d at 752 (denying motion to dismiss the plaintiffs' Title VI claim because they alleged "that Maryland's schools have secured more than $1 billion in federal funding and that [the defendant school] has received this money for the express purpose of creating jobs and maintaining existing ones").

Plaintiffs nonetheless argue that they can show a logical nexus "under an infection theory." (Doc. No. 55-1 at pp. 26–27.) The infection theory applies when the "employment discrimination infects the beneficiaries' entitlement of the recipient's services, programs, and activities."[17] DOJ, Title VI Legal Manual (Updated) § X.A (explaining that a primary objective

---

[17] The infection theory is most often recognized in the school desegregation context, with Court's finding that faculty segregation negatively impacts — "infects" — student integration. *See United States v. Jefferson Cnty. Bd. of Educ.*, 372 F.2d 836, 883 (5th Cir. 1966) (dismissing school board's argument that § 604 prohibits "interference with employment practices in schools" because the students, not the

analysis is satisfied if the employment "practices negatively affect the delivery of services to ultimate beneficiaries").

Plaintiffs could point to no case where either the Supreme Court or the Third Circuit adopted the infection theory.  (Draft Tr. at 31:2–5.)  And we could find only one case in this Circuit recognizing it.  *See Bhatt v. Uniontown Hosp.*, No. 83-2455, 1986 WL 30681, at *6 (W.D. Pa. Mar. 20, 1986) (quotation marks omitted).  But even assuming it applies, we find that Plaintiffs have not alleged any facts tending to show that employment discrimination at PHL necessarily results in discrimination against the alleged beneficiaries of the airline's mail carrying service — the broader public receiving mail.[18]

Because we find as a matter of law that there is no "logical nexus" between the alleged discrimination and American's mail delivery contracts with the U.S. Postal Service, we also grant American's motion to dismiss Count V.  Count V is dismissed with prejudice.  *See Jefferson Cnty. Bd. of Educ.*, 372 F.2d at 883 (recognizing infection theory and explaining that "additional clarifying language" was later added to Title VI to "make it clear that discrimination in certain employer-employee relationships, not affecting the intended beneficiaries of the program, would be excluded from the reach of the statute"); *Ahern*, 133 F.3d at 977 ("Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2)

---

teachers, are the intended beneficiaries of the federal financial assistance, and holding that although the school children are the primary beneficiaries, "[f]aculty integration is essential to student desegregation," and "[t]o the extent that teacher discrimination jeopardizes the success of desegregation, it is unlawful wholly aside from its effect upon individual teachers"); *Ahern v. Bd. of Educ. of Chicago*, 133 F.3d 975, 977 (7th Cir. 1998) ("That being said, [§ 604] was also never intended as a limitation on desegregation of school including through integration of faculty." (cleaned up)).

[18] When asked during oral argument, "Who are the intended beneficiaries of the subsidies that American receives for mail delivery?" Plaintiffs' counsel responded, "I believe that the intended beneficiaries are anybody who receives mail."  (Draft Tr. at 31:13–14.)

discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." (quotation marks omitted)).

### C.      Civil Conspiracy Counts

Finally, in Counts VI and VII, Plaintiffs bring civil conspiracy claims under state and federal law.  Plaintiffs contend that American Airlines and the Union have conspired to extort union funds by failing to properly back fill job assignments when employees are deployed on union business.  (Doc. No. 44 at ¶¶ 82–93.)  Plaintiffs claim that this conspiracy tortiously interferes with their business relationships with the Union and violates the RICO.  (*Id.* at ¶¶ 91, 99.)  American Airlines argues that we lack jurisdiction to consider these claims because they "constitute 'minor disputes' under the Railway Labor Act, 45 U.S.C. § 151 . . . over which the applicable System Board has exclusive jurisdiction."  (Doc. No. 47-1 at p. 29.)

