**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDRE FIELDS**, et al. | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-903-KSM** |
| **AMERICAN AIRLINES, INC.**, et al. | |
| Defendants. | |

**MEMORANDUM**

**Marston, J.**                                                                    **September 29, 2023**

Plaintiffs Andre Fields and Kendall Green[1] bring employment discrimination claims for

disparate treatment, disparate impact, retaliation, and hostile work environment under state and

federal law against their employer, Defendant American Airlines, Inc.[2]  American moves for

summary judgment on all counts, arguing that Plaintiffs failed to put forth evidence showing that

this case should proceed to trial.  (Doc. Nos. 148, 151, 158.)  Plaintiffs respond that they are

entitled to additional discovery on their disparate treatment and disparate impact claims and that

fact disputes preclude summary judgment as to their claims for retaliation and hostile work

environment.  (Doc. Nos. 157, 161.)  The Court held oral argument on American's motion on

March 3, 2023.  (*See* Doc. Nos. 165, 168.)

In addition to its motion for summary judgment, American also moves for sanctions,

arguing that Plaintiffs have violated the Federal Rules of Civil Procedure and a prior Order of

---

[1] Former-Plaintiff Andre Roundtree settled his claims with American and has been dismissed
from the case.  (*See* Doc. No. 155.)

[2] Plaintiffs also name U.S. Airways as a Defendant, but the parties agree that American Airlines
and U.S. Airways are the same entity following their merger in 2013.

this Court by failing to provide a computation of the damages that they claim in this case.  (Doc. No. 143.)  American asks the Court to preclude Plaintiffs from putting forth evidence of damages at trial as a sanction for this noncompliance.  (*Id.*)  Plaintiffs have not responded to the motion for sanctions.  Finally, after oral argument on the pending motions, Plaintiffs' counsel filed a motion for leave to withdraw as Fields's and Green's attorney.  (*See* Doc. No. 178.)  The Court held a show cause hearing on that motion on June 6, 2023.  (*See* Doc. Nos. 179, 180.)

## I.   FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Plaintiffs, the relevant facts are as follows.

### A.   *Plaintiffs' Employment with American*

Plaintiffs are African American men who have worked for American Airlines (or its predecessor) as "fleet service agents" at the Philadelphia International Airport ("PHL") since the mid-1990s.  (Doc. No. 157-1 at ¶¶ 1–2, 23–24; Doc. No. 148-4 at 24:23–25, 28:24–29:4; Doc. No. 148-5 at 12:25–13:19, 14:5–12.)  "Fleet service agent" is a broad term that refers to multiple shift assignments with different job responsibilities, including loading bags, transferring bags, catering, and lavatory service.  (Doc. No. 148-13 at 70:23–71:9.)  As fleet service agents, Plaintiffs are represented by a national union, TWU-IAM,[3] and the terms of their employment are set by a collective bargaining agreement ("CBA") between the Union and American.  (Doc. No. 148-4 at 30:5–12; Doc. No. 148-5 at 16:21–25.)  Per the terms of the CBA, Fields and Green bid for shift assignments according to their seniority.  (Doc. No. 148-5 at 27:5–12.)

---

[3] Both sides refer to the union by this acronym without providing its full name.  However, in the Fourth Amended Complaint and during their depositions, Plaintiffs allege that they are members of the "International Association of Machinists and Aerospace Workers Union, Local 1776."  (Doc. No. 84 at ¶¶ 6b, 6d,7b, 7d, 8b, 8d; *see also* Doc. No. 148-4 at 29:5–9; Doc. No. 148-5 at 271:16–23.)  For ease of reference, the Court refers to TWU-IAM as the "Union."

Since 2012, Fields has bid for the morning shift, working on Carousel 4 in the area known as the "domestic bag chute." (Doc. No. 157-1 at ¶¶ 4–5; *see also* Doc. No. 148-5 at 13:9–11, 27:5–18, 30:21–33:1.)  The domestic bag chute at PHL has four carousels, and flights are assigned to a specific carousel based on destination. (Doc. No. 157-1 at ¶ 9; Doc. No. 148-5 at 29:6–11.)  When a customer checks a bag at the American ticket counter, it is sent down the assigned carousel, where an agent, like Fields, places it on a cart and drives it to the correct gate to be loaded onto the appropriate aircraft. (Doc. No. 157-1 at ¶¶ 4–5; Doc. No. 148-5 at 19–14.)  Bruce Fauntleroy has been an American customer service manager at PHL's domestic bag chute since 2014 and in that capacity, supervises Fields. (Doc. No. 157-1 at ¶ 8; *see also* Doc. No. 148-8 at 7:15–17, 10:24–11:12, 365:22–36:1.)

Since 2015, Green has bid for and worked part-time as an assigned bag runner, which is sometimes referred to as an "ABR." (Doc. No. 157-1 at ¶ 26.)  Bag runners take bags from flights arriving at PHL to connecting flights departing PHL. (Doc. No. 157-1 at ¶ 32; Doc. No. 148-6 at 58:22–59:9; *see also* Doc. No. 148-6 at 126:5–127:18 (describing process of flight assignments to bag runners).)  Devon Chiddick was a customer service manager over ABRs from 2014 until 2019 and had direct oversight of Green during that time. (Doc. No. 148-7 at 11:5–17.)  In that capacity, Chiddick reported to Michael Spriggs, who was a duty manager in Customer Operations, which included the ABR Department, from 2014 to 2020. (*Id.* at 39:21–42:1; *see also* Doc. No. 148-6 at 15:17–21, 30:6–31:3, 45:5–9, 50:8–51:10.)

**B.    *Plaintiffs' Prior Complaints and Actions***

This is not the first complaint that Plaintiffs have brought against American while working for the airline.  In brief, before initiating this lawsuit, Plaintiffs brought two lawsuits related to a practice known as "top filling," one in September 2015 and one in May 2017. (*See* Doc. No. 148-5 at 34:19–35:15; Doc. No. 158-1 at ¶ 31.)  The phrase "top filling" refers to an

unofficial practice of using five-gallon water jugs to fill airplane lavatory tanks with a chemical solution (i.e., "blue juice").  Plaintiffs alleged that the used jugs were then placed in areas where they would be used by African American employees for drinking water.  All of Plaintiffs' top filling claims in this case have been dismissed with prejudice.  (*See* Doc. No. 82.)[4]

In addition, in September 2014, Plaintiffs filed a complaint with the Federal Aviation Administration ("FAA") and Occupational Safety and Health Administration ("OSHA") related to unsafe equipment.  (Doc. No. 157-21; *see also* Doc. No. 148-4 at 30:11–22, 33:19–34:12; Doc. No. 148-5 at 250:23–251:18.)  OSHA sustained those violations and issued fines against American in connection with that complaint.  (*See* Doc. No. 157-21 at 12–25.)  American agreed to alter its practices, and among other things, required employees to perform an 11-point inspection of tug[5] equipment before each use.  (Doc. No. 157-23 at 3.j; *see also* Doc. No. 157-19 at 2.)  Plaintiffs filed a second complaint with OSHA in May 2017, again arguing that American required employees to use to unsafe equipment.  (Doc. No. 157-19; *see also* Doc. No. 148-4 at 34:20–25; Doc. No. 148-5 at 33:14–34:4.)  That complaint was dismissed in January 2018 when Plaintiffs' prior counsel failed to cooperate with the agency.  (*See* Doc. No. 157-19 at 14, 26.)  Plaintiffs, through their current counsel, attempted to reopen that complaint in February 2019 but were unsuccessful.  (Doc. No. 157-19 at 32–29; *see also* Doc. No. 148-4 at 35:4–19; *see also* Doc. No. 158-1 at ¶ 42.)

Finally, in early 2018, Plaintiffs were part of a group of associates who met with counsel for American and representatives from the Philadelphia chapter of the NAACP to discuss

---

[4] A more detailed discussion of top filling and Plaintiffs' prior actions is included in this Court's Memorandum ruling on American's motion to dismiss Plaintiffs' Third Amended Complaint.  (*See* Doc. No. 81.)

[5] A "tug" is a vehicle that fleet service agents use to drive bags from one area of the airport to another area.

working conditions at PHL.  (*See* Doc. No. 157-14 at 11 (Plaintiffs' former counsel emailing

American's counsel that they could keep the meeting "small but that is still [him], [his] co-

counsel and probably several associates, Fields, Green, Smith, and Roundtree, and the President

and the Secretary of the Philadelphia NAACP"); *id.* at 21.)  On December 11, 2018, when those

conversations failed to lead anywhere, Plaintiffs filed charges with the EEOC and the PHRA,

alleging the instances of race discrimination that serve as the basis for this lawsuit, which was

filed on March 4, 2019.  (Doc. No. 148-4 at 36:4–6; Doc. No. 148-5 at 35:16–20.)

### C.    *Instances of Discrimination*

Plaintiffs base their discrimination claims on numerous incidents throughout their

employment with American.  The Court focuses on the incidents that fall within the limitations

period—i.e., those that occurred on or after March 4, 2015.[6, 7]  Broadly, these incidents can be

---

[6] American Airlines suggests the relevant cut off period is June 1, 2017, relying on this Court's
prior Memorandum, which found Plaintiffs' discrimination claims, to the extent they were *based on top-
filling*, were barred by the doctrine of res judicata.  (*See* Doc. No. 81 at 14 (limiting the res judicata
analysis to Plaintiffs' "discrimination claims *based on top filling*") (emphasis added); *id.* at 15 ("Plaintiffs
argue that they are not precluded from asserting discrimination claims *related to top filling* . . . .")
(emphasis added).)  Specifically, the Court found:

> [T]o the extent that Plaintiffs' claims are based on American Airlines' top filling
> *practices*, they are barred by the doctrine of res judicata, and we grant American's
> motion to dismiss with prejudice.  We emphasize however that res judicata does not
> prohibit Plaintiffs from asserting claims based on other, unrelated discriminatory
> conduct that occurred after the state court case was decided in 2017. . . .  Nor will we
> prohibit Plaintiffs from referring, within reason, to the top filling practice as relevant
> background information for Plaintiffs' discrimination claims.

(*Id.* at 16 (emphasis added); *see also see also* Doc. No. 82 at ¶ 1 (Order dismissing with prejudice
Plaintiffs' claims to the extent they are "based on American Airlines' top filling practices")).)  This ruling
was not meant to limit Plaintiffs' other claims related to discriminatory graffiti, discipline, and work
assignments.  (*See id.* at 18 (discussing Plaintiffs' allegations that "*since 2016*, employee-only
breakrooms and bathrooms have borne deeply offensive, racially discriminatory writings and carvings"
(emphasis added).)

[7] The relevant deadlines for Plaintiffs' Title VII and PHRA claims turn on the date that they filed
their charges with the relevant administrative agencies.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536
U.S. 101, 113 (2002) ("Each discriminatory act starts a new clock for filing charges alleging that act, [and
t]he charge . . . must be filed within the 180- or 300-day time period after the discrete discriminatory act
occurred."); *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469–70 (3d Cir. 2001) ("Under Title

categorized as claims that:  (1) employee-only areas at PHL are marked with racially offensive graffiti and imagery, (2) Plaintiffs have been issued progressive discipline because they complained about having to work in a discriminatory and/or unsafe work environment, and (3) Plaintiffs and other African American employees are consistently given a disproportionate share of the workload.

### 1.      Offensive Imagery and Graffiti

Both Plaintiffs claim to have seen racially offensive images and writings in employee-only bathrooms and work areas at PHL.

### a.      Fields

Fields testified to seeing multiple, repugnant writings in the bathroom stalls of "B terminal"[8] between 2017 and 2021:

- "Go back to Africa";

-  "N****** go home"; and

- "Fuck N******."

---

VII, a charge of race discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice. . . .  If the complainant also initiates a complaint with a parallel state agency, as occurred in the instant case, the period for filing the charge with the EEOC is extended to 300 days from the date of the alleged unlawful employment practice."); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 924 (3d Cir. 1997) ("To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination."). Fields and Green dually filed an administrative complaint with the EEOC and the PHRC on December 4, 2018.  (*See* Doc. No. 30-7 at 16 (with stamp of when the charges were received).)  Thus, the cut-off date is February 7, 2018 for the Title VII claims and June 7, 2018 for the PHRA claims.  However, because the Court applies the same substantive standard when analyzing race discrimination claims under Title VII, the PHRA, and § 1981, and Plaintiffs' claims fail even under § 1981's longer limitations period, the Court does not differentiate between the three statutes and considers all discriminatory acts that occurred after March 4, 2015 in deciding this motion. *See Riley v. Del. River & Bay Auth.*, 457 F. Supp. 2d 505, 512 (D. Del. 2006) (four-year statute of limitations applies to Section 1981 claims).  The one caveat to this is Plaintiffs' disparate impact claim, which is brought only under Title VII and the PHRA.  For that Count, the Court views February 7, 2018 as the relevant cut-off date.

   [8] PHL has seven terminals that service commercial flights:  A-East, A-West, B, C, D, E, and F. American is the predominant servicer for terminal B.  (*See* Doc. No. 148-6 at 98:20–99:9.)

(Doc. No. 148-5 at 285:15–23, 287:11–288:9.)  Fields did not report any of the writings to HR, but he believes he may have spoken with a manager identified as Matthew Rich[9] about the writings.  (*Id.* at 195:7–196:16.)  Fields does not know whether the graffiti was eventually painted over.  (*Id.* at 196:11–19.)

Fields likewise testified to seeing what appeared to be black face drawings near Carousel 4:

- A drawing of a banana with a "face of something on it . . . symbolizing Afro hair" (Doc. No. 148-5 at 189:16–190:2, 285:24–287:10);

- A drawing that "looked like a face" that had "red lips" (*id.* at 285:24–287:10); and

- A smiley face spraypainted on the ground near Carousel 4 by a coworker in 2021. (*id.* at 113:2–117:11 (Fields testifying that he wasn't sure what the image was but felt it was racially motivated).)

Fields does not remember reporting the banana image and red-lipped drawing to management, but he believes he may have spoken with Fauntleroy about them at some point. (*Id.* at 189:24–190:18, 195:25–196:10.  *But see* Doc. No. 148-8 at 88:1–90:3 (Fauntleroy testifying that he was never told about the other drawings, nor did he see them himself).)  Fields is also unsure when the two images appeared, or how long they remained on the wall before being painted over.  (Doc. No. 148-5 at 189:24–191:14.)  As for the smiley face drawing, Fields testified that he told Fauntleroy about the image in 2021 and asked Fauntleroy to forward his complaint to HR.  (*Id.* at 234:22–235:20.)  In addition to forwarding the complaint, Fauntleroy investigated the painting, issued a verbal warning to the employee who painted it, and had it removed.  (Doc. No. 148-8 at 90:4–100:13.)

Finally, Fields testified to seeing two monkey images on work equipment:

---

[9] Matthew Rich was the Fleet Service Manager for Ramp Operations at U.S. Airways from 2010 to May 2013.

- A sticker on a tug that displayed a monkey holding a sign that says, "keep it real"—an image created by English-based artist, Banksy (Doc. Nos. 148-19, 148-23; *see also* Doc. No. 148-5 at 191:15–192:11); and

- A "drawn monkey or gorilla" inside a tug (Doc. No. 148-5 at 194:10–16).

Fields does not remember when he saw the images.  (*Id.* at 192:12–194:5.)  The record does not reflect whether Fields reported the images to management.