"The Railway Labor Act ('RLA') was enacted by Congress in 1926 to provide 'a comprehensive framework for the resolution of labor disputes in the railroad industry,'" and in 1936, it was amended to cover the airline industry.  *Int'l Ass'n of Machinists & Aerospace Workers Dist. Local Lodge 1776 v. Jackson*, Civil Action No. 09-150, 2010 WL 597247, at *3 (E.D. Pa. Feb. 19, 2010) (hereinafter, *IAMAW Local 1776*) (quoting *Atchinson, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562–63 (1987)).  The RLA governs three types of disputes: representation disputes, major disputes, and minor disputes.  *Id.*  Only minor disputes are relevant here.

A "minor dispute is a dispute over the interpretation or application of existing collective bargaining agreements."  *Id.*  "A minor dispute concerns the meaning and application of the provision of the negotiated instrument that has been hammered out at the bargaining table," and it "includes disputes about the existence or extent of provisions established or implied in the

agreement by usage, practice, or custom." *United Transp. Union*, 894 F.2d at 628; *see also Capraro v. United Parcel Serv. Co.*, 993 F.2d 328, 332 (3d Cir. 1993) ("[E]ven where neither side relies upon an express provision of the collective bargaining agreement, arbitration is required if either side is advancing a plausible argument based on implied terms evidenced by course and practice under the collective bargaining agreement or the 'common law of the shop.'"); *IAMAW Local 1776*, 2010 WL 597247, at *3 ("When a claim is inextricably intertwined or substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, the claim is preempted." (quotation marks omitted)).

"[T]o ascertain whether the resolution of a claim depends on the meaning of the CBA, the court should analyze the elements of the claim in order to see if those elements would require the interpretation of the CBA." *IAMAW Local 1776*, 2010 WL 597247, at *3. The court must "look beyond the allegations of the complaint to determine whether the wrong complained of actually arises in some manner from a breach of the defendants' obligations under a collective bargaining agreement." *Id.* (cleaned up). If they do, then the dispute "is classified as a minor dispute," and "labor relations' version of the rule of law, mandatory arbitration, comes into play." *United Transp. Union*, 894 F.2d at 629; *see also Indep. Ass'n of Cont'l Pilots*, 155 F.3d at 691 ("Jurisdiction to entertain the merits of a minor dispute rests exclusively with the arbitral forum[.]"); *IAMAW Local 1776*, 2010 WL 597247, at *3 ("[M]inor disputes must be kept out of the courts and under the exclusive jurisdiction of an arbitration board.")

Here, although Plaintiffs have framed their conspiracy counts as claims for misappropriation, the wrong complained of is American's failure to properly fill the bidded positions when union members are pulled away on union business. (*See* Draft Tr. at 34:7–21 ("Our claim is that they are misappropriating union funds."), 35:20–24 (describing the harm as

36

the "failure to backfill the position and use that money that was specifically paid from the union

to American and instead giving it to the union officials for special projects . . . which takes

money away from the union members for their use and enjoyment").)  This injury implicates the

CBA between American and the Union, which outlines the rules and procedures governing

bidding for job assignments, compensation, and rules of seniority.  (*See* Doc. No. 80-1, 2014

Fleet Service Agreement, at pp. 22–24, 28–51, 127–29.)  *See IAMAW Local 1776*, 2010 WL

597247, at *6 ("[W]hile the Complaint here may be dressed up as a RICO suit, the wrong that

Plaintiffs seek to redress is an alleged conspiracy to wrongfully have them suspended and/or

terminated, which directly implicates the CBA.").  Indeed, in their response briefs, Plaintiffs

concede that in Counts VI and VII, "Plaintiffs have consistently and do now aver American and

the Union engaged in a concerted scheme *in an attempt to undermine the collective bargaining

agreement.*"  (Doc. No. 55-1 at p. 28 (emphasis added).)

   Plaintiffs argue that this Court may nonetheless retain jurisdiction over Counts VI and

VII under an exception to the rule that minor disputes must go before the System Board.  (Doc.