### b.    Green

Like Fields, Green testified to seeing incredibly offensive writings in employee-only areas at PHL:

- Writing in a bathroom stall in 2015 or 2016 that read, "Fuck N******" (Doc. No. 148-4 at 43:21–44:2);

- Writing on an exit door in Terminal B or Terminal C that read, "Fuck you, N******" (*Id.* at 47:5–48:14; *see also* Doc. No. 157-16 at 29);

- Writing in a bathroom stall that said, "I hate working with monkeys," (Doc. No. 148-4 at 64:16–21); and

- Writing that read, "Go back to Africa" (Doc. No. 157-16 at 15; Doc. No. 148-4 at 325:11–328:9 (testifying about "Go back to Africa" comments in general terms)).

In addition to these examples, Green testified that in total, he saw 30 to 40 offensive writings between 2015 to 2020.  (Doc. No. 148-4 at 42:10–44:2.)[10]  He has not, however, identified any of those writings with specificity or testified as to their substance.

He also testified to seeing offensive monkey imagery in employee-only areas:

---

[10] Plaintiffs submitted two exhibits, which they label "Select Deposition Exhibits of Kendall Green – 05/20/22 Volume II" and "Select Documents produced by Andre Fields (FIELDS)."  (*See* Doc. Nos. 157-3, 157-16, 157-22.)  These exhibits include photographs of racial writings, some of which were discussed by Plaintiffs in their depositions and other which were not.  (*See generally* Doc. Nos. 157-16, 157-22.)  As to the latter, Plaintiffs have provided no evidence showing that they saw the additional writings, that they took the photographs, or that the writings were made at PHL, let alone evidence about when the writings were seen, whether any of the writings were reported to management, and whether they were later removed.

- A sticker on a piece of equipment that displayed a monkey holding a sign that says, "keep it real"—a famous image created by English-based artist, Banksy (Doc. Nos. 148-19, 148-23); and

- A small stuffed monkey ("Sven," the mascot for the luggage company, Kipling) placed on top of a refrigerator in a breakroom in December 2018 (Doc. Nos. 148-21, 148-22; *see also* Doc. No. 148-4 at 329:10–330:9).

Green, testified that he never made a "specific report about any one particular writing." (Doc. No. 148-4 at 50:12–21.)  Instead, he spoke with manager Michael Van Loan about offensive writings and carvings on two to five occasions between 2015 and 2018 and spoke with a senior specialist in HR, Dr. Cathy Coleman, about the writings and carvings on one occasion in 2019.  (*Id.* at 50:23–53:3; *see also id.* at 43:21–23.)  He also reported the stuffed monkey to Chiddick in December 2018 and the monkey sticker to Chiddick in November 2020.  (*Id.* at 50:23–51:18, 59:4–19, 329:10–330:9, 423:7–424:15.)  The stuffed monkey was removed a few days after Green reported it.  (*Id.* at 58:15–20, 329:10–330:9.)  And he assumes the sticker was removed.  (*Id.* at 59:25–60:2.)

### c.    Former-Plaintiff Andre Roundtree

In addition to Plaintiffs' evidence, former-Plaintiff Roundtree testified that he saw an additional black face drawing in a bathroom stall next to the phrase, "Do you love the watermelon?"  (*See generally* Doc. No. 157-20.)  Roundtree reported the drawing to Cedric Rockamore, who was the Director of Ramp Operations at PHL from 2010 to 2014 and Vice President of Hub Operations at PHL from 2015 to 2017.  (*Id.*)  Rockamore testified that after receiving the complaint, American had corporate security and HR investigate the bathroom graffiti, but they closed the investigation when they were unable to determine who made the offensive markings.  (*See* Doc. No. 148-13 at 208:3–212:9 (explaining that the investigation team interviewed employees, but they were "unable to substantiate" who made the graffiti because the bathrooms represent a high traffic area without cameras).)

9

2.    **Discipline**

Next, Plaintiffs argue that they were wrongfully subjected to progressive discipline in 2015 and 2018.  Discipline at American proceeds in "levels."  The first infraction results in a "Coaching Discussion," which is a documented, verbal discussion about an employee's mistake.  (Doc. No. 148-8 at 144:2–8.)  If another infraction occurs within the year, then the employee proceeds to a "Level 1."  "[T]he employee may request a hearing" on the Level 1.  (Doc. No. 157-28 at 93 (explaining that the employee may request a hearing when they submit a written grievance related to the discipline).)  If another incident occurs within the year, the employee proceeds to a "Level 2."  A Level 2 does not result in suspension or demotion, but it does limit an employee's ability to transfer to other positions and to fill crew chief positions for the next year.  (Doc. No. 157-28 at 44–45 ("Employees on level two (2) or above of the progressive discipline or attendance control programs are not eligible to submit transfer bids for Lead Agent positions.").  *But see* Doc. No. 148-5 at 133:17–20 ("Q: Did you receive any changes to the terms or conditions of your employment as a result of this write-up?  A [Fields]: No.").)  After "Level 2," there is a "Level 3," and finally, a last chance agreement before termination.  (*See* Doc. No. 148-8 at 181:3–182:11.)  The progression restarts after one year from the last infraction.  (*Id.* at 188:5–18.).

a.    **Fields**

Fields was disciplined four times during the limitations period, once in 2015 and three times in 2018.  First, on November 8, 2015, Fauntleroy had a Coaching Discussion with Fields when Fields failed to deliver bags to a flight on time, resulting in a six-minute flight delay.  (Doc. No. 148-5 at 117:22–128:12.)  Fields concedes that the flight was delayed six minutes, but he nevertheless views the write up as discriminatory because Fauntleroy told him, "You're going to have to take this write-up," even though other employees were also working the carousel that

day.  (*Id.*)  Fields refused to sign the form documenting the Coaching Discussion.  (Doc. No. 148-8 at 146:4–147:8.)

Second, manager Juan Tovar told Fauntleroy to have a Coaching Discussion with Fields after Fields was seen "driving on the ramp without a safety vest" on February 6, 2018.  (Doc. No. 148-14; *see also* Doc. No. 148-5 at 41:7–43:7, 55:2–24, 232:25–233:25; Doc. No. 148-8 at 156:8–159:21 (Fauntleroy discussing the write up).)  All American employees are required to wear a safety vest when out on the ramp.  (Doc. No. 148-8 at 64:13–65:16.)  Fields concedes that he was not properly wearing his safety vest at the time.  (Doc. No. 148-5 at 43:8–20, 129:14–17.)  And he acknowledges that he was not suspended or demoted because of the discussion, nor was his pay affected.  (*Id.* at 129:7–13.)  Fields nevertheless argues that the write up was discriminatory because he has seen other agents wearing their vest improperly or at all.  (*Id.* at 129:18–130:16 (testifying that he has seen coworkers "drive out sometimes without a vest, but [he has] never heard of them or know anything of anybody—know of them getting written up").  *But see* Doc. No. 148-8 at 159:13–21 (Fauntleroy testifying that he has written up other employees for failing to correctly wear the safety vest).)

Third, Fields received a Level 1 write up from Supervisor Doug Campbell after he delivered 13 bags to the wrong gate on July 13, 2018.  (Doc. No. 148-15.)  Once again, Fields concedes that the bags were delivered to the wrong gate, and he agrees that he was not suspended or demoted because of the write up, nor was his pay affected.  (Doc. No. 148-5 at 139:21–144:11.)  Nevertheless, Fields argues that the write up was discriminatory, retaliatory, and harassing because he only delivered the bags to the wrong gate because the monitor had not been updated to reflect the correct gate.  (*Id.* at 144:13–146:24.)  When he explained that to Campbell, Campbell responded, "They told me to write you up."  (*Id.*)

Last, Fauntleroy issued a Level 2 write up when Fields failed to deliver 80 bags to the correct flight on September 1, 2018.  (Doc. No. 148-16; *see also* Doc. No. 148-5 at 133:2–136:15; Doc. No. 148-8 at 141:2–143:1, 179:1–7, 186:23–187:25.)  Once again, Fields argues that the write up was discriminatory, retaliatory, and harassing because he was the only one written up, even though he believes other employees were also responsible for the error.  (Doc. No. 148-5 at 134:22–138:12.  *But see* Doc. No. 148-8 at 141:2–143:1 (Fauntleroy testifying that it was Fields's "responsibility alone" to ensure the bags were taken to the correct location).)

### b.    Green

Green was disciplined in January 2018 when his Security Identification Display Area ("SIDA") badge expired while he was on vacation.  (Doc. No. 148-17; *see also* Doc. No. 148-4 at 75:2–21.)  SIDA badges provide access to the secured areas around the passenger terminals. American's SIDA badge policy states, "Employees will be elevated a Performance discipline level for not renewing their SIDA badges prior to their expiration date," and "[i]f the employee is not on a discipline level, they will be placed on discipline level 1."  (Doc. No. 148-18 at 2.)  The employee will also "be placed on suspension, without pay or benefits, effective immediately." (*Id.*)

Manager Stennisha Griffiths issued a Level 1 write up to Green, but because his badge was expired for only three days, she did not place him on suspension or deny him pay.  (Doc. No. 148-17; *see also* Doc. No. 148-4 at 76:15–77:2, 81:8–83:4, 88:10–14, 474:24–476:5.) Griffiths told Green that her supervisor, Jennifer O'Neil, who is Caucasian, told Griffiths that Green had to receive the Level 1 write up.  (Doc. No. 148-4 at 81:8–82:8.)  Griffiths also told Green that O'Neil had "made exceptions before for her people," which Green interpreted to mean "white people."  (*Id.* at 475:19–476:5; *see also id.* at 73:10–20 (Green testifying that "the manager who gave me discipline implied that there had been exceptions made for other folks"

12

and "the implications were that they were White coworkers"); *id.* at 81:8–82:8 (testifying that Griffiths "lifted her eyebrows as to sugg—as to suggest there was something else going on").)

Later in 2018, Green spoke to a different manager, William Jackson about the write up, and Jackson responded, "That's what you can expect when you want to be a Black Panther."  (*Id.* at 41:17–42:4, 152:16–25).)  Green reported the comment to a shop steward, and a few days later the three men met to discuss it.  (*Id.* at 153:1–6.)  During that meeting, Jackson said, "I don't know why you're so upset. . . .  I have been told to write your black ass up."  (*Id.* at 154:13–25, 411:17–412:5.)  Green does not know who told Jackson to write him up, and there is no evidence in the record that Jackson ever disciplined Green.  (*Id.* at 155:1–2, 157:9–11.)

### 3.   Workload

Finally, Fields and Green argue that African American fleet service agents are consistently given harder workloads than their Caucasian coworkers.

### a.   Fields

As discussed above, Fields has bid for the morning shift on Carousel 4 since 2012. During the morning shift, Carousel 4 is predominantly staffed by African American agents while at least one of the other carousels, Carousel 1, is predominantly staffed by Caucasian employees. (*See* Doc. No. 148-5 at 254:9–16; *see also* Doc. No. 148-8 at 220:19–221:19 (Fauntleroy testifying that Carousel 1 is 10% African American and 90% Caucasian, while Carousel 4 is 80% African American and 20% Caucasian).)  For years, Fields has complained that Carousel 4 is understaffed given the number of bags received during the morning shift.  (*See* Doc. No. 148-5 at 205:24–207:20 (testifying that understaffing on Carousel 4 began around 2013).)

During the morning shift, there are typically seven agents assigned to Carousel 1, six or seven agents assigned to Carousel 3, and six agents assigned to Carousels 2 and 4.  (Doc. No. 148-8 at 134:21–24 (Fauntleroy testifying that he tries to "make sure Carousel 1 and 3 have

seven people, and 2 and 4 have at least six").)  Fauntleroy testified that Carousel 1 has the highest bag counts, followed by Carousel 3 or 4, and finally Carousel 2.  (*Id.* at 204:14–205:1.)

It is unclear who assigned which bags to which carousels based on flight destination, but it is undisputed that from 2014 to 2020, the initial bag assignments were not made by managers at PHL.  (*Compare id.* at 52:12–55:6, 66:11–20 (stating flights are assigned to carousels by individuals at American's headquarters in Dallas, Texas), *with* Doc. No. 148-6 at 193:22–195:15 (testifying that an outside vendor assigned flights to carousels until 2020, when American switched from using a vendor to assign bags to carousels, to having a bag room manager, using an updated baggage system, assign carousels based on bag counts).)  During that time, however, managers at PHL did have the discretion to alter those bag assignments.  (Doc. No. 148-8 at 66:16–67:13.)  Despite this discretion, assignments were not changed on a day-to-day basis, and the template for which flight's bags go to which carousel largely remained the same.  (*Id.* at 76:20–78:18.)

Although the bag assignments did not change from day to day, "leads"—nonmanagement employees—could manually reassign baggage handlers to different carousels according to the company's operational needs.  (Doc. No. 148-5 at 67:19–94:3; *see also id.* at 273:1–275:19 (discussing operational needs); *id.* at 276:10–277:13 (same); Doc. No.148-8 at 17:24–18:17, 71:9–76:10 (Fauntleroy discussing operational needs and explaining that it refers to staffing; "[i]t's based on . . . callouts, shortages in staffing, sometimes we have to move people.  We don't like to but, you know, we have to cover the area").)  Fields testified that the leads harassed African American employees by understaffing Carousel 4 and "manipulating the schedule to favor [Fields's] white coworkers" on Carousel 1.  (Doc. No. 148-5 at 67:19–94:3; *see also id.* at 95:6–98:7 (discussing photograph that Fields took of the schedule).)  Although supervisors, like

Fauntleroy, had to approve these reassignments, Fields claims Fauntleroy was often unaware of what was going on or did not care. (*Id.* at 73:25–81:15.)

In 2019, in response to Fields's complaints about understaffing, Fauntleroy moved Las Vegas-bound flights from Carousel 4 to Carousel 3 to lighten the workload on Carousel 4. (Doc. No.148-8 at 48:5–49:8, 56:23–57:24; *see also* Doc. No. 148-5 at 147:15–149:15, 152:23–153:13.) Fields claims this did not solve the problem of understaffing and continued to complain to Fauntleroy, but Fauntleroy found no evidence of "unfair treatment or unfair or over-workload" and has made no more changes. (Doc. No.148-8 at 48:5–50:18.) Fields argues that the workload distribution is discriminatory, retaliatory, and harassing. (Doc. No. 148-5 at 207:9–208:20.)

### b.    Green

Green, meanwhile, argues that he and other part-time bag runners, a group that he believes is predominantly African American,[11] were assigned to flights that landed before or near their scheduled shift start times.[12] (Doc. No. 148-4 at 103:17–105:23; *see also id.* at 112:11–17

---

[11] Green testified that most bag runners are African American (Doc. No. 148-4 at 238:21–239:7), but there is no evidence in the record of the racial makeup of full- or part-time bag runners (*see id.* at 401:16–402:3 ("Q: Can you tell me, Mr. Green, how many ABR runners who are part time are Caucasian. A: Very few. Not a large percentage. Maybe—maybe 10 to 15 percent. I'm estimating, I'm guessing, but I'm not sure. But it's not a lot. Q: How many, if you know, ABR runners who are full time are Caucasian? A: I don't know. Q: Do you know how many ABR Runners who are full time are African American? A: I don't know. I mean the majority—I mean, the station is mostly—higher percentage is black, but I don't know how many, no."); *see also* Doc. No. 148-6 at 108:21–110:13). Green also has no knowledge about the number of flights assigned to bag runners that start their shift before he starts his shift. (*Id.* at 349:2–4.)