No. 55-1 at pp. 28–29.)  Plaintiffs are correct that "there are exceptions to RLA preemption, even

where the claims involved would ordinarily be of the type suited for resolution by the statutorily

mandated procedures."  *Capraro*, 993 F.2d at 334.  However, the exceptions should be used only

as a "last resort" and reserved for "those rare instances where meaningful arbitration is rendered

impossible by predisposition or prejudice" and the employee is thus "left without a meaningful

remedy."  *Id.* at 336 ("[O]n the record, it appears that there was at least a substantial risk that

Capraro would be denied access to the grievance and arbitration process.  Nevertheless, we

conclude that the possibility that a contractual provision might be used to deny Capraro access to

the congressionally mandated process is insufficient to qualify Capraro for an exception to the

general rule barring RLA-preempted suits from the courts."). "It is only where the employee is able to show a problem which renders the arbitration process unavailable, with or without judicial help, i.e., where predisposition, prejudice, or some similar phenomenon have made impartial arbitration impossible, that access to the courts can be granted." *Id.*

The Third Circuit has recognized at least four exceptions to the general rule barring RLA-preempted suits from federal court: "(1) when the employer repudiates the private grievance machinery;" "(2) when resort to administrative remedies would be futile;" "(3) when the employer is joined in a DFR (duty of fair representation) claim against the union," and (4) when "breach of the DFR by the union causes the employee to lose his right to press his grievance before the Board." *Capraro*, 993 F.2d at 334 (quoting *Childs v. Pa. Bd. of Maintenance Way Emps.*, 831 F.2d 429, 437–39 (3d Cir. 1987)). Plaintiffs argue that the first three exceptions apply in this case. (Doc. No. 55-1 at pp. 28–29; Draft Tr. at 36:7–16, 37:6–19.)

First, Plaintiffs argue that American Airlines repudiated the grievance procedure. Plaintiffs broadly interpret this exception, asserting that under the Supreme Court's decision in *Vaca v. Sipes*, a defendant "can't do wrong and then say, well, they should have gone and used the administrative remedies before they proceed to court." (Draft Tr at 36:12–19.) But this argument misstates the Court's analysis in *Vaca* as well as the nature of the repudiation exception. Contrary to Plaintiffs assertion, they cannot avoid the grievance process merely by alleging that American has committed some wrong. Instead, they must show that the wrong committed amounted to a repudiation of the CBA grievance procedures. *See Vaca v. Sipes*, 386 U.S. 171, 185 (1967) (explaining that when an employee "resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been fully exhausted," unless

"the conduct of the employer amounts to a repudiation of those contractual provision").  Here, Plaintiffs have not alleged any facts suggesting that they attempted to exhaust the grievance and arbitration procedures, *see id.* at 184 ("[I]t is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement."), let alone that American Airlines refused to engage in those procedures or denied Plaintiffs access to them, *see* Repudiate, Black's Law Dictionary (11th ed. 2019) ("To reject or renounce (a duty, obligation, offer, etc.); esp., to indicate an intention not to perform (a contract).").

Second, Plaintiffs argue that it would be futile to take their claims before the Board because "the union and the employer [a]re trying to circumvent the CBA," and if Plaintiffs are forced to pursue the lengthy grievance process, American could, in the meantime, continue its allegedly extortionist practices.  (Doc. No. 55-1 at p. 29; Draft Tr. at 36:11, 36:17–37:2.)  For this proposition, Plaintiffs rely on *Glover v. St. Louis-San Francisco Railway Co.*, 393 U.S. 324 (1994), asserting that in *Glover*,  "the Supreme Court determined 'to take the grievance before the National Railroad Adjustment Board (a tribunal composed of paid representatives from the Companies and the Brotherhoods) would consume an average time of five years, and would be completely futile under the instant circumstances where the Company and the Brotherhood are working hand-in-glove.'"  (Doc. No. 55-1 at p. 29.)  Plaintiffs ask us to "find similarly in the instant matter."  (*Id.*)  The first problem with this argument is that the quoted language was not a determination by the Court, but rather, an argument made by the plaintiffs in *Glover.  See Glover*, 393 U.S. at 227 (quoting the plaintiffs' amended complaint).  Instead, the Court found that the plaintiffs' "attempt to exhaust contractual remedies . . . is easily satisfied by petitioners' repeated complaints to company and union officials," all of which had been ignored or laughed