[12] Before 2020, flights were assigned to bag runners by "crew chiefs" (also known as "leads"), who were unionized, non-management employees. (Doc. No. 148-6 at 13:24–14:20, 146:22–147:19; Doc. No. 148-7 at 97:8–100:25; *see also* Doc. No. 157-29 at 9.) But around 2020, American transferred that responsibility to newly created management positions with the title, "Allocator." (Doc. No. 148-6 at 6:22–7:7, 125:19–21; *see also* Doc. No. 148-28 at ¶ 2.) Allocators oversee a computer software, known as "RealTime," that automatically assigns flights to bag runners using an algorithm that considers, among other things, "how many ABRs are available, ABRs' schedules for the day, flight schedules, and the location of incoming and outgoing flights at the airport." (Doc. No. 148-28 at ¶ 3; *see also* Doc. No. 148-6 at 10:7–13:1, 77:9–82:17.) RealTime can assign a flight to any employee at any time during their scheduled shift, even if it is close to their start or finish time. (Doc. No. 148-6 at 172:21–173:11 ("GS Realtime will assign a flight to anyone, really, at any time as long as it falls within their scheduled

(estimating that he was assigned around 20 flights that arrived close to, but after, his start time); Doc. No. 157-23 at ¶ 13 (identifying 8 dates between January 2019 and June 2020).)  Green was not expected to begin his shift early, but he believes these assignments left him and other part-time runners with insufficient time to perform their pre-flight duties.[13]  (Doc. No. 148-4 at 105:17–23, 112:2–10, 118:11–15; Doc. No. 148-28 at ¶ 6 ("If a flight is assigned to an ABR with an ETA prior to the ABR's scheduled start time, the bags simply wait for the ABR's shift to begin.  The ABR is not expected to arrive early or start working prior to their scheduled shift.").)

Spriggs, meanwhile, testified that although it is unusual for a bag runner to be assigned a flight with an arrival time before their scheduled start time, it "occur[s] approximately one time per week, depending on the weather."  (Doc. No. 148-28 at ¶ 5.)  He also testified that both Caucasian and African American bag runners are assigned flights with early arrival times.  (*Id.* at ¶ 6.)

Green was never disciplined for a delay in addressing flights that arrived before or near his start time.[14]  (Doc. No. 148-7 at 99:8–104:2; *see also* Doc. No. 148-6 at 14:21–15:15, 82:18–83:13 (Spriggs explaining that when a runner is assigned a flight at their start time, "we expect them to get to the gate as soon as possible after they clock in"); Doc. No. 148-7 at 99:8–104:2 (explaining that a runner may be assigned a flight that lands before their start time because they

---

shift."); *id.* at 174:8–177:2 (explaining that RealTime builds in "some setup time and some travel time").)  Allocators, in their discretion, may reassign flights as necessary depending on what is happening in the operation at a given moment.  (*See id.* at 68:14–75:16 (an allocator explaining that he reassigns flights when the system assigns them to employees who are doing other specialty tasks); *see also id.* at 77:9–82:17, 113:14–115:8.)  Spriggs is the current allocator responsible for assigning flights to Green and other bag runners on the morning shift.  (*Id.* at 63:4–7.)

[13] When a runner clocks in for a shift they are "expected to go get a scanner, log into the scanner, and then get the equipment that they need, a tug and cart, to go to their assigned flight."  (Doc. No. 148-6 at 83:15–84:1.)  This can take as long as 15 to 20 minutes.  (Doc. No. 148-6 at 99:10–100:10.)

[14] Indeed, other than the Level 1 for the expired SIDA badge, Green has received no discipline since 2012.  (Doc. No. 148-4 at 218:22–25.)

are "the closest person we can give it to," but "no negative or disciplinary action" associated with a delay in addressing those bags).)  And Green testified that he was able to complete his duties despite the difficult timing.  (Doc. No. 148-4 at 117:25–118:3, 125:15–25, 161:21–163:5 297:23–300:10.)  Green nevertheless views the assignments as discriminatory because he believes the flights could have been covered by Caucasian full-time bag runners.

Green has filed a grievance and an HR complaint about this allegedly discriminatory practice.  The Court discusses each in turn.

<em>i.     Grievance</em>

In April 2019, former-Plaintiff Roundtree, who is a Shop Steward with the Union, filed a grievance on Green's behalf.  (Doc. No 148-24.)  The grievance claimed that American assigned part-time runners, like Green, to flights before or near their scheduled start times, when those flights could have been covered by full-time runners, who were predominantly Caucasian.  (*Id.*; *see also* Doc. No. 148-4 at 164:7–21, 167:14–170:6.)  On May 10, 2019, management denied the grievance after conducting a "Step One" review[15] and finding "no contractual violation occurred."  (Doc. No. 148-11 at 140:6–151:15, 158:21–160:7.)  The denial letter was addressed to Roundtree and Billy Wilson, the Assistant General Chair of the Union.  (Doc. No. 148-25.)  Copies were also sent to the managing director of Customer Operations PHL and Labor Relations.  (*Id.*; *see also* Doc. No. 148-11 at 173:24–174:14.)  Green claims he did not receive a copy of the denial letter or know the outcome of his grievance until a year later, in May 2020, when Wilson emailed Green to say, "Upon review . . . a violation of the stated article and subsection, 1B, is not applicable," so the grievance was "being withdrawn without prejudice."

---

[15] A Step One review is an investigation by a neutral hearing officer on the allegations as submitted.  (Doc. No. 148-11 at 153:6–16; *see also id.* at 149:20–150:17.)

(Doc. No. 148-26; *see also* Doc. No. 148-4 at 170:13–173:14, 414:22–416:4.)

ii.      *HR Complaint*

On July 9, 2019—just a few months after filing the grievance but before he learned of its

outcome—Green asked Roundtree to go with him to meet with Dr. Coleman in HR to discuss his

grievance and to file a separate written complaint with HR.  (Doc. No. 148-4 at 173:15–179:4.)

Green gave Dr. Coleman copies of his grievance and the complaint, but they did not discuss

either in detail.  (*Id.* at 176:21–177:11 (testifying that Dr. Coleman told Green that she would

look into it and get back to him); *id.* at 420:22–421:8 (same); *see also* Doc. No. 157-16 at 22–27

(photos of Green's grievance and complaint sitting on a conference room table).)

On November 13, 2020, when Green had not heard back from Dr. Coleman about his

July 2019 complaint, Green followed up with her via email, stating that he "filed a racial

discrimination complaint with your office in 2019" and that he "continue[s] to experience racial

discrimination at American Airlines PHL including discriminatory stickers and markings on

ramp equipment."  (Doc. No. 148-10 at 2; *see also* Doc. No. 148-4 at 197:6–16, 241:24–243:19;

Doc. No. 148-9 at 97:15–98:16.)  Dr. Coleman responded that she was "unaware of an ongoing

discrimination claim" and asked for Green's contact information to ensure he was contacted

about his concerns.  (Doc. No. 148-10 at 5; *see also* Doc. No. 148-4 at 244:18–245:16, 262:5–

266:6.)  Over the next few days, Dr. Coleman repeatedly asked for Green's contact information

and the details of Green's earlier complaint, but Green refused to provide either.  (Doc. No. 148-

10 at 2–7; *see also, e.g.*, Doc. No. 148-4 at 203:13–205:22–249:22, 254:12–255:4, 262:5–266:6,

449:22–450:11; Doc. No. 148-9 at 105:14–109:3, 121:7–12.)  Instead, he stated, "the details of

my complaint can be found in the racial discrimination complaint that was given to you by

myself . . . in 2019."  (Doc. No. 148-10 at 7; *see also* Doc. No. 148-9 at 75:20–76:10 ("[W]hen I

18

was emailing him, I said just send me the complaint and I'll definitely look into it, I'll take care

of whatever; if we need to submit it, I will.  But I never got it from him.").)

## II.   PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint in this case on March 4, 2019.  (Doc. No. 1.)  After

multiple rounds of American moving to dismiss and Plaintiffs filing amended complaints,

Plaintiffs filed a Third Amended Complaint on March 23, 2020.  (Doc. No. 44.)  American again

moved to dismiss (Doc. No. 47), and at the joint request of the parties, the Court stayed the case

pending resolution of the motion to dismiss and Plaintiffs' motion to disqualify the undersigned

(*see* Doc. Nos. 42, 50, 52).  The Court denied the motion to disqualify on October 7, 2020 (Doc.

Nos. 72, 73), and granted in part and denied in part American's motion to dismiss on November

22, 2021 (Doc. Nos. 81, 82 (dismissing Plaintiffs' top filling claims with prejudice, Counts V

through VII with prejudice, and Counts III and IV without prejudice)).

Consistent with the Court's Order, Plaintiffs filed their operative Fourth Amended

Complaint on October 6, 2021.  (Doc. No. 84.)  It includes four counts:  hostile work

environment (Count I), disparate treatment (Count II), retaliation (Count III), and disparate

impact (Count IV).  Counts I, II, and III, are brought under Title VII, the PHRA, and § 1981.

(*Id.* at 5–20.)  Count IV is brought solely under Title VII and the PHRA.  (*Id.* at 20.)  American

moved to dismiss Count IV (Doc. No. 85), but the Court denied that motion after finding

Plaintiffs had cured the deficiencies identified in the Court's prior Memorandum (*see* Doc. No.

91).  On January 7, 2022, American filed its Answer.  (Doc. No. 92.)

While this final motion to dismiss was pending, the parties were directed to proceed with

discovery.  (*See* Doc. No. 83.)  On September 29, 2021, the Court entered an Amended

Scheduling Order, which set the deadline for discovery as May 6, 2022.  (*Id.*)  Following a

contentious period of initial discovery, the Court agreed to extend that deadline to June 17, 2022.

(Doc. No. 107.)

On June 29, 2022, American moved for sanctions against Plaintiffs under Federal Rule of Civil Procedure 37, arguing that Plaintiffs should be precluded from presenting any evidence of damages at trial because they failed to provide damages calculations as required by Rule 26 and a Court Order.  (Doc. No. 143.)  Plaintiffs have not responded to that motion.  A few weeks later, American moved for summary judgment on all counts.  (Doc. Nos. 148, 151, 158.)  Plaintiffs respond that they are entitled to additional discovery on their disparate treatment and disparate impact claims and that fact disputes preclude summary judgment as to their claims for retaliation and hostile work environment.  (Doc. Nos. 157, 161.)  The court held oral argument on American's motion for summary judgment on March 3, 2023.  (*See* Doc. Nos. 165, 168.)  A few weeks after oral argument, Plaintiffs' counsel filed a motion for leave to withdraw as Fields and Green's attorney.  (*See* Doc. No. 178.)  The Court held a show cause hearing on that motion on June 6, 2023.  (*See* Doc. Nos. 179, 180.)

The Court begins with Plaintiffs' request for additional discovery and American's motion for summary judgment and, finding that summary judgment is appropriate on all counts, denies as moot American's motion for sanctions and Plaintiffs' counsel's motion to withdraw.

## III.   LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying

facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## IV.   DISCUSSION

The Court begins with Plaintiffs' request for additional discovery in connection with their claims for disparate treatment and disparate impact.

### A.   *Request for Additional Discovery*

Plaintiffs do not substantively respond to American's motion for summary judgment on

21

their claims for disparate treatment and disparate impact.  Instead, Plaintiffs argue they lack

"facts essential to justify their opposition" and "renew their Rule 56(d) requests, as presented in

the declaration statement" of Plaintiffs' counsel.  (Doc. No. 157-4 at 31.)  In that declaration,

Plaintiffs' counsel requests additional time to seek documents and information related to

American's litigation hold efforts in this case; baggage handling systems at PHL, assignments of

bags to carousels at PHL; run sheets showing flight assignments to part time ABR runners and

Caucasian ABR runners for the morning shift (Sept. 1, 2015 to present); painting work orders

and contractor bids/writings that document the condition of bathrooms, break rooms, and

hallways; and records related to discipline taken against employees whose SIDA badges expired

while they were on vacation, and of that group, those who received a Level 1 disciplinary action

(Sept. 1, 2015 to present).  (Doc. No. 157-27 at ¶¶ 16, 18, 20–21, 25–26.)  Plaintiffs also seek to

depose two additional fact witnesses (Cameron Stanley and Pat Lewis), and a Rule 30(b)(6)

witness related to litigation hold procedures followed during this litigation, racial demographics

and bag counts for Carousels 1 and 4, the procedure for assigning flights and bags to certain

carousels, and the installation of new bag count software.[16]  (*Id.* at ¶¶ 16, 19, 22, 28.)

Unsurprisingly, American vehemently opposes this motion.  (Doc. Nos. 160, 163.)

　　　When a party opposing summary judgment "shows by affidavit or declaration that, for

specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or

to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  A party

---

[16] Plaintiffs also renew their motion to depose Dr. Stacey Tyler.  The Court denied their initial request to depose Dr. Tyler because they failed to demonstrate good cause for deposing her after the close of discovery.  (*See* Doc. No. 147 at ¶ 1.)  Plaintiffs still have not demonstrated good cause for waiting to request Dr. Taylor's deposition until after the deadline for discovery passed.

moving for additional discovery under Rule 56(d) must submit an affidavit explaining "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Stough v. Conductive Techs., Inc.*, 613 F. App'x 145, 147 (3d Cir. 2015) (quotation marks omitted) (affirming denial of Rule 56(d) motion where the plaintiff failed to show why the discovery materials were not previously obtained).

Because Plaintiffs have not explained why they were unable to obtain the requested discovery during the discovery period, their motion is denied. *See Lunderstadt v. Colafella*, 885 F.2d 66, 71–72 (3d Cir. 1989) ("Plaintiffs have not adequately explained their lack of diligence. Under these circumstances, we cannot conclude that the district court abused its discretion in declining to withhold ruling on the motion for summary judgment on Rule 56[d] grounds."); *Banks v. City of Philadelphia*, 309 F.R.D. 287, 292 (E.D. Pa. 2015) ("[Rule 56(d)] is not intended to protect those who have had an opportunity to complete discovery but who failed to do so by their own lack of diligence."); *Walter v. Travelers Personal Ins. Co.*, Civil No. 4:12-CV-346, 2016 WL 6962620, at *9 (M.D. Pa. Nov. 29, 2016) ("Rule 56(d) is designed to prevent the premature entry of summary judgment in cases where the nonmoving party has not had an opportunity to take full discovery, not to protect those who have had an opportunity to complete discovery, but who failed to do so by their own lack of diligence.") (quotation marks omitted).

Plaintiffs argue that they have diligently pursued discovery in this case, citing "[t]he number of depositions taken by Plaintiffs . . . the constant deficiency follow up letters for discovery responses to their requests, . . . the number of letter requests, correspondence and conferences between counsel (including during holidays/vacations) and with the Court." (Doc. No. 162 at 2.) But the fact that Plaintiffs were diligent as to some discovery does not mean that they have diligently pursued the additional discovery they now seek. A review of Plaintiffs'

discovery requests shows that they failed to request the identified documents and information. (*See* Doc. No. 157-5 (American's initial and supplemental responses to Plaintiffs' First Request for Production of Documents, dated November 19, 2021 and March 25, 2022); Doc. No. 157-6 (American's response to Plaintiffs' First Set of Interrogatories, dated March 31, 2022); Doc. No. 157-7 (American's response to Plaintiffs' Second Request for Production of Documents, dated April 11, 2022); Doc. No. 157-8 (American's response to Plaintiffs' Depositions Request [sic] for Production of Documents, dated May 23, 2022).)  Nowhere in these requests and interrogatories do Plaintiffs ask for information or documents related to American's litigation hold efforts, baggage handling systems, method for assigning bags to carousels, schedules for baggage runners, painting work orders, or discipline actions related to SIDA badges.  Nor did Plaintiffs request or notice the depositions of Cameron Stanley, Pat Lewis, or a 30(b)(6) witness. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, Civil Action No. 09–69125, 2011 WL 1539883, at *2 (E.D. Pa. Feb. 22, 2011) ("A request for a continuance to conduct additional discovery pursuant to Fed.R.Civ.P. 56(d) should be denied where, *inter alia*, movants had ample time and opportunity to conduct discovery, but failed to do so.") (quotation marks omitted); *see also Walter v. City of Ocean Springs*, 626 F.2d 1317, 1322 (5th Cir. 1980) ("The most common situation in which Rule 56[d] will not be applied to aid a nondiligent party arises when the nonmovant has complied with Rule 56[d] but has failed to make use of the various discovery mechanisms that are at his disposal or seeks a continuance of the motion for that purpose.") (quotation marks omitted).