away, and given that response, any attempt to formally "pursue contractual or administrative remedies would be absolutely futile." *Id.* at 331.  Therefore, the Court refused to "prolong the deprivation of rights" and found that the district court could retain jurisdiction.  *Id.*

Unlike the plaintiffs in *Glover*, there are no allegations that Plaintiffs have complained to American Airlines or their Union officials about the deployment process, that they have attempted to pursue the grievance process and been ignored or rejected, or that other facts exist which suggest predisposition or prejudice by the Board, such that pursuing administrative procedures would be futile.  *See Capraro*, 993 F.2d at 336 ("In those rare instances where meaningful arbitration is rendered impossible by predisposition or prejudice, we have been forced to allow an employee access to a court because he or she would otherwise be left without a meaningful remedy.").  Plaintiffs have alleged only that American Airlines and the Union have conspired to misappropriate funds.  But this does not amount to a showing of predisposition, prejudice, or other impossibility.

Last, Plaintiffs argue that they need not pursue the grievance process because they have alleged "that the union does not and did not fairly represent [the plaintiffs] as union members when they engaged in this scheme with the employer to not backfill positions and misappropriate funds to union representatives and officials." (Draft Tr. 37:13–19.)  Although Plaintiffs have not joined the Union in this action or asserted a claim for breach of fair representation, they argue that this exception nonetheless applies because courts in the Third Circuit have found jurisdiction where the plaintiffs merely "aver[ ] the employer colluded with the union."  (*Id.* at p. 28 (discussing *George v. Nw. Airlines, Inc.*, No. 02-cv-6405, 2004 WL 414062, at *12 (E.D. Pa. Feb. 27, 2004).)  But Plaintiffs read the holdings in *George* and similar cases far too broadly.

In *George*, the plaintiff sued both her employer and her union, claiming that they

"conspired to put together a Last Chance Agreement that would subject senior employees to termination without any recourse and that the purpose and effect of their collusive effort was to undermine the Union."  2004 WL 414062, at *2; *see also id.* at *4 (noting that "the purpose of Northwest's actions was to show that senior employees could be readily dispatched without a fight and that the Union will just accept employees' dues").  Relying on Third Circuit precedent, the district court reasoned that it could exercise jurisdiction over the dispute because the plaintiff's allegations suggested that the "employer had attempted to destroy or undermine the union's representation of the employees."  *Id.* at *4 (cleaned up); *cf. Int'l Ass'n of Machinists & Aerospace Workers*, 673 F.2d at 703 (holding that "the record does not demonstrate that Northwest has violated Section 2 by attempting to destroy or undermine [the union's] representation of its employees," and therefore "the dispute involving the disciplinary actions taken by Northwest are 'minor' disputes without the jurisdiction of the federal district courts").

Unlike the plaintiff in *George*, Plaintiffs in this case have not brought a claim against the Union for violation of the duty of fair representation.  *See George*, 2004 WL 414062, at *2 ("Plaintiffs' Amended Complaint advances claims against both the Union and Northwest. Plaintiffs allege that the Union violated its duty of fair representation when it denied them a Step Two hearing in violation of Article 16, Paragraph D of the CBA.").  Indeed, Plaintiffs have not sued the Union at all.[19]  Therefore, this case is not one where "the employer is joined in a DFR

---

[19] Throughout their briefing, Plaintiffs continually reserve their right to join the Union should the Court find that the Union is a necessary party.  However, the Court's holding would be the same regardless of whether the Union was also a named party in this action because Plaintiffs' claims allege a minor dispute, over which this Court lacks jurisdiction. *See Goclowski v. Penn. Cent. Transp. Co.*, 571 F.2d 747, 755 (3d Cir. 1977) (affirming dismissal of the plaintiffs' claim that their union and railroad employer conspired to transfer them to less advantageous positions to the extent those claims rested on allegations that the "transfer was a violation of the existing collective bargaining agreement" and finding the fact that "the Union is joined as a defendant does not alter the basis of the claim which primarily involves contractual interpretation").