Plaintiffs' counsel avers that she requested this information and references Plaintiffs' Second Request for Production of Documents Nos. 22, 23, 24, and 33.  (Doc. No. 157-27 at ¶ 15.)  Those requests sought "[d]ocuments supporting, rebutting or referencing American's

denial of allegations in Paragraph[s] 57 . . . 59 . . . 60 . . . [and] 75 of the Complaint." (*See* Doc. No. 157-7 at 12, 13, 17.)  Paragraphs 57, 59, 60, and 75 of the Fourth Amended Complaint include numerous subparagraphs, and American admitted in part and denied in part the allegations contained within each.  This recitation alone shows how far Plaintiffs stretch to find their discovery requests encompassed the information now sought.  But if one looks further and reviews the four paragraphs identified and the extent to which they are denied by American, only two paragraphs potentially implicate the documents that Plaintiffs now seek:

> 1.  Paragraph 60.b.i. alleges that in January 2018, "Green received an accelerated level 1 performance disciplinary action instead of a coaching discussion disciplinary action for an expired SIDA badge after consultation with senior manager Jenny O'Neil." (Doc. No. 84 at ¶ 60.b.i; see also Doc. No. 92 at ¶ 60 (admitting that the discipline occurred but denying it was improper));
>
> 2.  Paragraph 60.c.i.–iii. alleges that on December 7, 14, and 17, 2018, Fields "noticed" that Carousel 4 was understaffed compared to the other baggage carousels. (See Doc. No. 84 at ¶ 60.c.i.–iii; see also Doc. No. 92 at ¶ 60 (denying "for lack of knowledge or information what Plaintiffs 'noticed'")).

And although these paragraphs touch on the issues addressed in Plaintiffs' current Rule 56(d) motion, they are nowhere close to the diligent request for discovery required to grant such a motion.

Moreover, even if Plaintiffs had requested the discovery they now seek and Defendants failed to produce that discovery, Plaintiffs' Rule 56(d) motion would still fail because "a party may not claim the right to an extension of time under Rule 56[d], by claiming that the opposing party has not cooperated with discovery requests. . . .  A motion under Rule 56[d] is not the equivalent of a motion to compel." *Reyes v. Wilson Mem. Hosp.*, 102 F. Supp. 2d 798, 826 (S.D. Ohio 1998).

Tellingly, Plaintiffs neither moved to compel the production of the identified documents and depositions, nor raised these issues with the Court despite the Court's *heavy involvement* in

discovery in this case.  *See Schaffer ex rel. Schaffer v. A.O. Smith Harvestore Prods., Inc.*, 74

F.3d 722, 732 (6th Cir. 1996) ("Plaintiffs have not explained why they did not bring Defendants'

alleged numerous failures to comply with discovery requests to the attention of the court in a

timely manner.  Consequently, Plaintiffs have not . . . indicated how the district court abused its

discretion in refusing to consider the Rule 56[d] affidavit further.").  A quick review of the

docket during the almost-nine-month discovery period shows Plaintiffs were more than capable

of bringing discovery issues to the Court's attention.  In the six months between January 21,

2022 and July 6, 2022, the parties filed a total of *eleven* discovery motions (Plaintiffs filed five;

American filed six); Plaintiffs moved to extend the discovery deadline twice, the first of which

the Court granted and the second of which it denied; and the Court held at least *eight* telephone

conferences with counsel and entered *seven* orders related to discovery, including one order

assigning Special Master Judge Thomas J. Rueter (Retired) to oversee a new deposition of

Fields.  Many of these discovery disputes were about Plaintiffs' repeated attempts to take

discovery on issues that were precluded, dismissed, and time barred (including discovery related

to top filling).  *See Fields v. Am. Airlines*, No. 19-903, Docket (E.D. Pa.).  At each meeting, the

Court encouraged counsel to work together to ensure discovery proceeded in a purposeful and

efficient manner, and the Court *repeatedly emphasized* that the Court would not extend the

discovery deadline absent truly compelling circumstances.

The Court appreciates that the "amount of motions" and the "amount of acrimony in this

case" was often overwhelming for everyone involved.  (Draft H'rg Tr. at 63:21–66:24 ("I wrote

several deficiency letters.  Even getting a meet and confer turned into a war zone in this case.

And I have never been involved personally in a case where—and I do family law which is

contentious and I do employment, and I have never had this level of acrimony and push-back.

And I am not saying I am totally innocent, but I am saying . . . it takes two.  It takes two to tango.").  But the combative and extensive nature of discovery in this case—which shows that Plaintiffs knew how to request discovery, move to compel, and bring any issues to the Court's attention—highlights the defective nature of Plaintiffs' efforts as to the additional categories of discovery that they now seek.

Finally, although Plaintiffs do not argue to the contrary, the Court notes that Plaintiffs' counsel was aware that she needed at least some of the information she now seeks long before the discovery deadline passed.  Counsel knew during Spriggs's deposition in April 2022 that she lacked the racial demographics for full- and part-time bag runners.  (*See* Doc. No. 148-6 at 110:14–111:5 (Apr. 26, 2022) ("Ms. Gunter: We are asking that American produce the racial demographics of full-time ABR runners and the racial demographics of part-time ABR runners . . . [f]rom September 2015 to the present.  And, quite frankly, we have put it in writing.  But American is not producing documents, so we are requesting that again.").[17])  Further, counsel knew during the depositions of Chiddick and Fauntleroy in May and June 2022 that there were potential concerns about American's litigation holds in this case.  (*See* Doc. No. 148-7 at 145:22–148:10 (June 6, 2022) (Chiddick testifying that he was not aware of this lawsuit until 2022 and that he deletes emails daily, such that he has no emails from before April 2022); Doc. No. 148-8 at 161:3–170:12 (May 10, 2022) (Fauntleroy testifying that he deletes employee contact reports after 3 years and that he deletes emails and certain files (e.g., bag chute schedules, duty rosters) after 90 days).)  Despite these facts, Plaintiffs never supplemented their written discovery requests, moved to compel production of the requested information, or sought

---

[17] Despite this verbal assertion during the deposition, Plaintiffs did not include a request for this information in their follow up "deposition document requests."

sanctions for a deficiency in discovery.[18]

In short, "[t]his is, quite simply, not a case where a defendant has moved for summary judgment prematurely, without the plaintiff having had a full opportunity to engage in discovery." *Walter*, 2016 WL 6962620, at *9 ("[T]his is a civil action that was filed in early 2012, has been subject to extensive discovery by the parties (including several disputes regarding the same), and resulted in the defendant moving for summary judgment in August 2016—more than four years after the case was initiated. . . . [T]he plaintiff's belated suggestion that he wishes to take one or two additional depositions is unpersuasive, since he never explains why these depositions could not have been taken during the discovery period that was set long ago in this case, and which expired in August of this year.").

Because Plaintiffs have not shown that they diligently pursued the discovery they now seek, their request under Rule 56(d) is denied.

### B.      Motion for Summary Judgment

Having found Plaintiffs are not entitled to additional discovery, the Court now turns to the arguments raised in American's motion for summary judgment.  Four counts remain: (1) disparate treatment, (2) disparate impact, (3) retaliation, and (4) hostile work environment.[19]

---

[18] Plaintiffs also argue, without authority, that their efforts were nonetheless diligent because American supplemented its document production by producing a single document on July 26, 2022. (Doc. No. 162 at 6.)  American responds that it only "produced this document—an employee profile for Ed Wilson—after the discovery cutoff [ ] because Plaintiffs never mentioned Wilson or suggested he was in any way relevant to this litigation until shortly before discovery closed," during the second day of Green's deposition.  (Doc. No. 163 at 5.)  This reasoning is persuasive, and Plaintiffs' attempts to disparage American's supplementation, without more, is unavailing.  The suggestion that American's late supplementation renders *Plaintiffs* diligent is baseless.

[19] As stated previously, the disparate treatment, retaliation, and hostile work environment counts are brought under Title VII, the PHRA, and § 1981.  The disparate impact count is brought under Title VII and the PHRA.  The same analysis applies under all three statutes.  *Verdin v. Weeks Marine Inc.*, 124 F. App'x 92, 96 n.2 (3d Cir. 2005) ("[C]ourts utilize the same analysis for the merits of Title VII and Section 1981 claims."); *Williams v. Carson Concrete Corp.*, Civil Action No. 20-5569, 2021 WL

The Court addresses each count in turn.

### 1.    Disparate Treatment (Count II)

American moves for summary judgment on Plaintiffs' disparate treatment claims, arguing that Plaintiffs have failed to put forth evidence of a prima facie case or pretext.  (Doc. No. 148-1 at 17–25.)  Plaintiffs do not substantively respond to these arguments, and instead claim they lack "facts essential to justify [their] opposition" and renew their "Rule 56(d) requests, as presented in the declaration statement" of Plaintiffs' counsel.  (Doc. No. 157-4 at 31; *see also* Doc. No. 162.)  Similarly, during oral argument, Plaintiffs' counsel conceded that if the Court denies the Rule 56(d) request, Plaintiffs do not have enough evidence to support their disparate treatment claim.  (*See* Draft H'rg Tr. at 94:1–5 ("The Court: . . . [I]f I were to deny the motion for additional discovery, do you not have enough evidence to support the disparate treatment and disparate impact claims?  Ms. Gunter: I do not.").)  As discussed earlier in this Memorandum, Plaintiffs have not shown that they diligently pursued their requested discovery during the discovery period, and therefore, Plaintiffs' Rule 56(d) request is denied.  Because Plaintiffs concede they do not have sufficient evidence to support their disparate treatment claims, summary judgment is appropriate as to this count.  In the alternative, the Court, after a thorough review of the record, finds that Plaintiffs disparate treatment claim fails regardless.

### a.    Legal Standard

Disparate treatment race discrimination claims are governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Analysis under this framework proceeds in three steps.  *Opsatnik v. Norfolk S. Co.*,

---

1546455, at *3 (E.D. Pa. Apr. 20, 2021) ("Claims of employment discrimination brought under Title VII, the PHRA, the PFPO, and Section 1981 are analyzed coextensively.").

335 F. App'x 220, 222 (3d Cir. 2009).  "First, the plaintiff must establish a prima facie case of discrimination."  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  To establish a prima facie case of disparate treatment, a plaintiff must show that:  (1) he is a member of a protected class, (2) he was qualified for his position, and (3) he suffered an adverse employment action, (4) under circumstances giving rise to an inference of intentional discrimination.  *Id.* at 410–11; *see also Wallace v. Federated Dep't Stores, Inc.*, 214 F. App'x 142, 144–45 (3d Cir. 2007) (framing the fourth element as requiring evidence that "either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise to an inference of discrimination").

If the plaintiff carries his burden, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action.  *Jones*, 198 F.3d at 410–11 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  To demonstrate pretext, a plaintiff must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either:  (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Id.* at 412–13 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000) ("The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or

competent.").

**b.** **Analysis**

*i.* *Fields*

Beginning with Fields, there is no dispute that he is African American, and therefore, a member of a protected class.  Nor does American dispute that Fields had the minimum qualifications for his position as a fleet service agent working in the domestic bag chute.  As for the third element, American identifies two potentially adverse employment actions:  (1)  multiple incidents of minor discipline, and (2) understaffing Carousel 4.  (Doc. No. 151 at 23–27.) American then argues that neither action constitutes an actionable adverse employment action, and even if it did, Fields's claim still fails because he has cannot show that either action was taken under circumstances giving rise to a reasonable inference of discrimination.  (*Id.*)  Finally, American argues that it had a legitimate, nondiscriminatory reason for each action it took against Fields and that Fields has not demonstrated that those reasons are pretext for unlawful discrimination.  (*Id.*)

***Disciplinary Write Ups***

There are four instances of minor discipline that were asserted against Fields during the limitations period—one in 2015 and three in 2018.  There is no evidence, however, that any discipline rose to the level of an adverse employment action.  "In the context of a disparate treatment claim, 'an adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  *Barnes v. Nationwide Mut. Ins. Co.*, 11 F. Supp. 3d 477, 481 (E.D. Pa. 2014) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)); *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152–53 (3d Cir. 1999) ("The Supreme Court has defined a tangible employment action as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment

31

with significantly different responsibilities, or a decision causing a significant change in benefits.'") (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 760 (1998)).

The four instances of minor discipline that Fields received in 2015 and 2018 did not result in a "significant change" in his employment. Other than moving Fields up the line in progressive discipline, the two Coaching Discussions and the Level 1 infraction had no effect on Fields's employment—they did not alter his pay, job responsibilities, assignments, or schedule. (*See, e.g.*, Doc. No. 148-5 at 129:7–13.) Similarly, although the Level 2 infraction limited Fields's ability to apply for certain positions while it remained in his file, there is no evidence that Fields refrained from applying for one of those positions because of the Level 2 write up or that he applied for a position and was rejected. Finally, it is telling that all four write ups were *temporary*, and that that the progressive discipline schedule reset after one year. *See Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 (3d Cir. 2014) ("Here, the warnings would remain in his file only temporarily and did not 'effect a material change in the terms or conditions of his employment'; we therefore cannot 'characterize them as adverse employment actions.'") (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)).[20]

---

[20] In their post-argument letter briefs, the parties disagree about whether a write up constitutes an adverse employment action when it is part of a scheme of progressive discipline. The confusion stems from the fact that "adverse employment action" is defined differently in the disparate treatment context than it is in the retaliation context. *Compare Barnes*, 11 F. Supp. 3d at 481 ("In the context of a disparate treatment claim, 'an adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'") (quoting *Cardenas*, 269 F.3d at 263), *with Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, (E.D. Pa. 2014) ("An 'adverse employment action' in [the retaliation] context is an action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006)). Given this distinction, a write up that implicates progressive discipline may "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination," but *not* "alter an employee's compensation, terms, conditions or privileges of employment." *See, e.g.*, *Mckinnon v. Gonzales*, 642 F. Supp. 2d 410, 434–35 (D.N.J. 2009) (discussing the "critical distinction between the 'materially adverse action' element of a retaliation claim and the 'adverse employment action' element of a disparate treatment claim," and explaining that "[i]n the retaliation context . . . [t]he threshold is lower than the standard for 'adverse' action for discrimination claims") (quotation marks omitted). Notably, *Campo v. MidAtlantic*—the case on which Plaintiffs rely—discusses progressive discipline in the context

For these reasons, the Court finds that the four write ups were not "serious and tangible enough" to constitute adverse employment actions, and Fields has failed to state a prima facie case for disparate treatment as to these actions.