(duty of fair representation) claim against the union." *Capraro*, 993 F.2d at 334 (quotation marks omitted).  And even if we were to follow Plaintiffs' broad reading of this exception, we do not think their allegations are sufficient for us to find jurisdiction here.  Plaintiffs allege that American Airlines and the Union conspired to extort union funds, not that American Airlines has so undermined the Union as to render it unable to fairly represent Plaintiffs.  *See Int'l Ass'n of Machinists & Aerospace Workers*, 673 F.2d at 710 ("If, under the appropriate standard, it is determined that Northwest had not disciplined the employees in order to destroy or undermine IAM's representation, then as a 'minor dispute,' subject matter jurisdiction in the district court would be lacking, and IAM's action should have been dismissed.  If, however, the opposite were true, and Northwest's actions were found to constitute an effort by Northwest to destroy or undermine the IAM's representation of Northwest's employees, then the district court properly could assume jurisdiction over IAM's suit." (citations omitted)); *George*, 2004 WL 414062, at *4 ("Plaintiffs specifically aver in their pleadings that Northwest was engaged in a concerted scheme to destroy the Union by setting up employees for discipline and then pressuring the Union to refuse to process the employees' grievances." (cleaned up)).

For those reasons, we find that Counts VI and VII are preempted by the RLA's mandatory grievance and arbitration provisions, and that no recognized exception applies. Counts VI and VII are dismissed with prejudice.[20]

---

[20] During oral argument, American Airlines argued for the first time that Plaintiffs' disparate treatment and retaliation claims are also minor disputes under the RLA because "to determine whether the actions allegedly taken by American are adverse actions for purposes of their disparate treatment or retaliation claims, you'd have to interpret or apply the collective bargaining agreement," which "governs discipline and work assignments." (Draft Tr. 12:24–13:4.)  We disagree.  "[T]he [United States Supreme] Court has consistently held that the RLA minor dispute resolution machinery does not displace separate federal statutory rights granted to individual workers." *Blakely v. U.S. Airways, Inc.*, 23 F. Supp. 2d 560, 568 (E.D. Pa. 1998) (discussing Supreme Court cases and holding that the RLA did not strip the court of jurisdiction to consider union members' ADA claims); *id.* at 574 ("The overwhelming majority of the courts of appeal have determined that employees covered by CBAs containing mandatory arbitration

## V.      *Conclusion*

In sum, Defendants' motion is denied as to Counts I and II, except for any allegations related to top filling.  The motion is granted as to Counts III through VII.  Counts III and IV are dismissed without prejudice, and Plaintiffs may file an amended complaint if they can cure the deficiencies identified in this Memorandum.  Counts V through VII are dismissed with prejudice because either amendment would be futile or we lack jurisdiction.  An appropriate order follows.

---

clauses retain the right to pursue statutory employment discrimination claims in federal court regardless of whether the employee has exhausted his or her contractual remedy."); *see also Buell*, 480 U.S. at 564 ("The fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action for damages."); *Barrentine v. Ark. Best Freight Sys., Inc.*, 450 U.S. 728, 737 (1981) ("While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers."); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59–60 (1974) ("We think, therefore, that the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII."); *cf. Hawaiian Airlines Inc.*, 512 U.S. at 258 ("Wholly apart from any provision of the CBA, petitioner had a state-law obligation not to fire respondent in violation of public policy or in retaliation for whistle blowing.  The parties' obligations under the RLA to arbitrate disputes arising out of the application or interpretation of the CBA could not relieve petitioners of this duty.").