***Understaffing at Carousel 4***

That leaves Fields's claim that Carousel 4, which is primarily staffed by African American agents, is understaffed in comparison to Carousel 1, which is primarily staffed by Caucasian agents. Even assuming that this is an adverse employment action and that Fields has put forth sufficient evidence to give rise to an inference of discrimination, he has failed to show that American's legitimate, nondiscriminatory reason for its carousel staffing decision amounts to pretext.

Fauntleroy—Fields's manager and the only individual to testify with personal knowledge about the bag counts for each carousel—testified that Carousel 1 has the highest bag counts and for that reason, it is typically assigned an additional fleet service agent. (Doc. No. 148-8 at 204:14–205:1; *see also* Doc. No. 148-5 at 155:1–156:18 (showing Fields's baggage counts for six days in May 2022, and on each occasion, Carousel 1 handled more bags than Carousel 4).) Fields has not shown that this legitimate justification for American's staffing decisions is pretext for racial discrimination. He has not, for example, provided bag counts to show that Carousel 4 received more bags than Carousel 1, nor has he produced any evidence to suggest Fauntleroy

---

of a retaliation claim. *See* 564 F. Supp. 3d 362, 393 n.13 (2021); *see also Allen v. Nutrisystem, Inc.*, Civil Action No. 11–4107, 2013 WL 1776440, at *6 n.6 (E.D. Pa. Apr. 25, 2013) ("Written warnings can constitute adverse employment actions for the purpose of establishing the second prong of a prima facie *retaliation* claim." (emphasis added)); *Rivers v. Potter*, Civil Action No. 05–4868(JLL), 2007 WL 4440880, at *9 (D.N.J. Dec. 18, 2007) ("If, as contended by Rivers, the USPS employs a progressive disciplinary policy in which a previous infraction raises the penalty for a subsequent infraction, an employee could well choose not to engage to report discrimination if that might result in a letter of warning appearing in a personnel file even temporarily. The letter of warning, therefore, constitutes the kind of materially adverse employment action that could support a *retaliation* claim under Title VII." (emphasis added and internal citations omitted)).

assigned an extra agent to Carousel 1 because it was predominately staffed by Caucasian agents. Instead, the evidence shows that in 2019 Fauntleroy *reduced the baggage counts for Carousel 4* by moving the Las Vegas-bound flights to a different carousel.[21]

*　　*　　*

For those reasons, summary judgment is granted to American on Fields's disparate treatment claim.[22]

### ii.    Green

Turning to Green, again, there is no dispute that Green is a member of a protected class and qualified for his position as a bag runner.  American identifies three potentially adverse employment actions for Green:  (1) Dr. Coleman's failure to investigate Green's complaint in 2019, (2) the Level 1 discipline for an expired SIDA badge, and (3) the assignment of flights that landed at or before Green's scheduled shift start time.  (Doc. No. 151 at 27–30.)  Like with Fields, American argues that Green cannot survive the prima facie stage, and even if he could, he cannot show that American's legitimate reasons for each action are pretext for

---

[21] Fields testified that nonmanagerial leads altered the schedule assignments to ensure Carousel 4 had less workers.  This argument fails for two reasons.  First, Fields's assumption is not supported by personal knowledge or other evidence in the record.  Second, Fauntleroy—not the leads—had the final say on schedule alterations, and as the discussion above shows, there is no evidence that Fauntleroy acted with racial animus.

[22] During oral argument, Plaintiffs' counsel asserted that Fields also suffered "tangible adverse employment actions" in the form of "subpar equipment assigned to African American ramp agents; not enough time to perform his work duties; [and] verbal altercation[s] with white or Caucasian bag shoot leads."  (Draft H'rg Tr. at 71:3–12.)  Fields cannot make out a disparate treatment claim as to any of these actions.  First, even assuming the receipt of "subpar equipment," constitutes an adverse employment action, there is no evidence as to who assigned the equipment, whether that equipment was assigned only to African American agents, or whether it was otherwise assigned under circumstances that give rise to an inference of discrimination.  Fields cannot, therefore, make a prima facie case as to this action.  Second, the only evidence that Fields lacked sufficient time to perform his duties is in connection with his argument that Carousel 4 was understaffed.  This claim fails for the reasons discussed above.  Third Fields's "verbal altercations" with unidentified leads did not result in a "significant change" to Fields's employment, and therefore, are not actionable adverse employment actions.

discrimination.  (*Id.*)

### Failure to Investigate

First, the Court agrees with American that a failure to investigate a claim of discrimination is not an adverse employment action that can give rise to a claim for disparate treatment.  *See Hare v. Potter*, 220 F. App'x 120, 134 (3d Cir. 2007) (finding "no basis to credit" the plaintiff's gender discrimination claim where the plaintiff "fail[ed] to show how the Post Office's deficient investigation [of her discrimination complaint] constituted an 'adverse employment action'"); *cf. Scott v. Sunoco Logs. Partners, LP*, 918 F. Supp. 2d 344, 356 (E.D. Pa. 2013) (granting summary judgment as to the plaintiff's retaliation claim because a "failure to investigate is not an adverse employment action"); *Ashton v. SCI-Fayette*, No. CV 16-1795, 2018 WL 2966849, at *6 (W.D. Pa. June 13, 2018) ("Courts have held that the failure to investigate a plaintiff's complaint [of discrimination] does not constitute an adverse employment action" for purposes of a retaliation claim.).  Therefore, Green has not stated a prima facie case of disparate treatment as to that action.

### Discipline for SIDA Badge

Second, Green received a Level 1 write up for the expiration of his SIDA badge.  This discipline was not an adverse employment action for the reasons discussed above in connection with Fields's instances of minor discipline.

In the alternative, Green concedes that he violated American's SIDA badge policy, and thus, that American had a legitimate, nondiscriminatory reason for disciplining him.  Although the discipline did not precisely follow the terms of the CBA, Green can hardly argue that a *more lenient* punishment (i.e., receiving only a Level 1 discipline without the corresponding suspension) is evidence of discrimination.  Green testified that at the time he was disciplined, his

immediate supervisor, Griffiths, told him that her own supervisor, O'Neil, had let "her people" off for similar infractions in the past.  (Doc. No. 148-4 at 475:19–476:5.)  Green believes that "her people," referred to Caucasian employees because O'Neil is Caucasian.  (*Id.*  at 475:19–476:5; *see also id.* at 73:10–20 (testifying that "the manager who gave me discipline implied that there had been exceptions made for other folks" and "the implications were that they were White coworkers"); *id.* at 81:8–82:8 (testifying that Griffiths "lifted her eyebrows as to sugg—as to suggest there was something else going on").)  But Green's unsubstantiated belief is insufficient to show pretext at summary judgment.  *See Schaar*, 732 F. Supp. 2d at 493 ("[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.").  Notably, there is *no evidence* that Griffiths was referring to Caucasian employees or that Caucasian employees were not written up for expired SIDA badges.  *See Jones*, 198 F.3d at 412–13 (explaining that a plaintiff demonstrates pretext by pointing "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" (quoting *Fuentes*, 32 F.3d at 764)).

### *Flight Assignments*

Finally, Green testified that he and other part-time bag runners are assigned flights at or before their start time.  Even assuming Green has stated a prima facie case as to these assignments, he has not shown that American's legitimate reason for its scheduling decisions was pretext for discrimination.

Spriggs testified that ABR runners may be assigned flights that start around their scheduled start times to accommodate operational needs.  (*See* Doc. No. 148-6 at 68:14–75:16

(explaining that he reassigns flights when the system assigns them to employees who are doing other specialty tasks); *see also id.* at 77:9–83:13, 113:14–115:8.)  For example, a part-time runner arriving at 6:00 a.m. may be assigned a flight with an arrival time of 5:58 a.m. because the full-time runners have other assignments or because of flight changes caused by inclement weather.  (*Id.*; *see also* Doc. No. 148-28 at ¶ 5.)  Green has not put forth any evidence to discredit these explanations or to show that any reassignment was racially motivated.  To the contrary, Spriggs testified that runners of all races are infrequently assigned these early flights. (Doc. No. 148-28 at ¶ 6.)[23]  *See Jones*, 198 F.3d at 412–13.

*     *     *

For those reasons, American is also entitled to summary judgment on Green's disparate treatment claims.[24]

### 2.   **Disparate Impact (Count IV)**

Next, American moves for summary judgment on Plaintiffs' disparate impact claims under Title VII and the PHRA.  (Doc. No. 148-1 at 25–27.)  Plaintiffs again do not substantively respond to American's arguments, and instead, claim they lack "facts essential to justify [their] opposition" and renew their "Rule 56(d) requests, as presented in the declaration statement" of Plaintiffs' counsel.  (Doc. No. 157-4 at 31; *see also* Doc. No. 162.)  Similarly, during oral argument, Plaintiffs' counsel conceded that if the Court denies the Rule 56(d) request, Plaintiffs

---

[23] Green argues that the assignments were nevertheless discriminatory because full-time bag runners are primarily Caucasian and part-time bag runners are primarily African American.  Green has failed to produce any evidence related to the racial demographics of either group, and even if he had, there is no evidence that part-time bag runners are the only ones assigned to flights with arrival times at or before the beginning of their shift.

[24] During oral argument, Plaintiffs' counsel argued that Green also suffered an adverse employment action when he was given "subpar equipment."  (Draft H'rg. Tr. at 78:16–21.)  This argument fails for the reasons discussed above in connection with Fields's argument about subpar equipment.  *See supra* n.21.

do not have enough evidence to support their disparate treatment claim.  (*See* Draft H'rg Tr. at 94: 1–5 ("The Court: . . . [I]f I were to deny the motion for additional discovery, do you not have enough evidence to support the disparate treatment and disparate impact claims?  Ms. Gunter: I do not.").)  Because Plaintiffs concede they do not have sufficient evidence to support their disparate impact claims, summary judgment is appropriate as to this count.  In the alternative, the Court, after a thorough review of the record, finds that Plaintiffs disparate impact claim fails regardless.

### a.   Legal Standard

"Disparate impact redresses policies that are 'fair in form, but discriminatory in operation.'"  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).  A plaintiff makes out a disparate impact claim by showing that their employer "used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer."  *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 346 (3d Cir. 1990); *see also Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (describing "disparate impact" as "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities").

"Disparate-impact litigation proceeds in three steps."  *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011).  "First, a plaintiff must establish a *prima facie* case" by showing that a facially neutral standard has a significantly discriminatory result.  *Id.*  This means the "plaintiff must (1) identify a specific, facially neutral policy, and (2) proffer statistical evidence that the policy caused a significant [race]-based disparity."  *Karlo*, 849 F.3d at 69; *see also Kennedy v. City of Philadelphia*, 588 F. Supp. 3d 598, 606 (E.D. Pa. 2022) (describing the plaintiff's prima facie burden as having four requirements:  "(1) identify a specific employment

policy or practice of the employer, and (2) proffer evidence, typically statistical evidence, (3) of

a kind and degree sufficient to show that the practice in question has caused an adverse impact,

such as exclusion of applicants for jobs or promotions, (4) because of their membership in a

protect[ed] group" (cleaned up)).  If the plaintiff satisfies this burden, the burden switches to the

employer to show that the challenged practice is "job related for the position in question and

consistent with a business necessity."  *NAACP*, 665 F.3d at 476 (quotation marks omitted).

"Finally, a plaintiff can overcome an employer's business-necessity defense by showing that

alternative practices would have less discriminatory effects while ensuring that candidates are

duly qualified."  *Id.*

### b.      Analysis

American argues that Plaintiffs cannot meet their initial burden.  (Doc. No. 151 at 30–

32.)  The Court agrees.

A review of the record shows that Plaintiffs have not identified a "specific, facially

neutral policy."  Although they claim leads and managers relied on "operational needs" to alter

minorities' workloads, Plaintiffs concede that there is no specific policy outlining "operational

needs."  (*See* Doc. No. 148-4 at 392:14–393:13 ("Q: So there's no specific policy on operational

needs?  A: No.  It's all subjective based on how they feel and what they want to do.  And when I

say 'them,' I mean—'they,' I mean managers."); *see also* Draft H'rg Tr. at 91:10–15 (Plaintiffs'

counsel arguing that "the operational needs—I don't even know what to call it, your honor.

Depending on who I depose, it changed.").)  Instead, the phrase refers to the discretion that all

employees have to adjust standard procedures as needed to address the issues in scheduling that

are inherent in the airline industry.  (*See, e.g.*, Doc. No. 148-13 at 143:21–152:23 (Rockamore

testifying that "operational needs" does not refer to a "practice" or a "policy," but an in the

moment adjustment that is needed because of a "business imperative"); Doc. No. 148-28 at ¶ 7

(Chiddick declaring that "American does not have an 'Operational Needs' policy.  The term 'operational needs' simply refers to the needs of American's operation in any particular situation.").)

In addition, even if the phrase "operational needs" referred to a specific policy that allowed managers to alter the schedules of fleet service agents when certain criteria are met, Plaintiffs have not produced any evidence "that [operational needs] caused a significant [race]-based disparity" in the agents' workload.  *See Kennedy*, 588 F. Supp. at 609 ("Kennedy has failed to present any relevant statistical analysis showing a statistically significant connection between the Police Department's use of hair tests and adverse impacts, such as terminations or forced resignations, on African American officers due to false positive results, so she has failed to establish a prima facie case.").

Accordingly, summary judgment is granted in American's favor on Plaintiffs' disparate impact claims.

### 3.   Retaliation and Retaliatory Harassment (Count III)

Next Plaintiffs bring claims for retaliation and retaliatory harassment.  The *McDonnell Douglas* burden shifting framework governs both claims.  *See Tomaszewski*, 460 F. Supp. 3d at 593; *Abdul-Latif*, 990 F. Supp. 2d at 526.

#### a.   Legal Standard

To state a prima facie case for retaliation or retaliatory harassment, each Plaintiff must show:  "(1) that he engaged in protected employee activity; (2) suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) [ ] that there was a causal connection between [his] protected activity and the employer's adverse action."  *Miller*, 158 F. Supp. 2d at 412; *Abdul-Latif*, 990 F. Supp. 2d at 529.  "[T]here is no hard and fast rule as to whether the conduct in a given case is protected."  *Curay-Cramer v. Ursuline*

*Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).  Instead, the court must evaluate "the message being conveyed" and determine whether it is clear "from the context of the statement that the employee opposes an unlawful employment practice."  *Id.*  "As to the second element, 'adverse action' in the retaliation context encompasses a larger class of circumstances than the narrower 'adverse employment action' concept in substantive discrimination cases."  *Daniels*, 982 F. Supp. 2d at 482.  It covers "employer actions that are 'materially adverse to a reasonable employee or job applicant' and would 'dissuade a reasonable worker from making or supporting a charge of discrimination."  *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 175 (3d Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).  This standard applies regardless of whether Plaintiff complains of an individual action or a pattern of harassment.  *See Clarkson v. SEPTA*, Civil Action No. 14–2510, 2015 WL 1296055, at *1 (E.D. Pa. Mar. 23, 2015) ("In a retaliatory harassment claim, harassment that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination is sufficient to establish and adverse employment action.").  Finally, "[t]o demonstrate a causal connection, a plaintiff generally must show either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism, coupled with timing, to establish a causal link."  *Buchan v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quotation marks omitted).

If the plaintiff establishes a prima facie case of retaliation or retaliatory harassment, the burden shifts to the employer to provide a legitimate, nonretaliatory reason for the adverse action.  *Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 187 (3d Cir. 2003).  If they do, the burden returns to the plaintiff to show that the reason given is pretext for unlawful retaliation.  *Id.*

### b.    Retaliation

#### i.    *Fields*

Fields identifies five adverse actions in connection with his claim for retaliation:  the three write ups in 2018, understaffing at Carousel 4, and a letter that he received on June 14, 2019, while this litigation was pending, ordering him to attend an "official company meeting" about his FMLA leave.  We address each action in turn.

***2018 Disciplinary Write Ups***

First, Fields references write ups that he received in February, July, and September 2018.  Disciplinary actions can serve as the basis for a retaliation claim, especially when the write up is part of a progressive discipline regime.  *See Campo*, 564 F. Supp. 3d at 393 n.13 ("[W]ritten warnings can constitute adverse employment actions where, as here, a progressive discipline policy is in place."); *Allen*, 2013 WL 1776440, at *6 n.6 ("Written warnings can constitute adverse employment actions for the purpose of establishing the second prong of a prima facie retaliation claim.  When a warning is part of a progressive disciplinary policy such that each previous infraction raises the penalty for a subsequent infraction, courts in the Third Circuit have classified it as an adverse employment action.") (citations omitted); *Rivers*, 2007 WL 4440880, at *8 ("Here, both the temporary issuance of a letter of warning, and the later reduction of the letter to an official discussion comprise actions that would cause an employee to reconsider bringing an EEO charge.  If, as contended by Rivers, the USPS employs a progressive disciplinary policy in which a previous infraction raises the penalty for a subsequent infraction, an employee could well choose not to engage to report discrimination if that might result in a letter of warning appearing in a personnel file even temporarily.").

Fields has not, however, shown that any write up was causally connected to a protected activity under Title VII, the PHRA, or § 1981.  In his response brief, Fields argues that the write

ups occurred "after [he] ma[de an] OSHA whistleblower complaint in May 2017 through January 2018." (Doc. No. 157-4 at 27.) But Fields's 2017 OSHA/FAA petition complained about safety violations, not race discrimination.[25] (*See* Doc. No. 157-19 at 2.) *See Curay-Cramer*, 450 F.3d at 135 ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) ("With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause').");  *Paradisis v. Englewood Hosp. Med. Ctr.*, 680 F. App'x 131, 138 (3d Cir. 2017) ("Filing grievances unrelated to discrimination does not, however, constitute protected activity for purposes of Title VII."); *Dominici v. Reading Hosp./Tower Health*, No. 5:18-cv-04181, 2020 WL 2898658, at *23 (E.D. Pa. June 3, 2020) ("Dominici's written appeal from the Grievance to Blankenhorn similarly fails [to qualify as a protected action]. Although Dominici did use the word 'discrimination' in the appeal, she did not suggest the basis for any such discrimination or her membership in any protected class.").[26]

In the alternative, even if Fields could make out a prima facie case of retaliation as to the 2018 write ups, American has shown that each write up was issued for a legitimate,

---

[25] During oral argument, Plaintiffs' counsel argued that Plaintiffs' May 2017 OSHA complaint "complained of discrimination under Air21 Act." (Draft H'rg Tr. at 58:2–22.) But this assertion is not supported by the record. *Nowhere* in the 2017 complaint do Plaintiffs mention discrimination or race. (*See* Doc. No. 157-19 at 2–3.)

[26] During oral argument, Plaintiffs' counsel also suggested that the 2018 disciplinary write ups were issued in retaliation for Fields's involvement in discussions with the NAACP in April 2018. But notably, these discussions occurred *after* Fields's write up in January 2018, and around three months before Fields's next write up in July 2018. This timing is not unusually suggestive such that it can give rise to an inference of causation. *See Paradisis*, 680 F. App'x at 138 ("[A]ny adverse employment action which occurred before" the plaintiff filed her first claim with the EEOC "cannot form the basis of a retaliation claim"); *Abdul-Latif*, 990 F. Supp. 2d at 531 ("[S]ix days is at the long end of what has been held to be unusually suggestive.").

nonretaliatory reason:  Fields's admitted failure to follow requirements related to wearing safety vests and delivering bags to the correct place at the correct time.  Fields has not put forth any evidence to suggest that these reasons are pretext for retaliation.  *See Paradisi*, 680 F. App'x at 139 ("Paradisi' termination indisputably occurred after the Hospital learned of the original EEOC charge, but the summary judgment record shows, also indisputably, that Paradisis was removed from the per diem nurse's work schedule because she inexcusably failed to attend the June 28th training, which had been arranged specially for her. . . .  We agree with the District Court that no reasonable factfinder could conclude that Paradisi' termination was anything other than the result of her failure to attend this training session, and was not in retaliation for her pursuit of a charge before the EEOC."); *Royer v. Pa. State Univ.*, 84 F. App'x 226, 227–28 (3d Cir. 2004) ("Royer's argument for pretext boils down to the single allegation that" her boss, who "participated in the issuance of each warning letter," "did not take her complaints of sexual harassment seriously.  Regardless of whether this is true, there is no evidence from which a jury could find any link between [her boss's] response to Royer's allegations and his issuance of warning letters for improper conduct that Royer admittedly engaged in."). *Contra Moore*, 461 F.3d at 346 ("Even though disciplining an officer for workplace infractions would normally be a strong legitimate reason to overcome, the unusually strong evidence of retaliatory animus in this case . . . would allow a factfinder to reasonably conclude that William's supervisors went beyond legitimate discipline and were actually motivated by retaliatory animus.").

For those reasons, Fields's retaliation claim fails to the extent it is based on discipline he received in 2018.

### *Understaffing/Overworking at Carousel 4*

Likewise, Fields has not established a prima facie case of retaliation as to understaffing at

Carousel 4.  A plaintiff's unsubstantiated claim that he had a heavy workload, without more, does not rise to the level of a materially adverse employment action.  *See Charles v. Mott's LLP*, Case No. 2:17–cv–2879 (SDW)(LDW), 2018 WL 2002794, at *5 (D.N.J. Apr. 30, 2018) ("Plaintiff's speculation that he was overworked is not enough for this Court to infer that an adverse action was taken against him.  Plaintiff has neither produced any evidence that his workload assignments increased after he filed the EEOC Charge of Discrimination, nor has he submitted any evidence to establish that his workload assignments were unequally assigned as compared to his peers.  As such, Plaintiff cannot establish a *prima facie* case of retaliation.").  As discussed above, Fields has provided no evidence that Carousel 4 was in fact understaffed, and to the contrary, the record shows that Carousel 1 had an additional agent because it had a heavier bag load.  (*See* Doc. No. 148-8 at 204:14–205:1; *see also* Doc. No. 148-5 at 155:1–156:18.) Accordingly, the Court finds that "plaintiff has failed to produce sufficient evidence that his workload was increased to the point that it" would have dissuaded a reasonable employee from reporting discrimination.  *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 602 (E.D. Pa. 2020) (granting summary judgment in the defendant's favor on the plaintiff's retaliation claim where the plaintiff argued that his supervisor "retaliated against him by assigning him more responsibilities and not offering adequate support to handle the increased workload," but he "failed to produce sufficient evidence that his workload was increased to the point that it constituted an adverse action").

In the alternative, even if Fields could put forth evidence of understaffing, his retaliation claim would still fail because Fields claims the understaffing began at least as early as 2013, years before Fields engaged in any protected activity identified in the Fourth Amended Complaint.  (*See* Doc. No. 157-2 at ¶ 24.)  *See Paradisis*, 680 F. App'x at 138 ("[A]ny adverse

employment action which occurred before" the plaintiff filed her first claim with the EEOC

"cannot form the basis of a retaliation claim"). Thus, Fields has failed to establish a prima facie

case for retaliation based on the purported understaffing of Carousel 4.

### June 14, 2019 Letter

Third, Fields argues that a letter he received on June 14, 2019 was an adverse action

because it ordered Fields to attend an "official company meeting" to discuss his previously

unproblematic requests for FMLA leave, and it advised Fields of "the right to have union

representation and warn[ed] of potential termination." Fields has not, however, argued, let alone

shown, that he was disciplined, suspended, or otherwise punished in connection with this letter.

The mere *threat* of an adverse action—even the threat of termination—is not itself an adverse

employment action, even in the retaliation context. *See Clarkston v. SEPTA*, 700 F. App'x 111,

115 (3d Cir. 2017) ("[T]he sporadic threats of termination, workplace gossip, and disparaging

comments, do not rise to the level of a materially adverse employment action" for purposes of

the plaintiff's retaliation claims.); *Ilori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 759–60

(W.D. Pa. 2010) ("[The plaintiff's manager] told plaintiff if he did not resign [the manager]

would pick a date for him to resign, and told plaintiff his days at [the company] were

numbered. . . . [T]his conduct does not rise to the level of an adverse employment action as

proscribed in *Burlington Northern*. The threat was never carried out and had no demonstrable

impact on plaintiff's employment."); *Remp v. Alcon Labs., Inc.*, CIVIL ACTION NO. 13-6407,

2016 WL 1161616, at *8 (E.D. Pa. Mar. 24, 2016) (finding that a human resources manager's

"threats of discipline, termination and legal action" were "insufficient to demonstrate an adverse

employment action because they lacked any real consequences" where "the threats were never

carried out and had no demonstrable impact on the plaintiff's employment") (quotation marks

omitted); *see also Hellman v. Weisberg*, 360 F. App'x 776, 779 (9th Cir. 2009) ("[T]he mere

threat of termination does not constitute an adverse employment action."). *Cf. Ilori*, 742 F.

Supp. 2d at 759–60 ("[T]he warning letter *and probation*, viewed collectively, constitute adverse

employment actions. . . .  Being on probation denied plaintiff the opportunity to receive merit

pay increases and, along with the warning letter, caused plaintiff to suffer from anxiety at work,

compelling plaintiff to seek counseling.") (emphasis added).  Accordingly, Fields's retaliation

claim fails as to this action as well.

*     *     *

For those reasons, American is entitled to summary judgment on Fields's retaliation

claims.

ii.      *Green*

Green identifies three adverse actions, which he argues form the basis of his retaliation

claims:  (1) American's failure to investigate his complaints and reports of race discrimination,

(2) the issuance of Level 1 discipline for an expired SIDA badge, and (3) the assignment of

flights at or before his start time.  (Doc. No. 157-4 at 25; *see also* Doc. No. 148-4 at 373:18–

374:5.)

### Failure to Investigate

First, Green argues that Dr. Coleman purposefully failed to investigate his claims of

discrimination in retaliation for him making those complaints and filing a grievance.  (Doc. No.

84 at ¶¶ 60e., f.)  However, "[c]ourts have held that the failure to investigate a plaintiff's

complaint does not constitute an adverse employment action," even in the retaliation context.

*Ashton v. SCI-Fayette, Pa. Dep't of Corr.*, Civil Action No. 16-1795, 2018 WL 2966849, at *6

(W.D. Pa. June 13, 2018) (collecting cases); *cf. Hare*, 220 F. App'x at 134 (finding "no basis to

47

credit" the plaintiff's claim that "because she is a woman, [her supervisors] did not adequately investigate her charge" of sexual harassment).

### Discipline for SIDA Badge

Second, Green points to a Level 1 discipline that he received in January 2018 for failing to renew his SIDA badge.  Green argues that this write up was issued because he initiated proceedings with OSHA and the FAA in May 2017.  (*See* Doc. No. 84 at ¶ 60b.)  But as the Court stated previously, Plaintiffs' OSHA and FAA complaints alleged safety violations *not discrimination*, and therefore, were not protected activities under Title VII, the PHRA, and § 1981.  *See Curay-Cramer*, 450 F.3d at 135; *Paradisis*, 680 F. App'x at 138.

### Flight Assignments

Finally, Green argues that American retaliated against him for complaining about racial discrimination when supervisors assigned him to flights at or before his scheduled start time. (Doc. No. 157-4 at 25.)  He identifies eight dates between January 7, 2019 and June 4, 2022 when he was assigned such flights.  (*Id.*)  In his response brief, Green suggests that he was given these assignments in retaliation for complaining about discrimination to Dr. Coleman on July 9, 2019.  (*See also* Doc. No. 84 at ¶ 60f.)  But Green has not demonstrated any causal connection between that meeting and the assignment of flights at or before his start time.  Tellingly, of the eight dates identified by Green, half of them occurred *before* his July 2019 meeting with Dr. Coleman and thus cannot form the basis of his retaliation claim.  *See Paradisis*, 680 F. App'x at 138.

In the Fourth Amended Complaint, Green suggests that the assignments were actually made in retaliation for him filing a Charge of Discrimination with the EEOC on December 4, 2018.  (Doc. No. 84 at ¶ 60c.)  But Green filed his Charge a month before the first problematic

flight assignment.  It is, therefore, too attenuated to give rise to an inference of causation.  *See Abdul-Latif*, 990 F. Supp. 2d at 531 ("[S]ix days is at the long end of what has been held to be unusually suggestive.").  Green otherwise fails to identify any facts that suggest a causal connection between the filing of the Charge and the flight assignments.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (considering whether the plaintiff could point to "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons . . . , or any other evidence in the record sufficient to support the inference of retaliatory animus").

In the alternative, even if Green could make out a prima facie case, nothing in the record calls into question American's legitimate, nonretaliatory reasons for assigning Green flights that arrived before or near his start time.  To the contrary, the record shows that all bag runners received early flight assignments, because such assignments were necessary given the timing of incoming flights and the number of bag runners on shift.  (*See* Doc. No. 148-6 at 68:14–75:16, 77:9–83:13, 113:14–115:8; Doc. No. 148-28 at ¶¶ 5, 6.)  Green has not put forth any evidence to contradict this nonretaliatory justification or to suggest that the only bag runners assigned such flights are those who complained about discrimination.

*     *     *

For those reasons, American is entitled to summary judgment on Green's retaliation claims.

### c.    Retaliatory Harassment

Plaintiffs argue that the Court should also consider whether the evidence, collectively, supports a claim for retaliatory harassment.  Plaintiffs assert that they were subjected to discipline in 2018 and forced to work in an environment that contained racially offensive graffiti

and imagery[27] because they "filed FAA/OSHA complaints (faulty equipment assigned to African American[28] fleet service agents) in September 2014 and an OSHA whistleblower complaint, which they sought to re-open in May 2017 and February 2019."  (Doc. No. 157-4 at 30.)

American argues that the Court cannot consider Plaintiffs' retaliatory harassment claim because they failed to raise any such claim in their Fourth Amended Complaint.  (*See* Doc. No. 158 at 6 n.4.)  The Court agrees.  Plaintiffs contend that they argued retaliatory harassment "[t]hroughout their complaint" (Doc. No. 161 at 8), but the Fourth Amended Complaint *never* uses the phrase "retaliatory harassment" (*see generally* Doc. No. 84; *see also* Draft H'rg Tr. at 80:18–81:1 ("The Court:  You would agree retaliatory harassment is a separate claim?  Ms. Gunter:  It is a separate claim, but the allegations and the facts support the retaliatory harassment . . . .  The Court:  I am just asking whether that claim is in the Fourth Amended Complaint.  Ms. Gunter:  It's not specifically stated, no.")).  A review of Plaintiffs' extensive retaliation count similarly shows that Plaintiffs never use the term "harassment" or argue that they were subjected to a hostile work environment *in retaliation* for prior complaints.  (*Id.*)  Instead, the terms "harassment" and "hostile work environment" are used only in connection with Count I, which is titled "Race Discrimination—Harassment (Hostile/Abusive Work Environment Continuing Violations)."  (Doc. No. 84 at 5.)

---

[27] Plaintiffs also point to a statement by Rockamore in 2013, when he referred to Plaintiffs as "Black Panthers," and directed supervisors to write their "black ass[es] up."  (Doc. No. 157-4 at 27.)  As the Court discusses later in connection with Plaintiffs' hostile work environment claim, we cannot consider this statement because it falls well outside the limitations' period.  And even if the Court was to consider Rockamore's comments, they would not alter our analysis here because he made those comments *before* Plaintiffs initiated their OSHA/FAA claims in 2014.  Moreover, Rockamore left PHL from 2014 to 2015, and the supervisors to whom Rockamore spoke refused to discipline Plaintiffs.  It was only years later that Plaintiffs were issued discipline *by different supervisors*.

[28] Although Plaintiffs frame their FAA and OSHA complaints as stating faulty equipment was assigned to "*African American* fleet service agents," those complaints did not allege discrimination.  Indeed, the terms "African American," "race," and "discrimination" appear nowhere in Plaintiffs' agency submissions.  *See supra.* n.25.

To the extent Plaintiffs argue that they sufficiently raised a retaliatory harassment claim by including a claim for discriminatory harassment, they are mistaken.  A *discriminatory* harassment claim, brought under § 2000e-2(a), is markedly different from a *retaliatory* harassment claim, which is brought under § 2000e-3(a).  Obviously, the statutory basis for each action is different, as is the factual cause of the harassment in each case.  The legal standard that the Court uses to determine whether the harassment rises to the level of an adverse employment action also varies depending on the claim.  *See Moore*, 461 F.3d at 341–42 (explaining that after the Supreme Court's holding in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), a plaintiff alleging retaliatory harassment must meet the three prong retaliation test to state a prima facie case, not the five prong test for proving discriminatory hostile work environment because "the discrimination and retaliation provisions of Title VII have different statutory language and different purposes"); *compare Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67–68 (explaining that an employee alleging retaliation "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'" (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006))), *with Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [§ 2000e-2(a)'s] purview.").[29]

---

[29] Plaintiffs argue that the Third Circuit has identified two types of "retaliatory harassment" claims.  (Doc. No. 157-4 at 30.)  The first is based on harassment because of the plaintiff's protected characteristic (age, sex, gender, race, etc.); this claim proceeds under § 2000e-2(a)'s "well-established" framework for analyzing claims of hostile work environment.  *See Jensen v. Potter*, 435 F.3d 444, 454 (3d Cir. 2006), overruled in part on other grounds by *Burlington N. & Santa Fe Ry.*, 548 U.S. 53 (2006) ("When a woman who complains about sexual harassment is thereafter subjected to harassment based on that complaint," she may have "a claim that the harassment constituted sex discrimination (because a man who made such a complaint would not have been subjected to similar harassment).").  The second is

Plaintiffs failed to include a claim for retaliatory harassment in their Fourth Amended

Complaint, and it is not appropriate for them to bring that claim now.  *See Aldinger v. Spectrum*

*Control, Inc.*, 207 F. App'x 177, 181 & n.1 (3d Cir. 2006) (finding the district court's summary

judgment opinion was "fully explained, compelling and without error," where the trial court,

among other things, "refused to address" a claim that the plaintiffs raised "for the first time in

their brief in opposition to [the defendant's] motion for summary judgment" and failed to

"ple[a]d in their complaint"); *McLaud v. Indus. Res., Inc.*, Civil Action No. 3:14-CV-00737,

2016 WL 7048987, at *8 n.5 (M.D. Pa. Dec. 5, 2016).  *Contra Romdhani v. Exxon Mobil Corp.*,

Civil Action No. 07–715-LPS, 2010 WL 4682414, at *5 (D. Del. Nov. 10, 2010) ("Because the

facts identified by ExxonMobil in the affidavit are consistent with the overall allegations in the

Second Amended Complaint and do not raise any new claims or theories of relief, the Court is

not persuaded that they should be stricken.").

In the alternative, even if the Court were to consider Plaintiffs' retaliatory harassment

claim, the Court finds that Plaintiffs have not put forth evidence of a prima facie case.  To

---

harassment committed in retaliation for the plaintiff's engagement in a protected activity.  *See id.* ("As an abstract matter, retaliation against a person based on the person's complaint about sexual harassment is not necessarily discrimination based on the person's sex.  If the individuals carrying out the harassment would have carried out a similar campaign regardless of the sex of the person making the complaint, the harassment, while actionable as illegal retaliation, would not also be actionable as discrimination based on sex."); *Moore*, 461 F. 3d at 342  ("While white workers may be unable to successfully complain under the antidiscrimination provision of Title VII solely because they are required to work in an environment hostile to blacks, if they became the victims of "materially adverse actions" because they reasonably perceived that environment as violative of Title VII and objected, they have a valid retaliation claim.").  The Third Circuit has labeled both claims "retaliatory harassment"—a label that has caused confusion and is likely a vestige of when the two claims were governed by the same standard.  *See Jensen*, 435 F.3d at 449 (finding "our hostile work environment framework applies equally to Jensen's claim of retaliatory harassment" and referencing "severe or pervasive" requirement).  To avoid further confusion, and in light of the different standards governing each type of claim, the Court finds it more appropriate to distinguish Plaintiffs' retaliatory harassment claims under § 2000e-3(a) (i.e., claims that Plaintiffs were harassed because they complained), from Plaintiffs' "retaliatory harassment" claims under § 2000e-2(a) (i.e., claims that Plaintiffs were harassed *because they are African American men* who complained).  The first claim is addressed above.  The second is addressed in the next part in connection with Plaintiffs' other claims under Count I.

establish a prima facie case of retaliatory harassment, Plaintiffs must meet the same requirements

that they would in a typical retaliation case, showing that:  (1) they engaged in protected conduct,

(2) "after or contemporaneous with engaging in that conduct," American took a "material

adverse action against" them; and (3) "there was a causal connection" between the participation

in the protected activity and the adverse employment action."  *Phillips v. Potter*, Civil Action

No. 7-815, 2009 WL 1362049, at *2 (W.D. Pa. May 14, 2009).

Plaintiffs have failed to show they engaged in protected activity.  They argue that they

"engaged in conduct protected by Title VII" when they "filed FAA/OSHA complaints (faulty

equipment assigned to African American fleet service agents) in September 2014 and an OSHA

whistleblower complaint, which they sought to re-open in May 2017 and February 2019."  (Doc.

No. 157-4 at 30.)  As the Court stated previously, Plaintiffs cannot base their claims of retaliation

or retaliatory harassment under Title VII, the PHRA, and § 1981 on their agency complaints

because those complaints did not complain about, or even allege, race discrimination.  *See*

*Moore*, 461 F.3d at 341 ("With respect to 'protected activity,' the anti-retaliation provision of

Title VII protects those who participate in certain Title VII proceedings (the 'participation

clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition

clause').");  *Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL 4482457, at *5 (3d Cir.

Sept. 17, 2022) ("Many may suffer severe or pervasive harassment . . . but if the reason for that

harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.")

(quotation marks omitted).

For those reasons, Plaintiffs' retaliatory harassment claims fail.

\*       \*       \*

American is entitled to summary judgment on Count III of the Fourth Amended

Complaint as against both Fields and Green.

### 4.      Hostile Work Environment (Count I)

Last, Plaintiffs argue that they were subjected to a racially hostile work environment. Before addressing this claim, however, the Court must first address Plaintiffs' argument that we should consider acts that occurred before the limitations period under the continuing violation doctrine.

### a.      Continuing Violation Doctrine

Plaintiffs' hostile work environment claims are brought pursuant to two federal statutes, 42 U.S.C. § 1981 and Title VII, and one state statute, the PHRA. The § 1981 claims—the claims subject to the longest statute of limitations period—are governed by the four-year catchall statute of limitations provided by 28 U.S.C. § 1658. *See Jones v. R.R. Donelley & Sons Co.*, 541 U.S. 369, 383–85 (2004); *see also Verdin*, 124 F. App'x at 96 n.2 ("Because hostile work environment, wrongful termination, and failure to transfer 'arise under' the Civil Rights Act of 1991 in the sense that that Act defined the key 'make and enforce contracts' language in Section 1981 to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship,' these causes of action are governed by the four-year statute of limitations in 28 U.S.C. § 1658." (citation omitted)).  That means, absent extenuating circumstances, the Court cannot consider any acts from before March 4, 2015 when analyzing Plaintiffs' claim for hostile work environment.[30]  *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 110 ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened,'" and therefore, a party must file a

---

[30] Per the Court's prior Orders, Plaintiffs are precluded from relying on evidence of discrimination caused by top filling to the extent they occurred before June 1, 2017.  (Doc. No. 81 at 16.) Plaintiffs have not, however, put forth any evidence that top filling continued after that date.

charge or bring suit within the time period or "lose the ability to recover for it.").

Plaintiffs argue that extenuating circumstances exist in this case under the continuing violation doctrine. The continuing violation doctrine is a "limited" and "narrow" exception to the rule that a claim must be brought within the applicable statute of limitations. *Mudie v. Phila. Coll. of Osteopathic Med.*, Civil Action No. 21-2156-KSM, 2022 WL 1607544, at *10 (E.D. Pa. May 20, 2022); *see also Tearpock-Martini v. Borough of Schickshinny*, 756 F.3d 232, 236 (3d Cir. 2014) (describing the doctrine as "understandably narrow"). It allows the court to consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, . . . for purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 105; *see also O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) ("We find persuasive the reasoning of our sister circuits that the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law. Thus, in whatever statutory context the distinction may arise, *Morgan* will control.").

The doctrine recognizes that hostile work environment claims "are different in kind from discrete acts" and by "[t]heir very nature involve[ ] repeated conduct." *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. The unlawful employment practice often "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*; *see also id.* at 117 ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" (quoting 42 U.S.C. § 2000e-5(e)(1))). In such cases, it is "only in retrospect" that a "plaintiff recognize[s] that seemingly unconnected incidents were, in fact, part and parcel of a larger

discriminatory pattern." *Tearpock-Martini*, 756 F.3d at 236.  Because "the entire hostile work environment encompasses a single unlawful employment practice," so long as one "act contributing the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117; *see also Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) ("Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'") (quoting *O'Connor*, 440 F.3d at 127).

To benefit from the doctrine, a "plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel*, 706 F.3d at 165–66; *see also Nat'l R.R. Passenger Corp.*, 536 U.S. at 119 (clarifying that if an untimely act "had no relation to the [timely] acts . . . or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the [timely] act").  In other words, "[t]he plaintiff must do two things": (1) "he must demonstrate that at least one act occurred within the filing period," and (2) he "must establish that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754–55 (3d Cir. 1995), abrogated on other grounds by *Nat'l R.R Passenger Corp.*, 536 U.S. at 117–18 (quotation marks omitted).  "The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." *Id.*

Here, Plaintiffs point to multiple incidents that occurred outside of the limitations period:

(1) unidentified managers denying Fields training for the position of lead in the domestic bag chute at some point between 2012 and 2015 (Doc. No. 148-5 at 166:8–169:4 (testifying that every time he asked for training he was told, "Oh, well, it's not now.  Come back this time," or, "This person will do it" but then never receiving the training, and meanwhile, his white coworkers were getting "back-door training"); *see also id.* at 171:18–23 (testifying that he never complained to the company about not receiving training)),

(2) Plaintiffs' complaints of faulty work equipment in 2012, 2013, and 2014 (Doc. No. 157-13 at ¶ 8; Doc. No. 148-4 at 30:11–22, 33:19–34:12; Doc. No. 148-5 at 250:23–251:18),

(3) references by managers to gates and terminals, which were predominantly staffed by African American employees, as "Compton" and "Camden" (Doc. No. 157-1 (copy of putative class action complaint in *Phila. Branch v. Salters*, Civ. A. No. 2:10-cv-00043-PBT, Doc. No. 1)),

(4) statements by Rockamore to manager Stacey Tyler in 2013 that "we need to do everything possible to get the wanna be Black Panthers out of here" (Doc. No. 157-16 (letter by Stacey Tyler describing incident); *see also* Doc. No. 148-4 at 216:15–218:5 (testifying that in 2013, manager Stacey Tyler told Green that she and other managers "have been told that we have to do something about those Black Panthers"); *id.* at 220:18–25 (same); *id.* at 222:2–9 (testifying that he was referred to as a "Black Panther" once in 2013 and once in 2018); *id.* at 403:19–404:5, 406:4–15)),[31]

(5) statements by Rockamore to Matthew Rich—the Fleet Service Manager for Ramp Operations at U.S. Airways from 2010 to May 2013—to "'find a way to put paperwork' on ramp agents Andre Fields, Kendall Green and David Smith" and to "just write their black asses up, that's what they have a union for" (Doc. No. 157-18 at ¶ 9),

(6) Manager Don Logan, calling Fields "boy" during one incident between 2013 and 2015 (Doc. No. 148-5 at 38:10–12 (testifying that Logan told him, "Boy, pick up these bags."); *id.* at 44:19–49:4), and

(7) Racially offensive carvings in a bathroom stall that Roundtree reported to Rockamore in 2014 (*see* Doc. No. 157-20), and

---

[31] During oral argument, Plaintiffs' counsel stated, confusingly, that Plaintiffs "are not presenting [this comment] for liability sake," and instead, rely on it as evidence that it is "more probable than not the evidence that is in the record from June 1st, 2017 on was motivated by this environment where they are being targeted and called troublemakers and called black panthers, the reason they are getting these disciplinary actions and getting heavier workloads, et cetera."  (Draft H'rg Tr. at 72:4–73:3.)

(8) Understaffing at Carousel 4 beginning as early as 2013 (Doc. No. 148-5 at 205:24–207:20).

With two exceptions, Plaintiffs have failed to show that any of these untimely acts are "part and parcel" with the timely acts discussed up until this point in the Memorandum.

First, Fields claims that unidentified supervisors denied him training for the position of jam lead[32] at an unidentified time. This is a discrete act that falls outside the scope of the continuing violation doctrine. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114–15 ("During [the limitations] period, Morgan contends that he was wrongfully suspended and charged with violation of Amtrak's 'Rule L' for insubordination while failing to complete work assigned to him, *denied training*, and falsely accused of threatening a manager. All prior discrete discriminatory acts are untimely filed and no longer actionable." (emphasis added)); *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) ("We can thus take from *Morgan* the following non-exhaustive list of discrete acts for which the limitations period runs from the act: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, *denial of training*, wrongful accusation." (emphasis added)); *Johnson v. Fed. Ex. Corp.*, 996 F. Supp. 2d 302, 316 (M.D. Pa. 2014) ("[T]he continuing violation doctrine applies only to a pattern of discriminatory acts that are not individually actionable; this doctrine is inapplicable when there are discrete, actionable discriminatory acts.").

Second, Plaintiffs argue that they received faulty work equipment between 2012 and 2014. These complaints culminated in two OSHA complaints and changes to American's practices. Thus, consideration of these incidents also falls outside the continuing violations doctrine. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 119 (explaining that if an untimely act

---

[32] Fields testified that a "jam lead" is a "unique position" that was an "office leads position" in the bag chute area. (Doc. No. 148-5 at 277:22–278:8.)

"had no relation to the [timely] acts . . . or for some other reason, *such as certain intervening action by the employer*, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the [timely] act" (emphasis added)).  Moreover, Plaintiffs have put forth no evidence that American's decision to provide unsafe equipment was racially motivated.  *Contra. West*, 45 F.3d at 755 (finding that the plaintiff "has alleged facts sufficient to support application of the continuing violations theory" because "all of the incidents alleged by the plaintiff involved racial harassment" and "occurred consistently over the period since 1986, with increased frequency in 1989–1990.").

Third, Plaintiffs claim managers made racially offensive comments between 2010 and 2015.  Like consideration of the faulty equipment, the racially offensive references to terminals primarily staffed by African American employees was the subject of a separate lawsuit in 2010 and resulted in a change in American's policies.  (*See* Doc. No. 157-11 at 69 (U.S. Airways Apr. 30, 2016 Employee Handbook, which prohibits the use of any "code name" to refer "to certain terminals or Company locations, including 'Compton,' 'Camden,' 'the Ghetto,' 'Frankford,' 'South Philly,' 'King of Prussia,' and 'the Plantation'"").)  The lawsuit and policy change are "intervening action[s]" that foreclose application of the continuing violations doctrine.  *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 119.

As for the offensive comments by Rockamore in 2013 and Logan sometime between 2013 and 2015, those isolated incidents have no connection to the discriminatory acts that fall within the limitations period.  Notably, there is no evidence that either manager made any comment to or took any action against either Plaintiff during the limitations period, nor have Plaintiffs shown that these isolated, thought morally repugnant, statements are of the same type as the timely conduct that they challenge—anonymous, offensive writings in employee-only

areas, discipline actions by other supervisors, and unfair workload assigned by other managers.[33] *See Mandel*, 706 F.3d at 167 ("Mandel may proceed under a continuing violation theory. Mandel has alleged at least one act that falls within the statute of limitations (i.e. Bachert calling her a 'bitch' during a meeting), and many of the acts that occurred prior to the applicable limitations period involved *similar conduct by the same individuals*, *suggesting a persistent, ongoing pattern*." (emphasis added)); *West*, 45 F.3d at 755 (finding that the plaintiff "has alleged facts sufficient to support application of the continuing violations theory" because "all of the incidents alleged by the plaintiff involved racial harassment" and "occurred consistently over the period since 1986, with increased frequency in 1989–1990. The most physically threatening and hostile of the incidents—the large burlap noose and the Klan photographs—are alleged to have remained in the workplace for a period of months. The postings, threats, and hostile conversations appear to have occurred without respite"); *Mudie*, 2022 WL 1607544, at *16 (finding the continuation violation doctrine did not apply where the timely and untimely actions involved *different conduct by different individuals*); *Lake v. Stryker Sales, LLC*, Civil Action No. 20-5554, 2022 WL 605293, at *4 (E.D. Pa. Mar. 1, 2022) (same).[34]

---

[33] Green testified that in 2018, Jackson referred to him as wanting to be a "Black Panther"—the same phrase that Rockamore used in 2013. However, the Court cannot find that these two references, which were made by different supervisors five years apart, create a pattern of discriminatory practice. *See Oliver v. Clinical Practices of Univ. of Pa.*, 921 F. Supp. 2d 434, 445 (E.D. Pa. 2013) ("Acts that are taken by two different supervisors, acting independently, over different time periods generally demonstrate isolated events rather than a persistent, ongoing pattern of discrimination."). Moreover, the two references are decidedly different. Rockamore was *instructing* managers to discipline Green, while Jackson made the remark to Green when Green complained about the SIDA badge write up.

[34] A comparison of *Lamb v. Montgomery Township* and *Leonard v. Bristol Township School District* is helpful for understanding when timely and untimely acts are sufficiently connected that the continuing violation doctrine should apply. *Compare Lamb*, Civil Action No. 15-6759, 2016 WL 7426125, at *9 (E.D. Pa. Dec. 23, 2016) ("Plaintiff has demonstrated that at least one act constituting her hostile work environment claim occurred after September 6, 2012: the comment that if she were male, she could 'just piss on the side of the truck,' which occurred in a snowstorm in either 2012 or 2013. With respect to conduct occurring prior to September 6, 2012, the treatment Plaintiff experienced cannot be characterized as more than isolated or sporadic acts of discrimination. As discussed below, Plaintiff has

There are two exceptions to this ruling:  (1) the racially offensive carvings in bathroom stalls that Roundtree noticed and reported to Rockamore in 2014, and (2) Fields's allegations that Carousel 4 has been understaffed since at least 2013.  Plaintiffs testified that this conduct occurred consistently before and during the limitations period, such that the continuing violations doctrine should apply.

With the scope of the record clarified, the Court turns to whether that record supports Plaintiffs' claims for hostile work environment.

### b.   **Hostile Work Environment**

#### i.   *Legal Standard*

To state a claim for racially hostile work environment, a plaintiff must show:  (1) he "suffered intentional discrimination" because of his race; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected the plaintiff"; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of respondeat superior liability, meaning the employer is responsible."  *Castleberry*, 863 F.3d at 26; *see also Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 (D.N.J. 2003) ("Reduced to its most basic components, an actionable hostile work environment requires proof that Plaintiff was

---

not produced evidence to show that the Township's response to thefts in the Public Works Department, her treatment during her workers' compensation leave, the derogatory comments she heard, her termination for theft, or any of the other issues she identifies represented frequent acts of the same subject matter.  Accordingly, in analyzing Plaintiffs' hostile work environment claim, the Court will consider only those acts that occurred from September 6, 2012 to July 3, 2013."), *with Leonard*, Civil Action No. 09–4692, 2010 WL 2995540, at *5 (E.D. Pa. July 28, 2010) ("Plaintiff has adequately invoked the continuing violations doctrine.  In her Complaint, Plaintiff sets forth a pattern of related conduct that persisted over the course of her employment, as well as into the respective . . . statutory limitations periods . . . .  At the same time, the conduct outside the [limitations] periods never rose to the level of 'discrete discriminatory acts,' nor could it be characterized as 'isolated, sporadic acts.'  Her supervisor's unwelcome physical touching and other amorous advances; intrusive observation and interference with Plaintiff's professional and personal lives; assignment of degrading, unusual chores; and intimidating behavior evidences a discriminatory practice with the relation, frequency, and permanence to suffice as a continuing violation.") (citations omitted).

subjected to a level of gender- or race-based harassment which was 'severe or pervasive' enough to create a working environment which is both subjectively and objectively abusive or hostile to female or African American employees.").

"The first four elements of this claim establish that a hostile work environment existed." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). In determining whether harassment rises to the level of an actionable hostile work environment, we must consider the "totality of the circumstances . . . including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interfere[d] with an employee's work performance." *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Davis*, 285 F. App'x at 902 (same). The fifth element "establishes the basis on which to hold the employer liable." *Huston*, 568 F.3d at 104. "When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable." *Id.* "Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.*; *see also Greer*, 950 F. App'x at 174 ("For respondeat superior liability to exist, a plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate action." (quotation marks omitted)). "[A]n employer knew or should have known about workplace [racial] harassment if *management level* employees had actual or constructive knowledge about the existence of a [racially] hostile environment." *Huston*, 568 F.3d at 105.

*ii.*      *Analysis*

Plaintiffs argue that they suffered "severe or pervasive" harassment when:  (1) they were required to work heavier workloads than their Caucasian coworkers; (2) Fields had multiple "verbal altercations" with bag chute leads, who were Caucasian, about scheduling; (3) employee-only areas contained racially offensive writings, drawings, and monkey images, which were not always immediately removed; and (4) Caucasian coworkers made racially offensive comments while in the breakroom.  (Doc. No. 157-4 at 19–22.)  The first action is not, however, *evidence* of harassment.  As stated previously, there is no evidence that Carousel 4 was understaffed or that understaffing, if it occurred, was the product of racial animus, and the record shows that all bag runners, Caucasian and African American, were infrequently assigned to flights that arrived at or before their start times.  *See supra* Part IV.B.1.b.

That leaves the verbal altercations, racially offensive writings and imagery, and derogatory comments by coworkers.  American argues that these incidents are the type of "stray" and "offhand" comments that do not rise to the level of "severe or pervasive" required for a hostile work environment claim.  The Court is compelled to agree given Third Circuit case law on this issue.  *See Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) ("[A]lthough there was some evidence in this case of inappropriate racist comments, graffiti, and flyers, this evidence was insufficient without more to establish a hostile work environment" where "no racist comment, written or spoken, was ever directed at [the plaintiff] himself"); *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609–10 (3d Cir. 2007) (finding racial graffiti, including "a burning cross and KKK sign drawn on a bathroom wall" and ambiguous comments to the plaintiff by his coworkers were insufficient for "a trier of fact to conclude that discriminatory conduct in the workplace amounted to a change in the terms or conditions of [the plaintiff's] employment"); *Samuel v. Target Realty, LLC*, Civil Action No. 19-2203, 2021 WL 4774858, at

*15, *17 (E.D. Pa. Oct. 13, 2021) (finding "isolated comments"—including a coworker's use of the n-word, his comments about "black people loving chicken," his statement that a supervisor would not rent to the plaintiff because "she's not turning this into the hood or the ghetto," and his decision to share a racially offensive skit—even when combined with management's failure to remove a monkey that the plaintiff found hanging from the ceiling of an apartment that he was expected to clean, did not support a claim for hostile work environment); *see also Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir. 2014) (finding conduct was not sufficiently severe or pervasive as to give rise to hostile work environment claim where the plaintiff's supervisor used a telephone cord to depict a noose above the plaintiff's head and the plaintiff's coworkers made comments about "watermelon and fried chicken"); *Francis v. Chem. Bank Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (finding no hostile work environment where the plaintiff "identified only four isolated incidents," including one supervisor's reference to African American employees as "fucking moolies," and three statements by a second supervisor: (1) "that [n-word]"—referring to the plaintiff—"is a disgrace to all of yours," (2) "why should I give money to those fucking [racial epithet]" in reference to the United Negro College Fund, and (3) a written statement on the plaintiff's desk, "All [n-word] should go back to Africa with a Jew under each arm").

Beginning with Fields's "verbal altercations" with bag chute leads, Fields had provided virtually no evidence about those altercations.  He does not explain when they occurred, how frequently they occurred, what statements were made during the altercations, or why they amount to racial harassment.  And although the graffiti and the coworker comments are truly reprehensible, the Court is compelled to find that they were not specifically directed at Plaintiffs and thus cannot be the basis for satisfying the first factor of a hostile work environment claim.

*See Caver*, 420 F.3d at 262–63 ("We note first that no racist comment, written or spoken, was ever directed at Davis himself.  In addition, Davis does not dispute that he never personally saw any racist graffiti or flyers in the Department; he heard about the graffiti and flyers second-hand.  As a threshold matter, Davis cannot meet the first element of the hostile work environment claim under Title VII or the LAD—causation—*solely* by pointing to comments that were directed at other individuals.  Davis cannot show that the comments would not have been uttered or written but for *his* race if Davis was neither on the receiving end nor the subject of any comments."). *Contra Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 549 (D.N.J. 2018) ("Hankins's comment to Plaintiff [referring to her by a term that combined the n-word with "piglet"] was directed at Plaintiff—the term was not one that Hankins used in passing to refer to some other person, object, or situation (as offensive as that might nevertheless have been).  Plaintiff has testified that Hankins called her the word in question.  It is difficult to conclude that such a remark could, therefore, be appropriately characterized as 'stray' or 'offhand' which connote a lack of directness avowedly not present here.").

There is also no evidence that the altercations, graffiti/imagery, and comments were made by Plaintiffs' supervisors, or that the supervisors consistently failed to address coworker harassment when it was reported.  *Contra Castleberry*, 863 F.3d at 265–66 (finding the plaintiffs pleaded "severe conduct that could create a hostile work environment," where they alleged that "their *supervisor* used a racially charged slur in front of them and their non-African American coworkers . . . accompanied by threats of termination (which ultimately occurred)").  There is no evidence that Plaintiffs reported either the verbal altercations or the coworker comments to their supervisors.  Similarly, the record shows that Plaintiffs often did not report the offensive writings and drawings to their supervisors.  (*See* Doc. No. 148-4 at 50:12–21 (Green testifying that he

never made a "specific report about any one particular writing"); *id.* at 50:23–53:3 (Green

testifying that he reported the offensive graffiti to a manager on two to five occasions between

2015 and 2018 and one time in 2019)).  When they did report it, their supervisors (with one

exception) took Plaintiffs' complaints seriously, investigating the source of the offensive

writings and removing the imagery.  (*See* Doc. No. 148-4 at 58:15–20, 329:10–330:9 (Green

testifying that the stuffed monkey was removed a few days after Green reported it); Doc. No.

148-5 at 190:21–191:14 (Fields testifying that the banana drawing was removed); Doc. No. 148-

8 at 90:4–100:13 (Fauntleroy testifying that he investigated Fields's complaints about the smiley

face graffiti, reported the incident to HR, issued a verbal warning to the employee who painted it,

and had the graffiti removed); Doc. No. 157-20 (former-Plaintiff Roundtree testifying that he

reported the black face drawing and watermelon graffiti to Rockamore and that Rockamore had

the drawing painted over within the month); Doc. No. 148-13 at 208:3–212:9 (Rockamore

testifying that American had corporate security and HR investigate bathroom graffiti, and

explaining that the investigation team interviewed employees, but they were "unable to

substantiate" who made the graffiti because the bathrooms represent a high traffic area without

cameras)).  Although the evidence suggests that American could have acted more quickly to

remove the graffiti, the Court cannot find, as a matter of law, that these short delays created a

hostile work environment.

Finally, a review of the record shows that the altercations, graffiti/imagery, and coworker

comments occurred intermittently over the course of seven years.  *See Larochelle v. Wilmac

Corp.*, 210 F. Supp. 3d 658, 684–85 (E.D. Pa. 2016) ("Riker has at best established sporadic and

isolated incidents of harassment.  The two specific incidents she cites (the shoulder rubbing and

the hug) occurred over a nearly three-year period. . . .  In the totality of the circumstances, the

66

isolated instances that Riker refers to do not rise to the level of severe or pervasive conduct needed to maintain a hostile work environment claim."); *Rosati v. Colello*, 94 F. Supp. 3d 704, 716 (E.D. Pa. 2015) ("Rosati complains of three specific incidents:  two comments in a one-week period in February of 2012 from Sgt. Colello regarding whether she was 'getting fixed' or 'keeping her baby' and the May 2, 2012 incident.  Three incidents over a four month period is not a continuous period of harassment, nor was any incident so serious as to create a hostile work environment on its own.  This conduct was infrequent—Sgt. Colello and Rosati allegedly had three such interactions over a fourth month period.  The conduct was not severe—Sgt. Colello's comments, though offensive, were isolated.  There are no allegations that Sgt. Colello's conduct was physically threatening or humiliating.  Rather, his conduct was precisely in the category of mere offensive utterances.").  For those reasons, the Court cannot find that Plaintiffs experienced "severe or pervasive" harassment, as required to support a claim for racially hostile work environment.

Because Plaintiffs have not shown that they suffered "sever or pervasive" harassment, the Court need not address the remaining elements of a hostile work environment claim.  Summary judgment is granted in favor of American on Plaintiffs' hostile work environment claims.

## V.    CONCLUSION

Summary judgment is granted in American's favor as to all counts in the Fourth Amended Complaint.  Plaintiffs' request for additional discovery under Rule 56(d) is denied.  American's request for sanctions is denied as moot, as is Plaintiffs' counsel's motion to withdraw.[35]  An appropriate order follows.

---

[35] The Court also denies American's request for an award shifting the attorneys' fees it incurred drafting the sanctions motion.